# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,            )
                                          )
                    Plaintiff,            )
                                          )
           v.                             )    Civil Action No.
                                          )                        0 4 -    8 7 4
ALCATEL S.A. and                          )
ALCATEL USA, INC.,                        )
                                          )
                    Defendants.           )

## COMPLAINT AND DEMAND FOR JURY TRIAL

Telcordia Technologies, Inc. ("TELCORDIA") hereby sues Alcatel S.A. and Alcatel

USA, Inc. (sometimes collectively referred to herein as "ALCATEL") for infringing U.S. Patent

No. 4,893,306 ("the '306 patent"), and alleges as follows:

### THE PLAINTIFF

1.      Plaintiff TELCORDIA is a corporation organized and existing under the laws of

Delaware, having a place of business at One Telcordia Drive, Piscataway, New Jersey 08854.

2.      TELCORDIA is a provider of communications software, engineering, and

consulting services throughout the United States, including in the District of Delaware.

### THE DEFENDANTS

3.      Upon information and belief, defendant Alcatel S.A. is a corporation organized

and existing under the laws of France, having a business address at 54, rue La Boétie,

75008, Paris, France.

4.      Upon information and belief, defendant Alcatel USA, Inc. is a corporation

organized and existing under the laws of Delaware, having a business address at 3400 W. Plano

Parkway, Plano, Texas 75075.

5.     Upon information and belief, ALCATEL is a manufacturer of communication network products that ALCATEL ships, distributes, sells, and/or offers for sale throughout the United States, including in the District of Delaware.

## JURISDICTION AND VENUE

6.     The claims asserted in this Complaint arise under the Patent Laws of the United States, 35 U.S.C. §§ 1-376.

7.     Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.

8.     This Court has personal jurisdiction over Alcatel S.A. and Alcatel USA, Inc.

9.     Venue is proper under 28 U.S.C. §§ 1391 and 1400.

## INFRINGEMENT

10.     TELCORDIA realleges and incorporates by reference each of paragraphs 1-9 above.

11.     The '306 patent, entitled "Method and Apparatus for Multiplexing Circuit and Packet Traffic," was lawfully issued by the United States Patent and Trademark Office on January 9, 1990 to the inventors, Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu. The '306 patent issued from U.S. Patent Application Serial No. 07/118,977, filed November 10, 1987. A copy of the '306 patent is attached as Exhibit A.

12.     On its issuance, the '306 patent was assigned to Bell Communications Research, Inc. ("Bellcore"), which became TELCORDIA in 1999. TELCORDIA and Bellcore have at all times since the '306 patent's issuance held the entire right, title, and interest in the patent.

13.     Upon information and belief, ALCATEL has infringed one or more claims of the '306 patent by making, using, offering for sale, selling, and/or importing into the United States communication network products embodying the patented invention.

2

14.    Upon information and belief, ALCATEL has infringed one or more claims of the '306 patent by inducing others to infringe the patent and/or contributing to the patent's infringement by others.

15.    As a consequence of ALCATEL's infringement of the '306 patent, TELCORDIA has been damaged in an amount not yet determined.

16.    Upon information and belief, ALCATEL's infringement of the '306 patent will continue in the future, and TELCORDIA will continue to suffer damages as a consequence, unless ALCATEL's infringing acts are enjoined by this Court.

17.    Upon information and belief, ALCATEL's infringement of the '306 patent has been, and continues to be, willful.

## JURY DEMAND

18.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, TELCORDIA requests a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, TELCORDIA respectfully requests that the Court enter judgment against Alcatel S.A. and Alcatel USA, Inc.:

A.    determining that Alcatel S.A. and Alcatel USA, Inc. have infringed one or more claims of the '306 patent;

B.    permanently enjoining Alcatel S.A. and Alcatel USA, Inc., their officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with them or any of them who receive actual notice of the judgment, from further infringing any claim of the '306 patent;

C.    ordering Alcatel S.A. and Alcatel USA, Inc. to account for and pay to TELCORDIA all damages suffered by TELCORDIA as a consequence of the infringement of the '306 patent by Alcatel S.A. and Alcatel USA, Inc.;

D.    awarding TELCORDIA prejudgment and post-judgment interest on the damages suffered by it as a consequence of the infringement of the '306 patent by Alcatel S.A. and Alcatel USA, Inc.;

E.    trebling TELCORDIA's damages under 35 U.S.C. § 284 on the ground that the infringement of the '306 patent by Alcatel S.A. and Alcatel USA, Inc. was deliberate and willful;

F.    finding that this is an exceptional case under 35 U.S.C. § 285 and awarding TELCORDIA its reasonable attorney fees; and

G.    granting TELCORDIA such other and further relief as the Court may deem just and proper.

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware  19899
(302) 654-1888

Donald R. Dunner
Don O. Burley
Richard J. Smith
Vincent P. Kovalick
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C.  20005
(202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER
700 Hansen Way
Palo Alto, California  94304
(650) 849-6600

Attorneys for Plaintiff
Telcordia Technologies, Inc.

Dated:   July 16, 2004

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. |
| | ) |
| LUCENT TECHNOLOGIES, INC., | ) |
| | ) |
| Defendant. | ) |

0 4 - 8 7 5

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2004 JUL 16 PM 1:25

## COMPLAINT AND DEMAND FOR JURY TRIAL

Telcordia Technologies, Inc. ("TELCORDIA") hereby sues Lucent Technologies, Inc. ("LUCENT") for infringing U.S. Patent No. 4,893,306 ("the '306 patent"), and alleges as follows:

### THE PLAINTIFF

1.      Plaintiff TELCORDIA is a corporation organized and existing under the laws of Delaware, having a place of business at One Telcordia Drive, Piscataway, New Jersey 08854.

2.      TELCORDIA is a provider of communications software, engineering, and consulting services throughout the United States, including in the District of Delaware.

### THE DEFENDANT

3.      Upon information and belief, defendant LUCENT is a corporation organized and existing under the laws of Delaware, having a place of business at 600 Mountain Avenue, Murray Hill, New Jersey 07974.

4.      Upon information and belief, LUCENT is a manufacturer of communication network products that LUCENT ships, distributes, sells, and/or offers for sale throughout the United States, including in the District of Delaware.

## JURISDICTION AND VENUE

5.     The claims asserted in this Complaint arise under the Patent Laws of the United States, 35 U.S.C. §§ 1-376.

6.     Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.

7.     This Court has personal jurisdiction over LUCENT.

8.     Venue is proper under 28 U.S.C. §§ 1391 and 1400.

## INFRINGEMENT

9.     TELCORDIA realleges and incorporates by reference each of paragraphs 1-8 above.

10.     The '306 patent, entitled "Method and Apparatus for Multiplexing Circuit and Packet Traffic," was lawfully issued by the United States Patent and Trademark Office on January 9, 1990 to the inventors, Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu. The '306 patent issued from U.S. Patent Application Serial No. 07/118,977, filed November 10, 1987. A copy of the '306 patent is attached as Exhibit A.

11.     On its issuance, the '306 patent was assigned to Bell Communications Research, Inc. ("Bellcore"), which became TELCORDIA in 1999. TELCORDIA and Bellcore have at all times since the '306 patent's issuance held the entire right, title, and interest in the patent.

12.     Upon information and belief, LUCENT has infringed one or more claims of the '306 patent by making, using, offering for sale, selling, and/or importing into the United States communication network products embodying the patented invention.

13.     Upon information and belief, LUCENT has infringed one or more claims of the '306 patent by inducing others to infringe the patent and/or contributing to the patent's infringement by others.

14.    As a consequence of LUCENT's infringement of the '306 patent, TELCORDIA has been damaged in an amount not yet determined.

15.    Upon information and belief, LUCENT's infringement of the '306 patent will continue in the future, and TELCORDIA will continue to suffer damages as a consequence, unless LUCENT's infringing acts are enjoined by this Court.

16.    Upon information and belief, LUCENT's infringement of the '306 patent has been, and continues to be, willful.

## JURY DEMAND

17.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, TELCORDIA requests a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, TELCORDIA respectfully requests that the Court enter judgment against LUCENT:

A.    determining that LUCENT has infringed one or more claims of the '306 patent;

B.    permanently enjoining LUCENT, its officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with them or any of them who receive actual notice of the judgment, from further infringing any claim of the '306 patent;

C.    ordering LUCENT to account for and pay to TELCORDIA all damages suffered by TELCORDIA as a consequence of LUCENT's infringement of the '306 patent;

D.    awarding TELCORDIA prejudgment and post-judgment interest on the damages suffered by it as a consequence of LUCENT's infringement of the '306 patent;

E.    trebling TELCORDIA's damages under 35 U.S.C. § 284 on the ground that LUCENT's infringement of the '306 patent was deliberate and willful;

F.    finding that this is an exceptional case under 35 U.S.C. § 285 and awarding TELCORDIA its reasonable attorney fees; and

G.    granting TELCORDIA such other and further relief as the Court may deem just and proper.

_Steven J. Balick_

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

Donald R. Dunner
Don O. Burley
Richard J. Smith
Vincent P. Kovalick
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C. 20005
(202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER
700 Hansen Way
Palo Alto, California 94304
(650) 849-6600

Attorneys for Plaintiff
Telcordia Technologies, Inc.

Dated: July 16, 2004

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,          )
                                       )
              Plaintiff,          )
                                       )
              v.          )          Civil Action No.
                                       )                            0 4 - 8 7 6
CISCO SYSTEMS, INC.,                   )
                                       )
              Defendant.          )

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Telcordia Technologies, Inc. ("TELCORDIA") hereby sues Cisco Systems, Inc. ("CISCO") for infringing U.S. Patent Nos. 4,893,306 ("the '306 patent") and Re. 36,633 ("the '633 patent"), and alleges as follows:

## THE PLAINTIFF

    1.    Plaintiff TELCORDIA is a corporation organized and existing under the laws of Delaware, having a place of business at One Telcordia Drive, Piscataway, New Jersey 08854.

    2.    TELCORDIA is a provider of communications software, engineering and consulting services throughout the United States, including in the District of Delaware.

## THE DEFENDANT

    3.    Upon information and belief, defendant CISCO is a corporation organized and existing under the laws of California, having a place of business at 170 West Tasman Drive, San Jose, California 95134.

    4.    Upon information and belief, CISCO is a manufacturer of communication network products that CISCO ships, distributes, sells, and/or offers for sale throughout the United States, including in the District of Delaware.

**JURISDICTION AND VENUE**

5.    The claims asserted in this Complaint arise under the Patent Laws of the United States, 35 U.S.C. §§ 1-376.

6.    Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.

7.    This Court has personal jurisdiction over CISCO.

8.    Venue is proper under 28 U.S.C. §§ 1391 and 1400.

**COUNT I:  INFRINGEMENT OF THE '306 PATENT**

9.    TELCORDIA realleges and incorporates by reference each of paragraphs 1-8 above.

10.    The '306 patent, entitled "Method and Apparatus for Multiplexing Circuit and Packet Traffic," was lawfully issued by the United States Patent and Trademark Office ("PTO") on January 9, 1990 to the inventors, Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu. The '306 patent issued from U.S. Patent Application Serial No. 07/118,977, filed November 10, 1987.  A copy of the '306 patent is attached as Exhibit A.

11.    On its issuance, the '306 patent was assigned to Bell Communications Research, Inc. ("Bellcore"), which became TELCORDIA in 1999.  TELCORDIA and Bellcore have at all times since the '306 patent's issuance held the entire right, title, and interest in the patent.

12.    Upon information and belief, CISCO has infringed one or more claims of the '306 patent by making, using, offering for sale, selling, and/or importing into the United States communication network products embodying the patented invention.

13.    Upon information and belief, CISCO has infringed one or more claims of the '306 patent by inducing others to infringe the patent and/or contributing to the patent's infringement by others.

14.    As a consequence of CISCO's infringement of the '306 patent, TELCORDIA has been damaged in an amount not yet determined.

15.    Upon information and belief, CISCO's infringement of the '306 patent will continue in the future, and TELCORDIA will continue to suffer damages as a consequence, unless CISCO's infringing acts are enjoined by this Court.

16.    Upon information and belief, CISCO's infringement of the '306 patent has been, and continues to be, willful.

## COUNT II: INFRINGEMENT OF THE '633 PATENT

17.    TELCORDIA realleges and incorporates by reference each of paragraphs 1-16 above.

18.    The '633 patent, entitled "Synchronous Residual Time Stamp for Timing Recovery in a Broadband Network," was lawfully issued by the PTO on March 28, 2000 to the inventors, Paul E. Fleischer and Chi-Leung Lau. The '633 patent issued from U.S. Patent Application Serial No. 08/555,196, filed November 8, 1995. A copy of the '633 patent is attached as Exhibit B.

19.    On its issuance, the '633 patent was assigned to Bellcore, which became TELCORDIA in 1999. TELCORDIA and Bellcore have at all times since the '633 patent's issuance held the entire right, title, and interest in the patent.

20.    Upon information and belief, CISCO has infringed one or more claims of the '633 patent by making, using, offering for sale, selling, and/or importing into the United States communication network products embodying the patented invention.

21.    Upon information and belief, CISCO has infringed one or more claims of the '633 patent by inducing others to infringe the patent and/or contributing to the patent's infringement by others.

3

22.    As a consequence of CISCO's infringement of the '633 patent, TELCORDIA has been damaged in an amount not yet determined.

23.    Upon information and belief, CISCO's infringement of the '633 patent will continue in the future, and TELCORDIA will continue to suffer damages as a consequence, unless CISCO's infringing acts are enjoined by this Court.

24.    Upon information and belief, CISCO's infringement of the '633 patent has been, and continues to be, willful.

## JURY DEMAND

25.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, TELCORDIA requests a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, TELCORDIA respectfully requests that the Court enter judgment against CISCO:

A.    determining that CISCO has infringed one or more claims of the '306 and '633 patents;

B.    permanently enjoining CISCO, its officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with them or any of them who receive actual notice of the judgment, from further infringing any claim of the '306 and '633 patents;

C.    ordering CISCO to account for and pay to TELCORDIA all damages suffered by TELCORDIA as a consequence of CISCO's infringement of the '306 and '633 patents;

D.    awarding TELCORDIA prejudgment and post-judgment interest on the damages suffered by it as a consequence of CISCO's infringement of the '306 and '633 patents;

E.    trebling TELCORDIA's damages under 35 U.S.C. § 284 on the ground that CISCO's infringement of the '306 and '633 patents was deliberate and willful;

F.    finding that this is an exceptional case under 35 U.S.C. § 285 and awarding TELCORDIA its reasonable attorney fees; and

G.    granting TELCORDIA such other and further relief as the Court may deem just and proper.

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware  19899
(302) 654-1888

Donald R. Dunner
Don O. Burley
Richard J. Smith
Vincent P. Kovalick
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C.  20005
(202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER
700 Hansen Way
Palo Alto, California  94304
(650) 849-6600

Attorneys for Plaintiff
Telcordia Technologies, Inc.

Dated:  July 16, 2004

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,

               Plaintiff,

     vs.

ALCATEL S.A. and
ALCATEL USA, INC.,

              Defendants,
              Counterclaim-Plaintiffs.

Case No. 04-874 GMS

**JURY TRIAL DEMANDED**

**ANSWER AND COUNTERCLAIMS OF DEFENDANT/COUNTERCLAIM
PLAINTIFF ALCATEL USA, INC.**

For its Answer to the Complaint of Plaintiff Telcordia Technologies, Inc. ("Plaintiff"),
Defendant Alcatel USA, Inc. ("Alcatel USA"), upon knowledge as to its own acts and upon
information and belief as to the acts of others, by and through its undersigned attorneys, responds
to each of the numbered paragraphs thereof as follows:

**THE PLAINTIFF**

1.    Alcatel USA lacks knowledge or information sufficient to form a belief as to the
truth and correctness of the allegations in Paragraph 1 of the Complaint and therefore denies the
allegations.

2.    Alcatel USA lacks knowledge or information sufficient to form a belief as to the
truth and correctness of the allegations in Paragraph 2 of the Complaint and therefore denies the
allegations.

## THE DEFENDANTS

3.      Alcatel USA states that its parent company is named "Alcatel, a French société anonyme", that there is no entity named "Alcatel S.A.", but otherwise admits the allegations in Paragraph 3 of the Complaint.

4.      Alcatel USA admits the allegations in Paragraph 4 of the Complaint.

5.      Alcatel USA admits that it distributes, sells and offers for sale networking products throughout the United States. Alcatel USA denies the remaining allegations in paragraph 5.

## JURISDICTION AND VENUE

6.      Alcatel USA admits that the Complaint contains averments of patent infringement that arise under Title 35 United States Code.

7.      Alcatel USA admits that 28 U.S.C. §§ 1331 and 1338(a) grant this Court subject matter jurisdiction over civil actions arising under the patent laws of the United States.

8.      For purposes of this litigation only, Alcatel USA does not contest that this Court has personal jurisdiction over Alcatel USA. Alcatel USA lacks knowledge or information sufficient to form a belief as to the truth and correctness of the remaining allegations in Paragraph 8 and therefore denies the allegations.

9.      For purposes of this litigation only, Alcatel USA does not contest that, with respect to Alcatel USA, venue is proper under 28 U.S.C. §§ 1391(b), (c) and 1400(b). Alcatel USA lacks knowledge or information sufficient to form a belief as to the truth and correctness of the remaining allegations in Paragraph 9 and therefore denies the allegations.

## INFRINGEMENT

10.    Paragraph 10 of the Complaint realleges and incorporates by reference paragraphs 1-9 of the Complaint. Thus, Alcatel USA answers paragraph 10 in the same manner it answered paragraphs 1-9.

11.    Alcatel USA admits that, on its face, United States Patent No. 4,893,306 (the "'306 patent") is entitled "Method and Apparatus for Multiplexing Circuit and Packet Traffic"; was filed on November 10, 1987; issued from United States Patent Application No. 118,977 on January 9, 1990; and named Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu as inventors. Alcatel USA admits that what appears to be a copy of the '306 patent was attached to the Complaint as Exhibit A. Alcatel USA denies the remaining allegations in Paragraph 11 of the Complaint.

12.    Alcatel USA admits that, on its face, the '306 patent lists Bell Communications Research, Inc. as assignee. Alcatel USA lacks knowledge or information sufficient to form a belief as to the truth and correctness of the remaining allegations in Paragraph 12 of the Complaint and therefore denies the allegations.

13.    Alcatel USA denies the allegations in Paragraph 13 of the Complaint.

14.    Alcatel USA denies the allegations in Paragraph 14 of the Complaint.

15.    Alcatel USA denies the allegations in Paragraph 15 of the Complaint.

16.    Alcatel USA denies the allegations in Paragraph 16 of the Complaint.

17.    Alcatel USA denies the allegations in Paragraph 17 of the Complaint.

## JURY DEMAND

18.    Alcatel USA does not contest that Plaintiff has requested a jury trial on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### NON-INFRINGEMENT

19.    Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-18 of its Answer to the Complaint as if fully set forth herein.

20.    Alcatel USA has not infringed and does not infringe (either directly, contributorily or by inducement) any valid and enforceable claim of the '306 patent.

### SECOND AFFIRMATIVE DEFENSE
### INVALIDITY

21.    Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-20 of its Answer to the Complaint as if fully set forth herein.

22.    The '306 patent is invalid for failing to comply with one or more of the conditions and requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103 and 112, and the rules, regulations and laws pertaining thereto.

### THIRD AFFIRMATIVE DEFENSE
### UNENFORCEABILITY

23.    Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-22 of its Answer to the Complaint as if fully set forth herein.

24.    On information and belief, the '306 patent is unenforceable because the applicants, and/or individuals acting on behalf of the applicants, deliberately and knowingly withheld, omitted, and/or misrepresented material information in connection with the prosecution of the application which matured into the '306 patent in violation of the duty of candor to the

4

United States Patent and Trademark Office ("PTO"), as prescribed by 37 C.F.R. § 1.56. The reasons presently known to Alcatel USA that support its belief that the '306 patent is unenforceable are set forth in paragraphs 25-32 infra.

25.     The '306 patent is listed as issuing from U.S. Patent Application Ser. No. 118,977 filed November 10, 1987 (the "'977 application"). Hung-Hsiang Chao, Sang H. Lee, and Liang T. Wu are the applicants listed on the face of the '977 application. On information and belief, at the time that the application was filed, the applicants were each employed by Plaintiff.

26.     On or before November 22, 1985, Mark W. Beckner and Steven T. Minzer published an article entitled "A Tutorial on Asynchronous Time Division Multiplexing (ATDM): A Packet Access Capability For Broadband Interfaces to ISDNs" (the "Beckner-Minzer Article"). This article was published more than one year prior to the filing date of the '977 application and was material to the patentability of the '977 application. On information and belief, at the time that the article was published, the authors were each employed by Plaintiff.

27.     On information and belief, Hung-Hsiang Chao and Mark W. Beckner were co-workers at Plaintiff's company. On information and belief, Hung-Hsiang Chao and Mark W. Beckner were co-inventors on U.S. Patent No. 4,819,226, filed on the same day as the '977 application and covering related technology. On information and belief, Hung-Hsiang Chao was aware of Mark W. Beckner's publications, especially those related to network communications. For example, in an article entitled "Design Architectures of a DTDM Packet Assembler and Packet Multiplexer" authored by H.J. Chao, published on or before November 11, 1987, H.J. Chao thanks M. W. Beckner for his comments and cites other publications co-authored by M.W. Beckner. Notwithstanding the foregoing, neither the applicants nor any individuals acting on behalf of the applicants informed the PTO of this article.

5

28.    Based on the foregoing, on information and belief, one or more of the applicants, and/or individuals acting on behalf of the applicants, were well aware of the Beckner-Manzer Article, but they deliberately and knowingly withheld this material reference from the PTO during prosecution of the '977 application.

29.    On or before June 10, 1987, L. T. Wu (a co-inventor of the '306 patent), T. H. Lee (a co-inventor of the '306 patent), and T. T. Lee (not a co-inventor of the '306 patent) published an article entitled "Dynamic TDM – A Packet Approach to Broad Band Networking" (the "Wu Article"). This article was published prior to the filing date of the '977 application and was not entirely authored by the applicants of the '977 application. It was therefore material to the patentability of the '977 application and to the inventorship of the alleged inventions of the '977 application, but was not disclosed to the PTO. On information and belief, at the time that the article was published, the authors were each employed by Plaintiff.

30.    In addition, on information and belief, the Wu Article discloses a mode of practicing the alleged inventions of the '306 patent that was not disclosed in the '977 application.

31.    Based on the foregoing, on information and belief, the applicants, and/or individuals acting on behalf of the applicants, were aware of this publication and deliberately and knowingly withheld this material reference during prosecution of the '977 application.

32.    On information and belief, one or more additional references that were material to the patentability of the '306 patent were known to persons of ordinary skill in the art, and upon information and belief, were known by the applicants and/or any individuals acting on behalf of the applicants, but the applicants and/or any individuals acting on behalf of the applicants deliberately and knowingly withheld these additional material references from the PTO during prosecution of the '977 application.

## FOURTH AFFIRMATIVE DEFENSE
### LACHES

33.     Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-32 of its Answer to the Complaint as if fully set forth herein.

34.     On or about February 6, 1991, Plaintiff offered Alcatel Network Systems, a predecessor in interest to Alcatel USA, a license under certain patents, including the '306 patent.

35.     Plaintiff filed its Complaint in this action on July 16, 2004, over thirteen years after first contacting Alcatel Network Systems about a license under the '306 patent and fifteen years after the issuance of the '306 patent. Moreover, during the past thirteen years, Plaintiff gave Alcatel USA numerous reasons to believe that the '306 patent would not be asserted against it. Based upon the course of conduct of Plaintiff and the numerous interactions between the parties over the course of the past thirteen years, Plaintiff's delay in bringing suit is unreasonable, unjustified, and materially prejudicial to Alcatel USA.

36.     By reason, inter alia, of the foregoing, Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE
### LICENSE, ACQUIESCENCE

37.     Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-36 of its Answer.

38.     On or about May 21, 1998, Alcatel Network Systems and Plaintiff entered into an agreement to develop proposed generic requirements related to Synchronous Optical Network (SONET) Transport Systems (the "Agreement"). The terms of the Agreement grant Alcatel Network Systems and its affiliates a license to sell, license, or otherwise transfer products and

7

services that utilize or incorporate the alleged inventions of the '306 patent. Alcatel Network Systems provided Plaintiff with valuable consideration in exchange for the license.

39.    On information and belief, Plaintiff failed to disclose to Alcatel Network Systems the alleged applicability of the '306 patent to the products envisioned by the Agreement

40.    On information and belief, Plaintiff granted to the Regional Bell Operating Companies ("RBOCs") and to AT&T a license that included rights to use and to have made products covered by the '306 patent. To the extent that any of Plaintiff's allegations of infringement are premised on the alleged use, sale, offer for sale, or importation of Alcatel's products that were manufactured for or provided to the RBOCs or to AT&T, such allegations are barred pursuant to license.

41.    By reason, inter alia, of the foregoing, Plaintiff's claims are barred, in whole or in part, by the doctrines of express license, implied license and/or acquiescence.

## SIXTH AFFIRMATIVE DEFENSE
## EQUITABLE ESTOPPEL

42.    Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-42 of its Answer.

43.    By reason, inter alia, of the foregoing, Plaintiff's claims are barred, in whole or in part, by the doctrine of equitable estoppel.

## SEVENTH AFFIRMATIVE DEFENSE
## UNCLEAN HANDS

44.    Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-44 of its Answer to the Complaint as if fully set forth herein.

45.    By reason, inter alia, of the foregoing, Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

**PRAYER FOR RELIEF**
**FOR ANSWER**

WHEREFORE, Alcatel USA requests that the Court enter judgment:

    (a)   Dismissing the Complaint against Alcatel USA in its entirety with prejudice;

    (b)   Finding the '306 patent not infringed under 35 U.S.C. § 271;

    (c)   Finding the '306 patent invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112, and the rules, regulations and laws pertaining thereto;

    (d)   Finding the '306 patent unenforceable;

    (e)   Finding that, pursuant to 35 U.S.C. § 285, Federal Rule of Civil Procedure 11, and/or other applicable laws, Plaintiff's conduct in commencing and pursuing this action renders this an exceptional case and that Alcatel be awarded costs of this action and its attorneys' fees to the extent permitted by law; and

    (f)   Granting such other and further relief as the Court deems just and proper

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Alcatel USA requests a trial by jury of all issues so triable.

**COUNTERCLAIMS**

Alcatel USA, through its attorneys, asserts the following counterclaims against Plaintiff and alleges as follows:

**PARTIES**

1.     Alcatel USA is a corporation organized and existing under the laws of Delaware, having a business address at 3400 W. Plano Parkway, Plano, Texas 75075.

2.     As averred by Plaintiff in its Complaint, Plaintiff is a corporation organized and existing under the laws of Delaware, having a place of business at One Plaintiff Drive, Piscataway, New Jersey 08854.

## JURISDICTION AND VENUE

3.     This is an action for a declaratory judgment of non-infringement, unenforceability, and invalidity of the '306 patent.

4.     Plaintiff alleges in its Complaint in this action that it is the owner of the '306 patent, and that Alcatel USA infringes that patent. Alcatel USA denies that it infringes any valid claim of the '306 patent.

5.     As a consequence of the foregoing, there is an actual and justiciable controversy between Alcatel USA and Plaintiff with respect to which Alcatel USA requests a declaration by this Court.

6.     This Court has subject matter jurisdiction over this controversy based on 28 U.S.C. §§ 1331 and 1338(a), and 28 U.S.C. §§ 2201(a) and 2202.

7.     This Court has personal jurisdiction over Plaintiff.

8.     Venue is proper under 28 U.S.C. §§ 1391(b) and (c).

## FIRST COUNTERCLAIM – DECLARATORY JUDGMENT
## PATENT NON-INFRINGEMENT

9.     Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-8 of these Counterclaims and paragraphs 19-45 of its Affirmative Defenses as if fully set forth herein.

10.     Alcatel USA does not import, make, use, sell or offer for sale any communication network product that infringes, induces infringement of, or contributes to the infringement of,

any valid claim of the '306 patent, either literally or under the doctrine of equivalents, nor has it ever done so.

## SECOND COUNTERCLAIM – DECLARATORY JUDGMENT
### PATENT INVALIDITY

11.    Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-10 of these Counterclaims and paragraphs 19-45 of its Affirmative Defenses as if fully set forth herein.

12.    The '306 patent is invalid for failing to comply with one or more of the conditions and requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102. 103 and 112, and the rules, regulations and laws pertaining thereto.

## THIRD COUNTERCLAIM – DECLARATORY JUDGMENT
### PATENT UNENFORCEABILITY

13.    Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-12 of these Counterclaims and paragraphs 19-45 of its Affirmative Defenses as if fully set forth herein.

14.    On information and belief, the '306 patent is unenforceable because the applicants, and/or individuals acting on behalf of the applicants, deliberately and knowingly withheld, omitted, and/or misrepresented material information in connection with the prosecution of the application which matured into the '306 patent in violation of the duty of candor to the PTO, as prescribed by 37 C.F.R. § 1.56. The reasons presently known to Alcatel USA that support its belief that the '306 patent is unenforceable are set forth in paragraphs 15-22 infra.

15.    The '306 patent is listed as issuing from U.S. Patent Application Ser. No. 118,977 filed November 10, 1987 (the "'977 application"). Hung-Hsiang Chao, Sang H. Lee, and Liang

11

T. Wu are the applicants listed on the face of the '977 application. On information and belief, at the time that the application was filed, the applicants were each employed by Plaintiff.

16.     On or before November 22, 1985, Mark W. Beckner and Steven T. Minzer published an article entitled "A Tutorial on Asynchronous Time Division Multiplexing (ATDM): A Packet Access Capability For Broadband Interfaces to ISDNs" (the "Beckner-Minzer Article"). This article was published more than one year prior to the filing date of the '977 application and was material to the patentability of the '977 application. On information and belief, at the time that the article was published, the authors were each employed by Plaintiff.

17.     On information and belief, Hung-Hsiang Chao and Mark W. Beckner were co-workers at Plaintiff's company. On information and belief, Hung-Hsiang Chao and Mark W. Beckner were co-inventors on U.S. Patent No. 4,819,226, filed on the same day as the '977 application and covering related technology. On information and belief, Hung-Hsiang Chao was aware of Mark W. Beckner's publications, especially those related to network communications. For example, in an article entitled "Design Architectures of a DTDM Packet Assembler and Packet Multiplexer" authored by H.J. Chao, published on or before November 11, 1987, H.J. Chao thanks M. W. Beckner for his comments and cites other publications co-authored by M.W. Beckner. Notwithstanding the foregoing, neither the applicants nor any individuals acting on behalf of the applicants informed the PTO of this article.

18.     Based on the foregoing, on information and belief, one or more of the applicants, and/or individuals acting on behalf of the applicants, were well aware of the Beckner-Minzer Article, but they deliberately and knowingly withheld this material reference from the PTO during prosecution of the '977 application.

12

19.     On or before June 10, 1987, L. T. Wu (a co-inventor of the '306 patent), S.H. Lee (a co-inventor of the '306 patent), and T. T. Lee (not a co-inventor of the '306 patent) published an article entitled "Dynamic TDM – A Packet Approach to Broad Band Networking" (the "Wu Article"). This article was published prior to the filing date of the '977 application and was not entirely authored by the applicants of the '977 application. It was therefore material to the patentability of the '977 application and to the inventorship of the alleged inventions of the '977 application, but was not disclosed to the PTO. On information and belief, at the time that the article was published, the authors were each employed by Plaintiff.

20.     In addition, on information and belief, the Wu Article discloses a mode of practicing the alleged inventions of the '306 patent that was not disclosed in the '977 application.

21.     Based on the foregoing, on information and belief, the applicants, and/or individuals acting on behalf of the applicants, were aware of this publication and deliberately and knowingly withheld this material reference during prosecution of the '977 application.

22.     On information and belief, one or more additional references that were material to the patentability of the '306 patent were known to persons of ordinary skill in the art, and upon information and belief, were known by the applicants and/or any individuals acting on behalf of the applicants, but the applicants and/or any individuals acting on behalf of the applicants deliberately and knowingly withheld these additional material references from the PTO during prosecution of the '977 application.

## FOURTH COUNTERCLAIM – DECLARATORY JUDGMENT
## LACHES

23.     Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-22 of these Counterclaims and paragraphs 19-45 of its Affirmative Defenses as if fully set forth herein.

24.    On or about February 6, 1991, Plaintiff offered Alcatel Network Systems a predecessor in interest to Alcatel USA, a license under certain Plaintiff patents, including the '306 patent.

25.    Plaintiff filed its Complaint in this action on July 16, 2004, over thirteen years after first contacting Alcatel Network Systems about a license under the '306 patent and fifteen years after the issuance of the '306 patent. Moreover, during the past thirteen years, Plaintiff gave Alcatel USA numerous reasons to believe that the '306 patent would not be asserted against it. Based upon the course of conduct of Plaintiff and the numerous interactions between the parties over the course of the past thirteen years, Plaintiff's delay in bringing suit is unreasonable, unjustified, and materially prejudicial to Alcatel USA.

26.    By reason, inter alia, of the foregoing, Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## FIFTH COUNTERCLAIM – DECLARATORY JUDGMENT
### LICENSE, ACQUIESCENCE

27.    Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-26 of these Counterclaims and paragraphs 19-45 of its Affirmative Defenses as if fully set forth herein.

28.    On or about May 21, 1998, Alcatel Network Systems and Plaintiff entered into an agreement to develop proposed generic requirements related to Synchronous Optical Network (SONET) Transport Systems (the "Agreement"). The terms of the Agreement grant Alcatel Network Systems and its affiliates a license to sell, license, or otherwise transfer products and services that utilize or incorporate the alleged inventions of the '306 patent. Alcatel Network Systems provided Plaintiff with valuable consideration in exchange for the license.

14

29. On information and belief, Plaintiff failed to disclose to Alcatel Network Systems the alleged applicability of the '306 patent to the products envisioned by the Agreement

30. On information and belief, Plaintiff granted to the Regional Bell Operating Companies ("RBOCs") and to AT&T a license that included rights to use and to have made products covered by the '306 patent. To the extent that any of Plaintiff's allegations of infringement are premised on the alleged use, sale, offer for sale, or importation of Alcatel's products that were manufactured for or provided to the RBOCs or to AT&T, such allegations are barred pursuant to license.

31. By reason, inter alia, of the foregoing, Plaintiff's claims are barred, in whole or in part, by the doctrines of express license, implied license and/or acquiescence.

## SIXTH COUNTERCLAIM – DECLARATORY JUDGMENT
### EQUITABLE ESTOPPEL

32. Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-31 of these Counterclaims and paragraphs 19-45 of its Affirmative Defenses as if fully set forth herein.

33. By reason, inter alia, of the foregoing, Plaintiff's claims are barred, in whole or in part, by the doctrine of equitable estoppel.

## SEVENTH COUNTERCLAIM – DECLARATORY JUDGMENT
### UNCLEAN HANDS

34. Alcatel USA incorporates by reference and realleges each and every allegation contained in paragraphs 1-33 of these Counterclaims and paragraphs 19-45 of its Affirmative Defenses as if fully set forth herein.

35. By reason, inter alia, of the foregoing, Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hand

15

## PRAYER FOR RELIEF
## FOR COUNTERCLAIM

WHEREFORE, Alcatel USA requests that the Court enter judgment:

(a)  Declaring the '306 patent not infringed under 35 U.S.C. § 271;

(b)  Declaring the '306 patent invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112,
and the rules, regulations and laws pertaining thereto;

(c)  Declaring the '306 patent unenforceable;

(d)  Declaring that Plaintiff's claims are barred by the doctrine of laches;

(e)  Declaring that Plaintiff's claims are barred by the doctrines of license, implied
license and/or acquiescence;

(f)  Declaring that Plaintiff's claims are barred by the doctrine of equitable estoppel;

(g)  Declaring that Plaintiff's claims are barred by the doctrine of unclean hands;

(h)  Finding that, pursuant to 35 U.S.C. § 285, Federal Rule of Civil Procedure 11,
and/or other applicable laws, Plaintiff's conduct in commencing and pursuing
this action renders this an exceptional case and that Alcatel be awarded costs of
this action and its attorneys' fees to the extent permitted by law; and

(i)  Granting such other and further relief as the Court deems just and proper.

16

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Alcatel USA requests a trial by jury of all issues so triable.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_(signature)_

Josy W. Ingersoll (#. 1088)
Kevin M. Baird (# 4219)
The Brandywine Building
1000 West St.
Wilmington, DE 19801
Tel. (302) 571-6672
*Attorneys for Defendant / Counterclaim Plaintiff*
*Alcatel USA, Inc.*

OF COUNSEL:

Stuart J. Sinder
Benjamin Hershkowitz
Clement J. Naples
KENYON & KENYON
One Broadway
New York, NY 10004
Tel. (212) 425-7200

Dated: December 2, 2004

17

## CERTIFICATE OF SERVICE

I, Kevin M. Baird, hereby certify that on December 2, 2004, copies of the

foregoing document were caused to be served upon the following:

**BY HAND DELIVERY**

> Steven J. Balick, Esquire
> John G. Day, Esquire
> Ashby & Geddes
> 222 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

Kevin M. Baird (#4219)

99999.1782

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,            )
                                         )
                        Plaintiff,       )
                                         )
            v.                           )          Civil Action No. 04-875-GMS
                                         )
LUCENT TECHNOLOGIES INC.,                )
                                         )
                        Defendant.       )

**LUCENT TECHNOLOGIES INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS IN RESPONSE TO PLAINTIFF TELCORDIA TECHNOLOGIES, INC.'s COMPLAINT AND DEMAND FOR A JURY TRIAL**

Defendant, Lucent Technologies Inc. ("Lucent"), demands a trial by jury and respectfully submits its Answer, Affirmative Defenses, and Counterclaims in response to the Complaint and Demand For Jury Trial of Plaintiff Telcordia Technologies, Inc. ("Telcordia") as follows:

**I.      ANSWER TO TELCORDIA'S COMPLAINT AND DEMAND FOR JURY TRIAL**

**THE PLAINTIFF**

1.      Plaintiff TELCORDIA is a corporation organized and existing under the laws of Delaware, having a place of business at One Telcordia Drive, Piscataway, New Jersey 08854.

**ANSWER:**    Lucent admits that Telcordia is the Plaintiff in the above-captioned civil action. Otherwise, Lucent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1, and on that basis denies such allegations.

2.      TELCORDIA is a provider of communications software, engineering, and consulting services throughout the United States, including in the District of Delaware.

**ANSWER:**    Lucent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2, and on that basis denies such allegations.

## THE DEFENDANT

3.    Upon information and belief, defendant LUCENT is a corporation organized and existing under the laws of Delaware, having a place of business at 600 Mountain Avenue, Murray Hill, New Jersey 07974.

**ANSWER:**    Lucent admits that it is a corporation organized and existing under the laws of the state of Delaware. Lucent admits having a place of business at 600 Mountain Avenue, Murray Hill, New Jersey 07974.

4.    Upon information and belief, LUCENT is a manufacturer of communication network products that LUCENT ships, distributes, sells, and/or offers for sale throughout the United States, including in the District of Delaware.

**ANSWER:**    Lucent is without knowledge and information sufficient to form an understanding as to what is meant by "communication network products," and on that basis denies such allegations.

## JURISDICTION AND VENUE

5.    The claims asserted in this Complaint arise under the Patent Laws of the United States, 35 U.S.C. §§ 1-376.

**ANSWER:**    Lucent admits that the complaint purports to allege an action for patent infringement under 35 U.S.C. §§ 1, *et seq.* Lucent denies that the complaint properly states such a claim and specifically denies any wrongdoing or infringement.

6.    Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.

**ANSWER:**    Lucent admits that the complaint purports to base federal jurisdiction under 28 U.S.C. §§ 1331 and 1338. Otherwise, this allegation contains conclusions of law to which no answer is required.

7.    This Court has personal jurisdiction over LUCENT.

**ANSWER:**    Lucent admits that this Court has personal jurisdiction over Lucent, but denies that any wrongdoing or infringing acts have occurred in Delaware or elsewhere.

8.    Venue is proper under 28 U.S.C. §§ 1391 and 1400.

**ANSWER:**    Lucent admits that venue is proper in this Court.

## INFRINGEMENT

9.    TELCORDIA realleges and incorporates by reference each of paragraphs 1-8 above.

**ANSWER:**    Lucent repleads and incorporates by reference each of its answers to paragraphs 1-8 above.

10.    The '306 patent, entitled "Method and Apparatus for Multiplexing Circuit and Packet Traffic," was lawfully issued by the United States Patent and Trademark Office on January 9, 1990 to the inventors, Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu. The '306 patent issued from U.S. Patent Application Serial No. 07/118,977, filed November 10, 1987. A copy of the '306 patent is attached as Exhibit A.

**ANSWER:**    Lucent admits that what appears to be a copy of U.S. Patent No. 4,893,306 is attached as Exhibit A to the complaint. Lucent admits that, on its face, Exhibit A is entitled "Method and Apparatus for Multiplexing Circuit and Packet Traffic." Lucent admits that, on its face, Exhibit A states that U.S. Patent No. 4,893,306 was issued by the United States Patent and Trademark Office ("USPTO") on January 9, 1990. Lucent admits that, on its face, Exhibit A states that U.S. Patent No. 4,893,306 issued from U.S Patent Application Serial No. 07/118,977, filed November 10, 1987. Lucent admits that, on its face, Exhibit A identifies Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu as inventors. Otherwise, Lucent denies each and every allegation contained in Paragraph 10, and specifically denies that U.S. Patent No. 4,893,306 was lawfully issued by the USPTO to Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu.

11.    On its issuance, the '306 patent was assigned to Bell Communications Research, Inc. ("Bellcore"), which became TELCORDIA in 1999. TELCORDIA and Bellcore

have at all times since the '306 patent's issuance held the entire right, title, and interest in the patent.

**ANSWER:**    To the extent that this allegation contains conclusions of law, no answer is required.  Otherwise, Lucent is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11, and on that basis denies such allegations.

12.    Upon information and belief, LUCENT has infringed one or more claims of the '306 patent by making, using, offering for sale, selling, and/or importing into the United States communication network products embodying the patented invention.

**ANSWER:**    Lucent denies each and every allegation contained in Paragraph 12, and specifically denies any wrongdoing or infringement.

13.    Upon information and belief, LUCENT has infringed one or more claims of the '306 patent by inducing others to infringe the patent and/or contributing to the patent's infringement by others.

**ANSWER:**    Lucent denies each and every allegation contained in Paragraph 13, and specifically denies any wrongdoing or infringement.

14.    As a consequence of LUCENT's infringement of the '306 patent, TELCORDIA has been damaged in an amount not yet determined.

**ANSWER:**    Lucent denies each and every allegation contained in Paragraph 14, specifically denies any wrongdoing or infringement, and further denies that Telcordia is entitled to recover any damages whatsoever.

15.    Upon information and belief, LUCENT's infringement of the '306 patent will continue in the future, and TELCORDIA will continue to suffer damages as a consequence, unless LUCENT's infringing acts are enjoined by this Court.

**ANSWER:**    Lucent denies each and every allegation contained in Paragraph 15, and specifically denies any wrongdoing or infringement.

16.    Upon information and belief, LUCENT's infringement of the '306 patent has been, and continues to be, willful.

**ANSWER:**   Lucent denies each and every allegation contained in Paragraph 16, specifically denies any wrongdoing or infringement, and further denies any willful infringement.

## JURY DEMAND

17.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, TELCORDIA requests a trial by jury for all issues so triable.

**ANSWER:**   This paragraph contains conclusions of law to which no answer is necessary.

WHEREFORE, Lucent denies that any of its products infringe any valid claim of the patent identified in Telcordia's complaint, and further denies that Telcordia is entitled to any judgment against Lucent whatsoever.  Lucent asks that Telcordia's complaint be dismissed with prejudice, that judgment be entered for Lucent, and that Lucent be awarded attorneys' fees incurred in defending against Telcordia's complaint, together with such other and further relief as the Court deems appropriate.

## II.    AFFIRMATIVE DEFENSES

As and for its Affirmative Defenses, Lucent alleges as follows:

### First Affirmative Defense
(Failure to State a Claim)

18.   Telcordia's purported claims are barred because they fail to state a claim upon which relief can be granted.

### Second Affirmative Defense
(Non-Infringement)

19.   Lucent has not directly infringed, contributed to the infringement, or induced the infringement of any claim of the patent identified in Telcordia's complaint through any of its products.

### Third Affirmative Defense
#### (Patent Invalidity)

20.     Telcordia's purported claims for infringement are barred because the claims in the patent identified in Telcordia's complaint are invalid for failure to comply with the requirements of 35 U.S.C. §§ 1 *et seq.*

### Fourth Affirmative Defense
#### (Inequitable Conduct)

21.     Telcordia's purported claims for infringement are barred because one or more claims in the patent identified in Telcordia's complaint are unenforceable due to inequitable conduct.

22.     During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of articles published by J. O. Limb, including at least an article entitled "Description of Fasnet--A Unidirectional Local--Area Communications Network," published by J. O. Limb et al. in September of 1982.

23.     The article entitled "Description of Fasnet--A Unidirectional Local--Area Communications Network" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

24.     The article entitled "Description of Fasnet--A Unidirectional Local--Area Communications Network" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld the article entitled "Description of Fasnet--A Unidirectional Local--Area Communications Network" with an intent to deceive the USPTO.

25.    During prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of IEEE Standard 802.6 and QPSX products and systems that were known, in public use, and/or described in a printed publication prior to November 10, 1987.

26.    IEEE Standard 802.6 and QPSX products and systems were prior art that were material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

27.    IEEE Standard 802.6 and QPSX products and systems were not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld information regarding IEEE Standard 802.6 and QPSX products and systems with an intent to deceive the USPTO.

28.    During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of an article entitled "Dynamic TDM-A Packet Approach To Broadband Networking," published by I.T. Wu, S.H. Lee, and T.T. Lee in June 1987.

29.    The article entitled "Dynamic TDM-A Packet Approach To Broadband Networking" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

30.    The article entitled "Dynamic TDM-A Packet Approach To Broadband Networking" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting

-7-

attorneys, and/or others associated with the filing and prosecution of the application withheld the article entitled "Dynamic TDM-A Packet Approach To Broadband Networking" with an intent to deceive the USPTO.

31.    During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of an article entitled "A Protocol and Prototype For Broadband Subscriber Access to ISDNs," published by Mark Beckner, T.T. Lee, and Steven Minzer in March 1987.

32    The article entitled "A Protocol and Prototype For Broadband Subscriber Access to ISDNs" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

33.    The article entitled "A Protocol and Prototype For Broadband Subscriber Access to ISDNs" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld the article entitled "A Protocol and Prototype For Broadband Subscriber Access to ISDNs" with an intent to deceive the USPTO.

34.    During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of an article entitled "A Broadband ISDN Local Access System Using Emerging Technology Components," published by G. Hayward, L. Linnell, D. Mahoney and L. Smoot in March 1987.

35.     The article entitled "A Broadband ISDN Local Access System Using Emerging Technology Components" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

36.     The article entitled "A Broadband ISDN Local Access System Using Emerging Technology Components" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld the article entitled "A Broadband ISDN Local Access System Using Emerging Technology Components" with an intent to deceive the USPTO.

37.     During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of an article entitled "Starlite: A Wideband Digital Switch," published by A. Huang and S. Knauer in 1984.

38.     The article entitled "Starlite: A Wideband Digital Switch" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

39.     The article entitled "Starlite: A Wideband Digital Switch" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld the article entitled "Starlite: A Wideband Digital Switch" with an intent to deceive the USPTO.

40.     During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others

associated with the filing and prosecution of the application had knowledge of an article entitled "A CMOS VLSI Framer Chip for a Broadband ISDN Local Access System," published by H.J. Chao, T.J. Robe, and L.S. Smoot in May 1987.

41.    The article entitled "A CMOS VLSI Framer Chip for a Broadband ISDN Local Access System" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

42.    The article entitled "A CMOS VLSI Framer Chip for a Broadband ISDN Local Access System" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld the article entitled "A CMOS VLSI Framer Chip for a Broadband ISDN Local Access System" with an intent to deceive the USPTO.

43.    During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of an article entitled "Broadband User-Network Interfaces to ISDN," published by Steven Minzer in June 1987.

44.    The article entitled "Broadband User-Network Interfaces to ISDN" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

45.    The article entitled "Broadband User-Network Interfaces to ISDN" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or

others associated with the filing and prosecution of the application withheld the article entitled "Broadband User-Network Interfaces to ISDN" with an intent to deceive the USPTO.

46.    During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of an article entitled "Broadband ISDN Switching Capabilities From a Service Perspective," published by Dan R. Spears in October 1987.

47.    The article entitled "Broadband ISDN Switching Capabilities From a Service Perspective" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

48.    The article entitled "Broadband ISDN Switching Capabilities From a Service Perspective" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld the article entitled "Broadband ISDN Switching Capabilities From a Service Perspective" with an intent to deceive the USPTO.

49.    During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of United States Patent No. 4,082,922 entitled "Statistical Multiplexing System For Computer Communications," issued to Wesley W. Chu on April 4, 1978.

50.    U.S. Patent No. 4,082,922 was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

51.     U.S. Patent No. 4,082,922 was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld U.S. Patent No. 4,082,922 with an intent to deceive the USPTO.

52.     During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of United States Patent No. 4,093,823 entitled "Statically Multiplexing System For Computer Communications," issued to Wesley W. Chu on June 6, 1978.

53.     U.S. Patent No. 4,093,823 was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

54.     U.S. Patent No. 4,093,823 was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld U.S. Patent No. 4,093,823 with an intent to deceive the USPTO.

55.     During the prosecution of the application for the patent identified in Telcordia's complaint, one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application had knowledge of an article entitled "A Wide-Band Local Access System Using Emerging-Technology Components," published by Lloyd R. Linnell in July 1986.

56.   The article entitled "A Wide-Band Local Access System Using Emerging-Technology Components" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

57.   The article entitled "A Wide-Band Local Access System Using Emerging-Technology Components" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld the article entitled "A Wide-Band Local Access System Using Emerging-Technology Components" with an intent to deceive the USPTO.

58.   The article entitled "Synchronous Wideband Network-An Interoffice Facility Hubbing Network" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application withheld the article entitled "Synchronous Wideband Network-An Interoffice Facility Hubbing Network" with an intent to deceive the USPTO.

59.   The article entitled "Synchronous Wideband Network-An Interoffice Facility Hubbing Network" was prior art that was material to the patentability of one or more claims of the patent identified in Telcordia's complaint.

60.   The article entitled "Synchronous Wideband Network-An Interoffice Facility Hubbing Network" was not disclosed to the USPTO during the filing and prosecution of the application for the patent identified in Telcordia's complaint. One or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution of the application

withheld the article entitled "Synchronous Wideband Network-An Interoffice Facility Hubbing Network" with an intent to deceive the USPTO.

### Fifth Affirmative Defense
(Laches)

61.    Telcordia's claim for any damages purportedly incurred prior to filing this action is barred by the equitable doctrine of laches.

### Sixth Affirmative Defense
(License)

62.    Bell Communications Research, Inc. ("Bellcore"), which became TELCORDIA in 1999, granted to American Telephone and Telegraph Company ("AT&T") a license that includes rights to use and to have made products covered by the patent identified in Telcordia's complaint.  To the extent that any of Telcordia's allegations of infringement are premised on the alleged use, sale, offer for sale, or importation of Lucent's products that were manufactured for or provided to AT&T, such allegations are barred pursuant to license.

63.    Bellcore, which became TELCORDIA in 1999, granted to the Regional Bell Operating Companies ("RBOCs") a license that included rights to use and to have made products covered by the patent identified by Telcordia's complaint.  To the extent that any of Telcordia's allegations of infringement are premised on the alleged use, sale, offer for sale, or importation of Lucent's products that were manufactured for or provided to the RBOCs, such allegations are barred pursuant to license.

64.    Because Telcordia fails to specify any Lucent products that purportedly infringe the patent identified in Telcordia's complaint, Lucent reserves the right to plead additional defenses, such as equitable estoppel, exhaustion, implied license, and patent misuse, when Telcordia

specifically identifies its contentions regarding Lucent products that purportedly infringe and any

damages that Telcordia may contend that it incurred as result of such purported infringement.

### III.    COUNTERCLAIMS

### Jurisdiction and Venue

65.    This is an action for declaratory relief for which this Court has jurisdiction

under 28 U.S.C. §§ 1331, 1338, and 2201.

66.    To the extent that this action remains in this Court, venue is appropriate

because Telcordia has consented to the propriety of venue in this Court by filing its claim for patent

infringement in this Court, in response to which these counterclaims are asserted.

67.    Lucent is a corporation organized and existing under the laws of the state of

Delaware, with its principal place of business in Murray Hill, New Jersey 07874.

68.    Telcordia alleges that it is a corporation organized and existing under the laws

of Delaware, having a place of business at One Telcordia Drive, Piscataway, New Jersey 08854.

### First Counterclaim
### (Non-Infringement)

69.    Lucent repeats and realleges paragraphs 65-68 above as if fully set

forth herein.

70.    By filing its complaint, Telcordia has purported to assert a claim for

infringement.

71.    Lucent has denied Telcordia's claim of infringement and believes that the

complaint has been filed without good cause.

72.    An actual controversy has arisen between Lucent and Telcordia concerning

the infringement of the patent identified in Telcordia's complaint.

73.     Lucent is entitled to judgment from this Court finding that the patent identified in Telcordia's complaint is not infringed by any Lucent product.

74.     Telcordia also filed this action without a good faith basis, making this an exceptional case. Consequently, Telcordia is liable for any and all attorneys' fees incurred by Lucent in connection with this action.

### Second Counterclaim
(Invalidity)

75.     Lucent repeats and realleges paragraphs 65-68 above as if fully set forth herein.

76.     Lucent has denied that the patent identified in Telcordia's complaint is valid and has asserted that such patent is invalid pursuant to 35 U.S.C. §§ 1 *et seq.*

77.     Lucent is entitled to judgment from this Court finding that the patent identified in Telcordia's complaint is invalid for failure to comply with the requirements of 35 U.S.C. §§ 1 *et seq.*

### Third Counterclaim
(Inequitable Conduct)

78     Lucent repeats and realleges paragraphs 65-68 as if fully set forth herein.

79.     Lucent repeats and realleges paragraphs 21-60 as if fully set forth herein as and for its counterclaim that the patent identified in Telcordia's complaint is unenforceable as result of inequitable conduct committed before the USPTO during the prosecution of the patent by one or more of the inventors, and/or the prosecuting attorneys, and/or others associated with the filing and prosecution.

### Fourth Counterclaim
(License)

80.     Lucent repeats and realleges paragraphs 65-68 as if fully set forth herein.

81.   Bellcore granted to AT&T a license that includes rights to use and to have made products covered by the patent identified in Telcordia's complaint. To the extent that any of Telcordia's allegations of infringement are premised on the alleged use, sale, offer for sale, or importation of Lucent's products that were manufactured for or provided to AT&T, such allegations are barred pursuant to a license.

82.   Bellcore granted to the RBOCs a license that included rights to use and to have made products covered by the patent identified by Telcordia's complaint. To the extent that any of Telcordia's allegations of infringement are premised on the alleged use, sale, offer for sale, or importation of Lucent's products that were manufactured for or provided to the RBOCs, such allegations are barred pursuant to a license.

## IV.    DEMAND FOR JURY TRIAL

83.   Lucent hereby demands a trial by jury.

## V.    RELIEF

WHEREFORE, Lucent seeks the following relief:

84.   That the patent identified in Telcordia's complaint, and every claim thereof, be declared not infringed, invalid, and unenforceable;

85.   That Telcordia take nothing by its complaint and that Telcordia's complaint be dismissed with prejudice;

86.   That, pursuant to 35 U.S.C. § 285, Federal Rule of Civil Procedure 11, and/or other applicable laws, the Court find that Telcordia's conduct in commencing and pursuing this action renders this an exceptional case and that Lucent be awarded its attorneys' fees incurred in connection with this action; and

87.    That Lucent be granted such other and additional relief as this Court

deems just and proper.

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

John W. Shaw (No. 3362)
Glenn C. Mandalas (No. 4432)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19899-0391
(302) 571-6600
Attorneys for Lucent Technologies Inc.

Of Counsel:

Steven C. Cherny
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022
(212) 906-1200

David Nelson
Israel Sasha Mayergoyz
Neilish Patel
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL 60606
(312) 876-7700

Dated:  December 2, 2004

## CERTIFICATE OF SERVICE

I, John W. Shaw, hereby certify that on December 2, 2004, copies of the

foregoing document were caused to be served upon the following:

**BY HAND DELIVERY**

> Steven J. Balick, Esquire
> Ashby & Geddes
> 222 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE  19899

**BY FEDERAL EXPRESS**

> Don O. Burley, Esquire
> Finnegan Henderson Farabow
>  Garrett & Dunner LLP
> 1300 I Street, NW
> Washington, DC  20005-3315

_____
John W. Shaw (#3362)

# EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

TELCORDIA TECHNOLOGIES, INC.,

      Plaintiff,

    v.

CISCO SYSTEMS, INC.,

      Defendant.

Civil Action No. 04-876-GMS

DEMAND FOR JURY TRIAL

## CISCO SYSTEMS' ANSWER TO COMPLAINT,
## AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendant Cisco Systems, Inc. ("Cisco"), by and through its undersigned counsel, hereby responds to the Complaint of plaintiff Telcordia Technologies, Inc. ("Telcordia") by admitting, denying, alleging, and counterclaiming as follows:

### I. ANSWER

### THE PLAINTIFF

1.     Cisco is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1 of the Complaint and therefore denies those allegations.

2.     Cisco is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 of the Complaint and therefore denies those allegations.

### THE DEFENDANT

3.     Cisco admits the allegations in paragraph 3 of the Complaint.

4.     Cisco admits the allegations in paragraph 4 of the Complaint.

### JURISDICTION AND VENUE

5.     Cisco admits that this action purports to arise under the Patent Laws of the United States, 35 U.S.C. §§ 1-376.

6.    Cisco admits that this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 over the allegations in the Complaint as plead.

7.    Cisco admits that it is subject to personal jurisdiction in this judicial district.

8.    Cisco denies the allegations of paragraph 8 of the Complaint.

### COUNT I: INFRINGEMENT OF THE '306 PATENT

9.    Cisco incorporates by reference its responses in each of paragraphs 1-8 above.

10.    Cisco admits that U.S. Patent No. 4,893,306 ("the '306 patent") entitled "Method and Apparatus for Multiplexing Circuit and Packet Traffic," states on its face that it issued on January 9, 1990 to Hung-Hsiang J. Chao, Sang H. Lee, and Liang T. Wu as named inventors. Cisco admits that the '306 states on its face that it issued from U.S. Patent Application No. 118,977, filed on November 10, 1987.   Except as so expressly admitted, Cisco denies the allegations of paragraph 10 of the Complaint.

11.    Cisco admits that the '306 patent states on its face that it was assigned to Bell Communications Research, Inc.  Except as so expressly admitted, Cisco denies the allegations of paragraph 11 of the Complaint.

12.    Cisco denies the allegations in paragraph 12 of the Complaint.

13.    Cisco denies the allegations in paragraph 13 of the Complaint.

14.    Cisco denies the allegations in paragraph 14 of the Complaint.

15.    Cisco denies the allegations in paragraph 15 of the Complaint.

16.    Cisco denies the allegations in paragraph 16 of the Complaint.

### COUNT II: INFRINGEMENT OF THE '633 PATENT

17.    Cisco incorporates by reference its responses in each of paragraphs 1-16 above.

2

18.    Cisco admits that U.S. Patent No. Re. 36,633 ("the '633 patent") entitled "Synchronous Residual Time Stamp For Time Recovery In A Broadband Network," states on its face that it issued on March 28, 2000 to Paul E. Fleischer and Chi-Leung Lau as named inventors. Cisco admits that the '633 states on its face that it issued from U.S. Patent Application No. 08/555,196, filed on November 8, 1985. Except as so expressly admitted, Cisco denies the allegations of paragraph 18 of the Complaint.

19.    Cisco admits that the '633 patent states on its face that it was assigned to Telcordia Technologies Inc. Except as so expressly admitted, Cisco denies the allegations of paragraph 19 of the Complaint.

20.    Cisco denies the allegations in paragraph 20 of the Complaint.

21.    Cisco denies the allegations in paragraph 21 of the Complaint.

22.    Cisco denies the allegations in paragraph 22 of the Complaint.

23.    Cisco denies the allegations in paragraph 23 of the Complaint.

24.    Cisco denies the allegations in paragraph 24 of the Complaint.

## II. DEFENSES

25.    In addition to the defenses described below, Cisco expressly reserves the right to allege additional defenses as they become known through the course of discovery.

## FIRST DEFENSE – NON-INFRINGEMENT

26.    Cisco has not infringed, directly or indirectly, any valid claims of the '306 patent or '633 patent.

## SECOND DEFENSE – INVALIDITY

27.    The '306 patent and '633 patent are invalid for failure to meet the conditions of patentability of 35 U.S.C. § 101 et seq., including, without limitation §§ 102, 103, 112, and 251.

3

### THIRD DEFENSE – LACHES AND ESTOPPEL

28.     The relief sought by Telcordia is barred in whole or in part by the doctrines of laches and/or equitable estoppel.

### FOURTH DEFENSE – PATENT MISUSE/UNCLEAN HANDS

29.     The relief sought by Telcordia is barred in whole or in part by the doctrines of unclean hands and/or patent misuse.

### FIFTH DEFENSE – PATENT EXHAUSTION/IMPLIED LICENSE

30.     The relief sought by Telcordia is barred in whole or in part by the doctrines of patent exhaustion and/or implied license.

### SIXTH DEFENSE – INTERVENING RIGHTS

31.     The relief Telcordia seeks is barred, in whole or in part, because Cisco is entitled to intervening rights with respect the '633 patent.

### SEVENTH DEFENSE – INEQUITABLE CONDUCT

**A.     The '306 patent**

32.     The '306 patent is unenforceable under the doctrine of inequitable conduct. On information and belief, prior to the issuance of the '306 patent, the named inventors and/or others substantively involved in prosecuting the applications leading to the '306 patent were aware of material information, including prior art, but withheld, concealed and/or mischaracterized that information with the intent to deceive the Patent and Trademark Office. The concealed information includes, without limitation: (1) L.T. Wu, S.H. Lee, and T.T. Lee, "Dynamic TDM – A Packet Approach to Broadband Networking," *Proceedings of the IEEE International Conference on Communications '87*, 46.1.1-46.1.8 (1987); (2) IEEE Standard 802.6 "Distributed Queue Dual Bus" and/or Queue Packet and Synchronization Circuit Exchange ("QPSX")

products known, made, used, sold, offered for sale, in public use, patented and/or described in a printed publication prior to November 10, 1987; (3) the well-known FASTNET local area network protocol and products known, made, used, sold, offered for sale, in public use, patented and/or described in a printed publication prior to November 10, 1987, including as described in, *inter alia*, Limb et al., "An Architecture and Protocol for a High Speed Local Area Network Supporting Integrated Traffic," *Proceedings of the IEEE Infocom* 1984 (1984) and Limb. J.O. and Flores C., *Description of Fastnet – A Unidirectional Local Area Communications Network*, in <u>Advances in Local Area Networks</u> (IEEE Press 1987); (4) the Cisco/Stratacom IPX product known, made, used, sold, offered for sale, in public use, patented and/or described in a printed publication prior to November 10, 1987, including as described in, *inter alia*, Corbalis, "The Challenge of Packet Voice," *Telecommunications* (October 1986) and Corbalis, "A Design Example of a T1-based Fast Packet Voice Switch," *Proceedings of the IEEE International Communications Conference '87* (1987); (5) ISDN and B-ISDN schemes and products known, made, used, sold, offered for sale, in public use, patented and/or described in a printed publication prior to November 10, 1987, including as described in, *inter alia, Proceedings of the First Pan European Conference on ISDN "ISDN Europe 86"* (November 5-7, 1986), the Groupe Special Large Bande ("GSLB") publication entitled "CEPT Studies on Broadband Aspects of ISDN – Status Report" (May 1986), Beckner, M. et al., "A Protocol and Prototype for Broadband Subscribers Access to ISDNs," *Proceedings of the International Switching Symposium 1987: 'Innovations in Switching Technology,'* Vol. 2 pp. 462-69 (March 1987), Minzer, S., "Broadband User-Network Interfaces to ISDN" *Proceedings of the IEEE International Communications Conference '87* (June 1987), Spears, D.R., "Broadband ISDN Switching Capabilities from a Service Perspective," *IEEE Journal on Selected Areas in Communications*, Vol. SAC-5 No. 8,

5

pp. 1222-30   (October 1987), Linnell, L.R., "A Wide-Band Local Access System using Emerging-Technology Components" *IEEE Journal on Selected Areas in Communications*, Vol. SAC-4 No. 4, pp. 612-18 (July 1986), and Hayward, G. et al., "A Broadband ISDN Local Access System Using Emerging Technology Components," *Proceedings of the International Switching Symposium 1987: 'Innovations in Switching Technology,'* Vol. 3, pp. 597-601 (March 1987); and (6) the Prelude network known, made, used, sold, offered for sale, in public use, patented and/or described in a printed publication prior to November 10, 1987, including as described in, *inter alia*, J.P. Courdreuse et al., "Prelude: An Asynchronous Time Division Switched Network," *Proceedings of the IEEE International Communications Conference '87* (June 1987).

### B.    The '633 Patent

33.    The '633 patent is unenforceable under the doctrine of inequitable conduct. On information and belief, prior to the issuance of the U.S. Patent No. 5,260,978, the patent from which the '633 patent reissued, the named inventors and/or others substantively involved in prosecuting the applications leading to the '978 patent were aware of material information, including prior art, but withheld, concealed and/or mischaracterized that information with the intent to deceive the Patent and Trademark Office. The concealed information includes, without limitation:  (1) U.S. Pat. No. 4,530,091 entitled "Synchronization of Real-Time Clocks in a Packet Switching System," issued to Crockett, G.B.; (2) U.S. Pat. No. 5,255,291 entitled "Microprocessor Based Packet Isochronous Clocking Transmission System and Method," issued to Holden, B.D., et al.; (3) JP 3-114333 entitled "Clock Synchronization format in packet transmission, a packet transmitter, and packet receiver," issued to Ishikawa T., et al.; (4) CCITT Study Group XVIII/8 Contribution D.1123, entitled "Proposed Method to Provide the Clock Recovery Function for Circuit Emulation," December 1990; (5) Letter from P. Adam of CNET

6

dated August 26, 1991 concerning discussion on TS/SFET; (6) Memorandum from R. Lau and

B. Kittams of Bellcore dated October 11, 1991 concerning A Compromise of SFET and TS; (7)

Memorandum from T. Houdoin to B. Kittams and R. Lau dated October 14, 1991 concerning

Compromise SFET/TS; (8) CNET Memorandum from T. Houdoin to R. Lau and B. Kittams

concerning Compromise SFET/TS (undated); (9) CCITT Study Group XVIII Contribution

D.1020, entitled "Timing Recovery for CBR Circuit Emulation," (December 1990); (10) CCITT

Study Group XVIII Contribution D.1451, entitled "Performance Comparison of Timing

Recovery Methods of CBR (June 1991); (11) Submission to T1S1, entitled "Broadband Aspects

of ISDN," T1S1.5/91-382 (Nov. 4, 1991); (12) Summary Minutes of T1 Services, Architecture,

and Signaling Technical Subcommittees (T1S1) Session (Nov. 8, 1991); (13) CCITT Study

Group XVIII Contribution entitled "Synchronous Residue-Time Stamp: A Combination of

SFET/TS" (December 1991); (14) CCITT Study Group XVIII Contribution entitled "Report of

the Meeting of SWP XVIII/8-3 (Services IVS and AAL types 1 and 2)" (December 1991); and

(15) well-known prior art pulse stuffing synchronization techniques, including as described in,

*inter alia*, Lau, R. C. et al., "Synchronous Techniques for Timing Recovery in BISDN," *IEEE*

*Globecom*, pp. 814-820 (Dec. 1992).

### III. COUNTERCLAIMS

Counterclaim plaintiff Cisco counterclaims against counterclaim defendant Telcordia as

follows:

### JURISDICTION AND VENUE

34.    These counterclaims arise under Title 35 of the United States Code.  The Court

has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a),

2201, and 2202.

**THE PARTIES**

35.    Cisco is a corporation organized and existing under the laws of California, having a principal place of business at 170 West Tasman Drive, San Jose, California 95134.

36.    Telcordia alleges that it is a corporation organized and existing under the laws of Delaware, having a principal place of business at One Telcordia Drive, Piscataway, New Jersey 08854. Telcordia further alleges that it is a provider of communications software, engineering and consulting services throughout the United States, including in the District of Delaware.

## FIRST COUNTERCLAIM – DECLARATORY JUDGMENT
### '306 PATENT

37.    Cisco incorporates herein by reference the allegations of paragraphs 1 - 36 of this Answer, Affirmative Defenses and Counterclaims.

38.    Cisco counterclaims against Telcordia pursuant to the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

39.    In its Complaint against Cisco filed July 16, 2004, Telcordia alleged that Cisco has infringed and is currently infringing the '306 patent by making, using, offering for sale, selling and/or importing communication network products embodying the patented invention of the '306 patent.

40.    An actual controversy exists between Telcordia and Cisco by virtue of the allegations of Telcordia's Complaint in this action and Cisco's Answer as to the validity, enforceability and infringement of the '306 patent.

41.    The '306 patent is invalid, unenforceable, and not infringed, as set forth in paragraphs 25 through 33 above.

8

42.     Cisco is entitled to judgment that the '306 patent is invalid, unenforceable, and not infringed.

## SECOND COUNTERCLAIM – DECLARATORY JUDGMENT
### '633 PATENT

43.     Cisco incorporates herein by reference the allegations of paragraphs 1 - 42 of this Answer, Affirmative Defenses and Counterclaims.

44.     Cisco counterclaims against Telcordia pursuant to the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

45.     In its Complaint against Cisco filed July 16, 2004, Telcordia alleged that Cisco has infringed and is currently infringing the '633 patent by making, using, offering for sale, selling and/or importing communication network products embodying the patented invention of the '633 patent.

46.     An actual controversy exists between Telcordia and Cisco by virtue of the allegations of Telcordia's Complaint in this action and Cisco's Answer as to the validity, enforceability and infringement of the '633 patent.

47.     The '633 patent is invalid, unenforceable, and not infringed, as set forth in paragraphs 25 through 33 above.

48.     Cisco is entitled to judgment that the '633 patent is invalid, unenforceable, and not infringed.

## DEMAND FOR JURY TRIAL

49.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Cisco hereby demands a trial by jury of all issues.

## PRAYER FOR RELIEF

WHEREFORE, Cisco prays for judgment as follows on Telcordia's Complaint and on Cisco's Counterclaims:

      A.     That Telcordia's Complaint be dismissed with prejudice and that Telcordia take nothing;

      B.     That judgment be entered in favor of Cisco against Telcordia on Telcordia's Complaint;

      C.     For entry of an Order declaring the '306 patent and the '633 patent invalid, unenforceable, and not infringed by Cisco;

      D.     That Telcordia be required to pay Cisco's costs of suit;

      E.     That Telcordia be required to pay Cisco's attorneys' fees pursuant to 35 U.S.C. § 285;

      F.     That this case be declared an exceptional case; and

      G.     That Cisco be awarded such other and further relief as the court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL

*Jack Blumenfeld*

Jack B. Blumenfeld (#1014)
1201 North Market Street
Wilmington, DE 19899-1347
(302) 658-9200
  Attorneys for Defendant
  Cisco Systems, Inc.

Of counsel:

WEIL, GOTSHAL & MANGES LLP
Matthew D. Powers
Edward R. Reines
Bao Nguyen
Sonal N. Mehta
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

December 2, 2004

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that copies of the foregoing were caused to be served this 2nd day of December, 2004 upon the following in the manner indicated:

### BY HAND

Steven J. Balick,
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

### BY FEDERAL EXPRESS

Don O. Burley
Finnegan, Henderson, Farabow, Garrett & Dunner
1300 I Street, N.W.
Washington, DC 20005-3315

Jack B. Blumenfeld

# EXHIBIT 7

## 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
 4  TELCORDIA TECHNOLOGIES INC.,     CIVIL ACTION
 5           Plaintiff,
 6      v.
 7  ALCATEL S.A., and ALCATEL
    USA INC.,
 8           Defendants.             NO. 04-874 (GMS)
 9  TELCORDIA TECHNOLOGIES INC.,
10           Plaintiff,
11      v.
12  LUCENT TECHNOLOGIES. INC.,
13           Defendant.              NO. 04-875 (GMS)
14  TELCORDIA TECHNOLOGIES INC.,
15           Plaintiff,
16      v.
17  CISCO SYSTEMS INC.,
18           Defendant.              NO. 04-876 (GMS)
19                        - - -
20                  Wilmington, Delaware
21        Thursday, April 14, 2005 at 2:00 p.m.
              RULE 16.2(b) CONFERENCE
22
23  BEFORE:    HONORABLE GREGORY M. SLEET, U.S.D.C.J.
24                        - - -
25
```

## 2

```
 1  APPEARANCES:
 2
 3      ASHBY & GEDDES
        BY:  STEVEN J. BALICK, ESQ.
 4
            and
 5
    FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
 6      BY:  RICHARD L. RAINEY, ESQ., and
             DON. O. BURLEY, ESQ.
 7           (Washington, District of Columbia)
 8           Counsel on behalf of Telcordia
             Technologies Inc
 9
    YOUNG CONAWAY STARGATT & TAYLOR
10      BY:  JOSY W. INGERSOLL, ESQ.
11          and
12  KENYON & KENYON
        BY:  STUART J. SINDER, ESQ., and
13           BENJAMIN HERSHKOWITZ, ESQ.
             (New York, New York)
14
            and
15
    ALCATEL USA, INC.
16      BY:  JOHN BERRES, ESQ.
             In-House Counsel
17
            Counsel for Alcatel S.A.
18           and Alcatel USA, Inc.
19  YOUNG CONAWAY  STARGATT & TAYLOR
        BY:  JOHN W. SHAW, ESQ.
20
21          and
22  LATHAM & WATKINS, LLP
        BY:  STEVEN C. CHERNEY, ESQ.
23           (New York, New York)
24          and
25
```

## 3

```
 1  APPEARANCES: (Continued)
 2
 3      LATHAM & WATKINS, LLP
        BY:  ISRAEL SASHA MAYERGOYZ, ESQ.
 4           (Chicago, Illinois)
 5          and
 6  LUCENT TECHNOLOGIES, INC.
        BY:  ELAINE DRAGER, ESQ.
 7           In-House Counsel
 8           Counsel for Lucent
             Technologies, Inc.
 9
    MORRIS NICHOLS ARSHT & TUNNELL
10      BY:  JOHN B. BLUMENFELD, ESQ.
11          and
12  WEIL GOTSHAL & MANGES, LLP
        BY:  EDWARD R. REINES, ESQ.
13           (Redwood Shores, California))
14          and
15  WEIL GOTSHAL & MANGES, LLP
        BY:  JESSICA DAVIS, ESQ.
16           (New York, New York)
17           Counsel for Cisco Systems Inc.
18
19
20                    Brian P. Gaffigan
                      Official Court Reporter
21
22
23
24
25
```

## 4

```
 1
 2                    - oOo -
 3               P R O C E E D I N G S
 4   (REPORTER'S NOTE:  The following 16(2)(b)
 5  scheduling hearing was held in open court, beginning at
 6  2:00 p.m.)
 7        THE COURT:  Good afternoon, everyone.
 8        (Attorneys respond, "good afternoon, Your
 9  Honor.")
10        THE COURT:  This is an informal office
11  conference but because of the numbers we don't have the
12  space inside to accommodate everyone, so why don't we start
13  with plaintiff whom I'm assuming are the outgunned lawyers
14  here.
15        MR. BALICK:  Yes, Your Honor.  Your Honor,
16  usually I'm on the other side.
17        THE COURT:  Hello, Mr. Cherney.  How are you?
18        MR. BALICK:  It's not true today.
19        THE COURT:  I'll leave this alone.
20        MR. BALICK:  Your Honor, I'm here on behalf of
21  Telcordia; and here from the Finnegan Henderson firm here
22  are Don Burley and Richard Rainey.
23        THE COURT:  Good afternoon.
24        MR. RAINEY:  Good afternoon, Your Honor.
25        MR. BALICK:  Your Honor, Mr. Dunner was planning
```

**5**

1    and looking forward to being here and unexpectedly couldn't
2    make it but he sends his regrets.
3        THE COURT:  Okay.  That's fine.
4        Do you want to start, Mr. Cherney?
5        MR. CHERNEY:  Steve Cherney and Sasha Mayergoyz
6    from Latham & Watkins for Lucent; John Shaw; and Elaine
7    Drager is from Lucent Technologies.
8        THE COURT:  Good afternoon.
9        Mr. Shaw.
10       MR. SHAW:  I'm here for Alcatel; and with me are
11   Stuart Sinder and Ben Hershkowitz from Kenyon & Kenyon.
12       THE COURT:  Good afternoon.
13       MR. SHAW:  And John Berres who is Vice President
14   and Deputy Director of Intellectual Properties.
15       THE COURT:  Good afternoon.
16       Mr. Blumenfeld.
17       MR. BLUMENFELD:  Good afternoon, Your Honor.
18   For Cisco, I'm here with Ed Reines from Weil Gotshal in
19   California and Jessica Davis from Weil Gotshal in New York.
20       THE COURT:  Good afternoon.
21       All right.  We have things we have to talk
22   about.  I think it's quite a comprehensive joint status
23   report and I guess the first thing we should talk about is
24   on page two.  And that is Alcatel USA's motion to dismiss
25   for lack of personal jurisdiction.

**6**

1        I would be prepared -- I know I am probably
2    catching you a little unawares with this statement but I'd
3    be prepared to hear a little bit about your positions on
4    this.  I do have a distinct inclination.  So if you want to
5    be heard before I put it to paper completely, I'm willing to
6    listen.
7        The motion is by Alcatel.
8        MR. SINDER:  Yes, Your Honor.
9        THE COURT:  Yes.
10       MR. SINDER:  If I may, I think I can summarize
11   the motion very quickly.  There are two Alcatel companies
12   that were named as defendants.  One is the U.S. company that
13   sells the accused products and the other is the ultimate
14   foreign French parent holding company.
15       THE COURT:  Right.
16       MR. SINDER:  As our papers indicate, it's just a
17   holding company.  It has no activities in the United States.
18   It doesn't manufacture any products.  It doesn't sell any
19   products, not only in Delaware but anywhere in the country.
20   It's basically in the nature of an investment company and
21   it holds the various subsidiaries of Alcatel.
22       And we don't believe that any case has been made
23   by Telcordia in its papers that would support the exercise
24   of personal jurisdiction over the parent.  If you go through
25   the requirements of the Delaware long-arm statute, there is

**7**

1    insufficient contacts for any specific jurisdiction which
2    would require that the cause of action arise out of some
3    contact with Delaware.  And this being a case for patent
4    infringement, it would require that Alcatel SA have taken
5    some steps in connection with selling the product and that
6    hasn't even really been alleged.
7        General jurisdiction would require continuous
8    and systematic contacts which really haven't been alleged.
9    So what the plaintiff really comes down to I think in their
10   response to our motion is they say that there should be
11   jurisdiction under an agency theory, and we don't believe
12   that they have even made out a prima facie case that there
13   is an agency relationship between the Alcatel parent and
14   the U.S. subsidiary.
15       THE COURT:  What are the elements of that
16   theory?  Agency?
17       MR. SINDER:  Well, the elements of that
18   theory would require that the parent who they're trying
19   to get in effects controls the day-to-day activities of
20   the subsidiary.  We put in a declaration from Alcatel USA
21   indicating that it has a separate management team, it files
22   separate financial statements, it files separate tax
23   returns, it funds its own activities.
24       THE COURT:  Is there an officer that the
25   entities share in common?

**8**

1        MR. SINDER:  There is.
2        THE COURT:  Or two?
3        MR. SINDER:  There is one officer of the
4    subsidiary who is part of the executive team of the parent
5    but not an employee of the parent.  There is only five
6    employees of the parent, and there is one member of the
7    executive team of the parent who sits on the board of the
8    sub.  So that is the only overlap.
9        In our view, in our view if that was sufficient,
10   virtually any foreign company that has a subsidiary in
11   Delaware would be subject to jurisdiction in Delaware.  We
12   think in most cases you would have a situation where there
13   is some cooperation between manage- ment teams so you'd have
14   somebody on a subsidiary who would consult with the parent
15   management team and vice-versa and we think that would be a
16   common occurrence.
17       So I think the situation here is much clearer
18   for no holding of jurisdiction than it is in a numbers of
19   the cases in this district.  The couple of cases involving
20   the Guidant Corporation in which there were many more
21   contacts and in which this Court found that there was not
22   sufficient basis for jurisdiction here.  There basically
23   aren't any contacts except for that small overlap in
24   executive function but otherwise the companies operate
25   completely independently.

9

```
 1            Now, the other theory which the plaintiff is
 2   proposes is Rule 4(k)(2) of the federal rules.
 3            THE COURT:  Right.
 4            MR. SINDER:  And that's the rule, as Your Honor
 5   knows, that was promulgated to plug a loophole really in the
 6   federal rules:  a situation where a company had extensive
 7   contacts with the country as a whole which would have been
 8   sufficient for jurisdiction but because they were spread so
 9   thinly, there wasn't sufficient contact with any one state
10   for any one state to exercise jurisdiction.  So, in effect,
11   the rule was, well, if that is the case and no one state
12   can exercise jurisdiction, but there are continuous and
13   systematic contacts with the country as a whole, you can, a
14   federal court can exercise jurisdiction.
15            But for all the reasons I just mentioned,
16   Alcatel doesn't have contacts with any other state either.
17   In other words, it couldn't.  The contacts with Delaware
18   which really don't exist, they don't exist anywhere in the
19   United States so it really doesn't have contacts sufficient
20   with the country as a whole for 4(k)(2) to be implicated.
21            I should note that there is also no showing that
22   the second prong of the test required for jurisdiction under
23   4(k)(2) has been met, which is that Alcatel isn't subject to
24   jurisdiction anywhere.  I mean I can't tell you whether that
25   is the case, whether there might be some jurisdiction where,
```

10

```
 1   when all the facts came out, it was possible that there was
 2   sufficient contacts based on whatever the cause of action
 3   was.  And I don't think there has been a showing by the
 4   plaintiff that Alcatel isn't subject to jurisdiction any-
 5   where, but I don't think it really matters because they
 6   haven't really met the other prong which is sufficient
 7   systematic and regular contacts with the United States in
 8   order to exercise jurisdiction and wouldn't survive a due
 9   process challenge.
10            We also wanted to bring to Your Honor's
11   attention that we really in a way do not understand why the
12   plaintiff persists in trying to obtain jurisdiction over the
13   parent, and we think that is either because they have some
14   sort of ulterior motive to perhaps create some burden on
15   the parent to prompt a settlement -- the U.S. Supreme Court
16   has specifically indicated that the Court should be very
17   vigilant in considering that as a possible issue.
18            And the second possibility is that -- and we
19   suspect that the plaintiff really didn't do a sufficient
20   prefiling investigation as required under Rule 11.  Their
21   justification seems to be in their papers that they didn't
22   know who to sue.  It's too confusing.  Well, our reply brief
23   indicates that is just not a credible position, especially
24   for this plaintiff.  This plaintiff probably knows more
25   about the telecommunications industry and the players.
```

11

```
 1            THE COURT:  You are getting into my next
 2   question, and that is fine, which is how would you respond,
 3   how do you respond to their contention it would be premature
 4   for the Court to rule, given the current state of the
 5   record.  Go ahead.
 6            MR. SINDER:  All right.
 7            THE COURT:  There is a discovery request.
 8            MR. SINDER:  There is a discovery request.  It's
 9   pretty well settled in order for there to be jurisdictional
10   discovery, there has to be some prima facie case made as to
11   some factual basis on which they believe that the discovery
12   would demonstrate a basis for jurisdiction.  We don't
13   believe they have shown that.
14            There is a recent case I should mention in which
15   because it came from this court, went up to the Federal
16   Circuit in which jurisdictional discovery was ordered but
17   that's very distinguishable for two reasons.  That was a
18   stream of commerce theory in which the parent admittedly
19   made, the foreign parent made the product, put it into the
20   stream of commerce in the U.S. and there was some issue
21   because of the divided U.S. Supreme Court as to did that
22   really pass the test?  Because there were two tests and you
23   couldn't tell, unless there were more facts, whether it met
24   the minimum test that some of the judges espoused or not.
25            This situation, Alcatel is not a parent.
```

12

```
 1   Alcatel SA is not putting anything into the stream of
 2   commerce.  It doesn't manufacture or sell any products at
 3   all.  The other thing that distinguishes that case and I
 4   think underscores our not understanding why the plaintiff is
 5   pushing to have the parent in, other than the reasons I
 6   mentioned, is because they have in front of the Court the
 7   company that sells the products they're accusing.  That is
 8   Alcatel USA.  It's answered the complaint.  It's not
 9   fighting jurisdiction.
10            And by the way, that was not the case in the
11   Supreme Court, the Federal Circuit case I was mentioning.
12   There a dismissal.  It would have resulted in a denial of a
13   remedy for the plaintiff.  That is certainly not the case
14   here because all the products sold in the United States
15   through any of the Alcatel companies are sold through
16   Alcatel USA.
17            THE COURT:  Thank you, counsel.
18            Who is going to respond?
19            MR. BURLEY:  Your Honor, Don Burley.  And you
20   did take me aback with this.
21            THE COURT:  Sorry about that.
22            MR. BURLEY:  So Mr. Rainey has kindly given me
23   his notebook with our reply brief in it.
24            Telcordia's basic position here is that while
25   Mr. Sinder says that Alcatel SA is a holding company and
```

13

1   does nothing neither with respect to manufacturing the
2   equipment at issue, nor with respect to selling it, what we
3   really have to prove that is Mr. Sinder's word.
4        The Alcatel SA website which is cited
5   extensively both in connection with our moving brief, our
6   initial motion and in our reply brief is extensive in
7   talking about Alcatel SA's operations in the United States.
8   It's very clear from the Alcatel SA, the parent website,
9   that in fact Alcatel is a worldwide corporation that has an
10  extensive business in the U.S.  That it's in fact, if not
11  the most important market in the world for Alcatel, is one
12  of the most important markets in the world and there is
13  simply no way for us to know now, on the state of the
14  record, even following this briefing, that in fact SA is
15  simply a holding company and that all of the products at
16  issue are manufactured and sold by Alcatel USA Inc.
17       In fact, just with respect to a couple of
18  relatively basic but I would think critical or at least
19  fundamental facts, how many employees does Alcatel SA have,
20  the moving papers of Alcatel indicate that SA has five
21  employees.  The website I believe identifies 15 members of
22  what are called Alcatel's management team as well as 12
23  additional people identified as eight directors.  So we now
24  have at least by my count, 27 people who are upper
25  management at Alcatel SA.

14

1        So I mean I think at a minimum, it's safe to say
2   that at this stage of the record, either it's clear that
3   Alcatel SA operates in the U.S. through some subsidiary
4   agent, some agency relationship of Alcatel USA or that some
5   sort of discovery is absolutely needed to determine exactly
6   what the relationship is.
7        Now, when Mr. Sinder talks about motive, why
8   have we done this, it's certainly not simply to be
9   difficult.  It is to make sure that we have, as defendants
10  in the case, the people who are properly responsible for the
11  activities that we allege are infringing activities.  We
12  don't know, and certainly did not know when we filed this
13  suit, and do not know on the basis of the record now, that
14  we have in fact the people who are the infringers.
15       And beyond that, as we point out on page 14,
16  footnote 14, while Mr. Sinder, and I believe Alcatel in its
17  opposition brief, said that Alcatel USA would certainly be
18  financially secure enough to satisfy any potential judgment,
19  that is not -- again, that is the statement of Alcatel SA in
20  its papers but there is no indication that that in fact is
21  true.
22       We attached as Exhibit 13 to the brief and quote
23  some of the points from the Dunn & Bradstreet report that is
24  attached as Exhibit 13 the fact that the Dunn & Bradstreet
25  report concerning Alcatel USA says that Alcatel USA has a

15

1   high risks of severe payment delinquency over the next 12
2   months because of slow payments.  Payment experiences
3   involve past due payments and evidence of open liens.  So
4   it's not at all clear that we do in fact have a financially
5   secure party, much less the actual and only party that is a
6   possible infringer in this case.
7        And I think the final point I would like to make
8   is dealing with Rule 4(k)(2), as I understood Mr. Sinder
9   initially, his argument for why there is no jurisdiction and
10  can't be any jurisdiction in the U.S. is that Alcatel SA is
11  a holding company.  Well, that would apply obviously in --
12  that same argument would apply in any state.  Rule 4(k)(2)
13  imposes due process in a situation where there is no
14  jurisdiction of any individual state and says as long as
15  jurisdiction over the foreign company would comport with due
16  process with the U.S. Constitution, jurisdiction can be
17  founded on Rule 4(k)(2).
18       So we believe that that clearly applies in this
19  situation.  Either there is jurisdiction under the general
20  long-arm statute or there is jurisdiction under Rule
21  4(k)(2).
22       THE COURT:  Well, what do you say to the point
23  made in one of Alcatel's submissions in its reply brief at
24  17 to its contention there is an extensive relationship, has
25  been an extensive relationship between Telcordia and Alcatel

16

1   and Telcordia well knows just who Alcatel is and what it is?
2        MR. BURLEY:  Your Honor, this is actually
3   something we spent -- and this isn't in the papers but I'm
4   perfectly willing to explain my understanding of the
5   situation.  We spent literally hundreds of hours I think
6   trying to make sure that we were suing the right entities,
7   and meaning properly suing, only the companies that were
8   subject to jurisdiction in this court.
9        We were, my law firm was negotiating with
10  Alcatel in another case over a different matter and I talked
11  to the attorneys involved in that case and I talked to the
12  people at Telcordia that have had dealings with Alcatel.
13  When Alcatel deals with people, they deal with people as
14  Alcatel, which I take from Mr. Sinder's papers certainly
15  means Alcatel SA, the parent corporation.
16       What they have said in fact is that when you say
17  that they actually criticized us, and I wasn't quite sure
18  where that particular point was going but they criticized
19  us for calling Alcatel SA "Alcatel SA" rather than simply
20  Alcatel.  Alcatel is the parent company.  It is the same
21  as I understand it legally as Alcatel SA which is a French
22  word which I would, or two words, "Societie" something,
23  which I would bungle if I tried to pronounce it.  But it
24  means, as I understand it, basically, the SA is the
25  organizational structure, the legal organization under

17

1  French law that Alcatel is organized according to.

2          There is simply no support and in fact it is not

3  true that Telcordia understands the internal structure of

4  Alcatel and that it has any basis for knowing or concluding

5  that Alcatel SA is purely a holding company that neither

6  manufactures nor sells product. Again, we spent hundreds of

7  hours trying to make that determination and I do not know to

8  this day that that is correct.

9          THE COURT: Okay. Mr. Sinder, your reply.

10         MR. SINDER: Yes. Just on a couple of points,

11  Your Honor. The point about financial ability to pay for

12  Alcatel USA I think is really one that doesn't have any

13  support. Our reply brief had a declaration from the Chief

14  Financial Officer of Alcatel USA indicating its current

15  asset value is over $7 billion. And the Dunn & Bradstreet

16  report, just decided in the year 2002, which was the depths

17  of the depression in the telecom industry, indicated Alcatel

18  averaged nine days beyond terms in payment but that the

19  industry average was 12 days. I mean to me -- and that was

20  three years ago.

21         It is true that like most multinational

22  companies, Alcatel promotes itself without the specifics of

23  each separate corporate entity. It calls itself Alcatel but

24  if you go on the website and you want to find out what is

25  happening in the United States, it appears right on the page

18

1  itself that it's Alcatel USA and the agreements that Alcatel

2  USA has with its customers are agreements that don't say

3  Alcatel, they say Alcatel USA Inc. which is the name of the

4  company. Everybody who deals with them knows that. Nobody

5  is confused.

6          This is not an instance of consumer confusion

7  because Alcatel sells infrastructure equipment to large

8  carriers in effect. So we're dealing with large

9  corporations. Everybody knows who they are dealing with.

10         And Mr. Burley really doesn't give accurate or

11  sufficient credit to the relationship between the companies

12  which goes back, as our papers indicate, 13 years. And

13  they are the Canadian subsidiary which manufactures some of

14  these products. There is a license agreement between that

15  company and Telcordia on a different patent, the one that

16  they didn't assert against Alcatel but they did assert

17  against Cisco. There is correspondence on the patent they

18  sued Alcatel on between the companies that goes back into

19  the early nineties and it's addressed to the appropriate

20  entity.

21         So they know who they're dealing with here.

22  It's really I don't believe credible that they spent

23  hundreds of hours and couldn't figure out who to sue.

24  They've been dealing with these companies, have had meetings

25  with them, have tried to induce Alcatel to take a license

19

1  under the patents in suit, you know, for years and years.

2          As to the website, once again, sure, there is a

3  single website. You wouldn't expect each subsidiary of a

4  multinational company to have its own website. But there

5  are cases in this district which say, well, you can't. The

6  fact there is website accessibility in the United States,

7  which is literally every website that exists is accessible

8  from the United States, that isn't sufficient to result in a

9  finding of jurisdiction just because you can access it here.

10         I think on balance, there hasn't been any

11  showing by the plaintiff of a need -- and Mr. Burley really

12  hasn't articulated one -- of a need for a parent company

13  that -- I mean it does only have five officers. Whether its

14  management team is also made up of officers of some of its

15  subsidiaries may be the case but we're talking about a

16  company with, in terms of a lawsuit of this nature for

17  patent infringement, only a handful of employees vs. Alcatel

18  USA which has over 5,000 employees here in the United

19  States. And there doesn't seem to be any basis that has

20  been articulated why Telcordia needs that parent company in

21  the lawsuit.

22         THE COURT: Okay. Well, the discussion has

23  been helpful. I've taken, as I've indicated, more than a

24  preliminary look at the papers. I'm going to not announce

25  a decision today but will shortly. I don't think that

20

1  whichever way I go on that, at this time it's going to

2  prevent us from entering upon a schedule and doing the other

3  work that we have to do here today. Everyone I'm sure will

4  agree with that. Is there anyone who dissents from that

5  view?

6          MR. SINDER: No, I think that is accurate.

7          THE COURT: All right. I think we can go ahead

8  and do our schedule. But the discussion, I thought I would

9  take advantage of having you here.

10         MR. SINDER: If I may, Your Honor.

11         THE COURT: Sure.

12         MR. SINDER: Since we don't believe that there

13  has been any showing sufficient to find jurisdiction or to

14  justify discovery, if the case went forward and you were to

15  dismiss Alcatel SA and in the discovery process, through

16  Alcatel USA, which they're obviously going to conduct, they

17  find information that suggests that Alcatel SA in fact is

18  performing activities that would subject it to jurisdiction,

19  you know, that's something they can address at that time and

20  if they can justify the fact that they couldn't have known

21  that earlier. We don't believe they're going to find that,

22  so I think it's a nonissue. You know, they could always

23  move to join them.

24         THE COURT: Well, and that is a fair point and

25  they could move the Court to reconsider, if it were to deny

21

1  or to dismiss and deny the motion for discovery. the Court
2  reconsider those rulings.
3     So, okay, thank you. Let's then talk about what
4  we have to talk about. We have two patents being asserted
5  in this case; right? The '306 and the '633.
6     MR. BLUMENFELD: Two against Cisco and one
7  against the other two defendants.
8     THE COURT: Yes. And I suspect at this point we
9  don't have a good understanding of how many elements are in
10  dispute, how many claims are being asserted. It's a little
11  early.
12     MR. CHERNEY: They haven't identified any
13  specific claims yet.
14     THE COURT: All right. Let's talk about another
15  legal issue, and that occurs at page three. And that's the
16  parties' positions on the claim construction that has gone
17  on heretofore in the Fore Systems Inc. case, both by Judge
18  Farnan and by the Federal Circuit. And I believe it's
19  the defendants' view that this court need not engage in
20  additional, further claim construction on those matters. Do
21  I have it?
22     MR. CHERNEY: That's plaintiffs.
23     THE COURT: I have it exactly the opposite.
24  Okay. So let's hear from Telcordia first.
25     MR. RAINEY: Your Honor, Richard Rainey for

23

1  deciding that the issue of claim construction was a pure
2  issue of law, much like parties would be bound if the Court
3  of Appeals for the Third Circuit were to rule on a statutory
4  construction issue. We believe it's an analogous situation
5  here.
6     THE COURT: Okay. And defendants believe that
7  Telcordia is bound but you are not. Who is going to take
8  this?
9     MR. CHERNEY: I will.
10     THE COURT: Okay.
11     MR. CHERNEY: Obviously, the reason we believe
12  Telcordia is bound is because they got to litigate the
13  issues. They put forth claim constructions. They litigated
14  the claim constructions. So we, our view is they're
15  collaterally estopped because they went up.
16     It doesn't sound like they're disagreeing with
17  it because they sound like they're happy with what happened
18  in terms of the claim construction in front of Judge Farnan
19  and the Federal Circuit. Our perspective as to us, in
20  contradiction to Telcordia, is take the example of, for
21  example, say I come up with something from the prosecution
22  history or argument from the specification. Or some other
23  argument in light of perhaps the Phillips case coming out. I
24  didn't get a chance to argue this, nor did the Alcatel
25  people, nor did the Cisco people at that time. We didn't

22

1  Telcordia.
2     Essentially, Your Honor, it's one of the patents
3  that is asserted in this case that was considered by Judge
4  Farnan and by the Federal Circuit in the prior Fore Systems
5  case that is the '306 patent which is common to all three of
6  the defendants in this case. And Judge Farnan had issued an
7  initial claim construction in that case which on the '306
8  patent resulted in a stipulated judgment of noninfringement
9  against Telcordia. That went up to the Federal Circuit and
10  the Federal Circuit reversed the claim constructions on the
11  '306 patent.
12     It then was remanded back to Judge Farnan who
13  considered an additional term in the patent which was also
14  disputed that the Federal Circuit declined to reach in the
15  appeal and Judge Farnan ruled in favor of Telcordia on that
16  claim construction as well. The case then settled so there
17  was not actually a full trial on that case.
18     But we believe that the issues as to the claim
19  terms that were addressed by Judge Farnan and by the Federal
20  Circuit certainly have been fully vetted and certainly the
21  Federal Circuit's rulings on that as a Court of Appeals
22  on a pure issue of law should be binding on any future
23  proceeding. We believe that is consistent with what the
24  Supreme Court was talking about when it issued its Markman
25  decision where it talked about uniformity and consistency in

24

1  have a chance to be heard on the claim construction point.
2     I'm not saying the Fore System lawyers didn't do
3  a good job, I just don't know. They put their best foot
4  forward given what is important to them. I don't know why
5  they argued the way they argued, whether things, more things
6  were important to them in terms of prior art, in terms of
7  infringement. They made the case they did and Telcordia
8  litigated with them and that worked out the way it did but I
9  didn't get to be heard and I didn't get to make the argument
10  and there may be arguments that I make or the Cisco people
11  or the Alcatel make that you say are all right.
12     THE COURT: That's an interesting argument.
13     MR. CHERNEY: Judge Farnan's decisions are out
14  there. Obviously, the Federal Circuit decisions are out
15  there. They're not going to be out of the way, although the
16  Federal Circuit expressed it's non precedential, so in some
17  respects I'm not sure they can cite it as binding precedent
18  in this case. They ruled the way they ruled that said it
19  was nonprecedential.
20     So I mean I didn't get to go up in front of
21  the Federal Circuit and say, you know, one of the judges
22  says okay. What is your answer to this question? You
23  know, maybe I would have answered a different way, a more
24  persuasive way. It's one of those things whereas always
25  with collateral estoppel the people that get to participate

25

1  are estopped but the people who don't get to participate
2  shouldn't be stuck because otherwise that would give a
3  company like Telcordia an incentive to go sue someone like
4  Fore Systems, perhaps knock them off and then come after
5  people like Alcatel, Cisco, Lucent and say, okay, you are
6  stuck with what Fore Systems did on this budget and based
7  on what they thought was important to them.
8       MR. RAINEY: Your Honor, on the issue of the
9  nonprecedential decision, actually the Federal Circuit has
10  expressly addressed that and said despite the fact that they
11  have labeled a prior decision on a claim construction as
12  nonprecedential does not bar that case from being cited and
13  considered in subsequent decisions, so the Court has
14  actually expressly addressed that very point.
15       THE COURT: But it's authoritative, not binding,
16  is that correct?
17       MR. RAINEY: Well, I think --
18       THE COURT: Or is that incorrect?
19       MR. RAINEY: I think stare decisis is the
20  principle of law that would apply to a nonparty in the
21  proceedings.
22       In any event, the issue of collateral estoppel,
23  I think Mr. Cherney is correct in articulating that the
24  theory, we would be bound by it. We obviously are happy
25  with the decision with Judge Farnan and subsequent ruling

26

1  and by the Federal Circuit in its appeal, so we're not going
2  to be advocating that those rulings should be different.
3  Whether collateral estoppel is the right theory or whether
4  we're just simply happy with those rulings is a matter we
5  can address.
6       THE COURT: Do you resist their contention that
7  they should be able to raise anew, or raise arguments that
8  were not advanced or actually argue claim construction to
9  this Court?
10       MR. RAINEY: I think as to the issues at the
11  very least decided by the Federal Circuit, I think that is
12  the law of the land as far as those claims are concerned.
13  To me, Markman doesn't make a lot of sense if, in every
14  subsequent case, the arguments Mr. Cherney makes are
15  applicable in every single patent case. There is nothing
16  unique about this situation that is different from any other
17  situation. Markman from the Supreme Court is going to have
18  no force or effect if a party can simply say you can
19  disregard what the Federal Circuit has done on this pure
20  issue of law simply because we found an argument that we
21  think is more persuasive than the argument the parties made.
22  I mean that, in our view, that just eviscerates what the
23  Supreme Court was trying to talk about in trying to come up
24  with an uniform, consistent approach in dealing with.
25       THE COURT: So there is a tension between a

27

1  finality and's a new party that was a nonparty about its
2  ability to advance its theory based upon a new theory
3  and/or perhaps adducing new evidence.
4       MR. RAINEY: I think that this is not a simple
5  issue that has a simple answer to it, but --
6       THE COURT: Okay.
7       MR. RAINEY: We believe that at the very least
8  what the Federal Circuit has said should be the end of it as
9  to those issues.
10       THE COURT: So for purposes of our schedule and
11  setting up a Markman process, what are the parties and the
12  Court should do, Mr. Cherney.
13       MR. CHERNEY: I have to take a look back at the
14  schedule.
15       THE COURT: Well, there is a process.
16       MR. CHERNEY: I mean right now we have a
17  schedule that seems to contemplate that both sides will
18  brief Markman issues.
19       THE COURT: It does. But I want, since it was
20  noted for, brought to my attention in your joint status
21  report.
22       MR. CHERNEY: It seems what we could do is that
23  each side should follow the process set forth here; and if
24  Telcordia wants to raise as some type of bar to us deviating
25  from that, they should raise it in the papers and cite

28

1  whatever support they have and we should argue to the
2  contrary just like anyone would in terms of support.
3  Essentially what they're saying in support of our claim
4  construction positions, they should be bound. "I hereby
5  cite the Federal Circuit's decision and I want to make some
6  type of argument based on Markman" and we will respond to
7  that at the time, but it seems as far as contemplating a
8  full Markman schedule and they're free to make this argument
9  at that time and we're free to respond.
10       THE COURT: Do you agree?
11       MR. RAINEY: Yes, Your Honor. I think that is
12  fine. And I would also add that the Markman schedule that
13  we have that talked about in this case contemplates patents
14  beyond the '306 patent which is the only patent that was
15  considered in the Fore Systems case that is now presently in
16  these cases. So we're still going to need a Markman
17  procedure to deal with the '633 patent and we have advised
18  the defendants we're planning to add additional patents in
19  this case and those patents will have to be addressed down
20  the road as well.
21       THE COURT: Okay.
22       MR. CHERNEY: And we have to talk about that.
23       I don't know if we're at the point yet in
24  talking about status report, about talking about adding
25  other patents and obviously that is something we'll have to

29

1  deal with right now in terms of being asserted. There is
2  only one patent asserted against Lucent and one patent
3  against Alcatel and the claim construction process that is
4  outlined obviously contemplated applying that process to the
5  '306 patent.
6          And so it sounds to me like we're in agreement
7  that Telcordia will make whatever arguments it wants to make
8  in terms of why it believes the Court and the parties are
9  bound by whatever occurred in the Federal Circuit and Judge
10 Farnan and we'll respond to it. It's premature to deal with
11 it at this point, it seems to me.
12         MR. RAINEY: We did not put this in the
13 scheduling order for the purpose of saying the parties
14 should be barred from addressing it.
15         THE COURT: That's fine.
16         MR. RAINEY: If they want to make their
17 argument, fine.
18         THE COURT: That's fine. I just wanted to be
19 sure we were clear on process.
20         MR. RAINEY: Absolutely, Your Honor.
21         THE COURT: It seems that the parties agree
22 impliedly or implicitly that this should be a consolidated
23 process up through at least probably the pretrial
24 conference, but I don't know that it's clear, I don't recall
25 that it's made clear in the joint status report that there

30

1  is an interest in consolidating these matters for trial.
2          MR. REINES: Your Honor, I think the way
3  everyone has been operating is really cooperating and there
4  has been good coordination and we can enter into a
5  scheduling order going forward without the formality level
6  of a consolidation.
7          THE COURT: Counsel, give me a name.
8          MR. REINES: Sure. Ed Reines from Weil Gotshal
9  on behalf of Cisco.
10         THE COURT: All right.
11         MR. REINES: Going to the actual level of
12 consolidating for purposes of discovery may have an appeal
13 until it becomes an impediment to the cooperation process.
14 I think it's the sense of the overall group, let's just keep
15 coordinating in an effective way and which we have been and
16 do that before we start changing case numbers and things
17 like that.
18         MR. RAINEY: I think our position is there is
19 no reason not to consolidate the cases for purposes of
20 discovery. I don't think we disagree at all. At this
21 point, it's premature to address consolidation for trial.
22         THE COURT: Why wouldn't the Court enter a
23 formal order consolidating the matters for discovery and
24 other pretrial purposes?
25         MR. REINES: Yes. I mean the way we structured

31

1  the entire statements so far is that assuming they wouldn't
2  be consolidated. So, for example, there is a reference to
3  the numerical limits that are done by case and so, for
4  example, each of the defendants has a number by virtue of
5  its being an independent case. So there is a disruption
6  quotient to what we've done. I'm not sure of the value of
7  moving to the formal consolidation order. Until that is an
8  impediment, I guess I would proceed the way everybody
9  proceeded.
10         THE COURT: I don't have a problem. If it
11 becomes later an issue, then we can address it. Okay.
12 That's fine.
13         The next issue that I see is there is a
14 difference of view as to amending and joining. Am I correct
15 in that?
16         MR. RAINEY: Yes, Your Honor. Your Honor, I
17 think that is one of the largest concerns that the defend-
18 ants have as a group is on this specter of new patents
19 coming in as much as a year plus after the case started. I
20 think Mr. Sinder is going to address that.
21         MR. SINDER: Yes. Your Honor, this is in
22 addition to what I indicated before about the plaintiff
23 knowing a lot about these defendants because it's basically
24 been corresponding or meeting with them over the years so it
25 knows a lot of what they do. This case has been pending for

32

1  nine months and our feeling is there comes a time when the
2  plaintiff ought to decide what patents it wants to assert.
3  They want to have until November, another, what, seven or
4  eight months of discovery in order to add patents. We think
5  they should decide now. In other words, if they haven't
6  asserted a patent against one of the defendants, we think it
7  should be basically too late.
8          One of the reasons for that has to do with
9  fairness and burden in discovery. We've gotten extensive
10 discovery requests from them. The parties have exchanged
11 some initial discovery requests after we filed the joint
12 status report.
13         At least from an Alcatel standpoint, we have a
14 variety of facilities around the United States and there
15 are prior art issues that are overseas and what not.
16 We're going to have to send people, search for documents,
17 interview potential witnesses and four or five months from
18 now or seven months from now, I don't want to have to do
19 that again with a whole new patent. I think that is really
20 prejudicial.
21         And I think based on the timetable that we've
22 seen here, we think they should decide -- they should have
23 decided already but we think they should decide now, before
24 we start the discovery process, whether they're going to sue
25 us on anything else.

33

1       MR. REINES:  And, Your Honor, just one thing to
2   add a background on Mr. Sinder's point about the length of
3   this interactions between the parties and Telcordia.  These
4   discussions go back well into the 1990s involving the
5   patents in suit.  So there are laches arguments and other
6   things which we don't need to discuss now.  But the
7   licensing negotiations at the portfolio level I think Mr.
8   Sinder mentioned to me earlier today started in 1991 between
9   Alcatel and Telcordia.  In our case, it was more the
10   1997-1998 time period.  I don't know Lucent.
11       So it's been an ongoing discussion for many,
12   many years.  To say now that they need more information or
13   whatever else nine months into the case, it would appear to
14   us that it's time for the parties to put a schedule together
15   and discovery limits based on what has been developed to
16   date.
17       MR. CHERNEY:  And I just want to raise one
18   anecdote in terms of how does this come up practically in
19   this case so far.
20       As Mr. Sinder, Mr. Reines said, we were sued all
21   together nine months ago.  Telcordia asserted two patents
22   against Cisco, one patent against Alcatel, one patent
23   against Lucent.  At that point, we said, well, we never
24   heard of this other patent that they're asserting against
25   Cisco.  They never mentioned it to us.  We got together in

34

1   settlement conversations.  Since then, they don't bring it
2   up.  We don't spend the last nine months focusing on that
3   patent or any other patent.  They know how our products
4   work.  They apparently know how our products work enough
5   to assert one patent against us.
6       We get into the joint status report conference
7   and the people at Telcordia are kind enough to send us a
8   draft of what they think the joint status report should look
9   like.  And it says we are contemplating asserting the other
10   patent from the Cisco case against Lucent and Alcatel and it
11   also has a portion in there that says we would like until
12   November 18th to add other things.
13       So I say to the people at Telcordia a couple
14   things.  First of all, why am I hearing this for the first
15   time about this patent?  There has been no discovery.  Why
16   am I hearing this for the first time after nine months and
17   many years into it, you contacting me.  I could be using
18   these nine months to prepare.  And I don't really get an
19   answer as to that.
20       And I said, are there other patents that you
21   have, when you say you are contemplating?  Because it would
22   be very helpful both in terms of this patent that they're
23   asserting against Cisco and any other patents, in terms of
24   doing the joint status report because we're trying to set
25   discovery limits and the schedules and all that.  Or is this

35

1   just a catchall you are trying to put in?  And the quote
2   that came from Telcordia was it's just a catchall in case we
3   want to add some patents.
4       Just about the time we ended the joint status
5   report, and as the joint status report reflects, no other
6   patents were added as of that time so we went forward again
7   on the basis of one patent being asserted against Lucent
8   after this nine month process.
9       Immediately thereafter, a lawyer, an in-house
10   house lawyer from Florida called Ms. Drager, who is an
11   in-house lawyer at Lucent, and said, well, looks like we're
12   leaning towards asserting the patent we asserted against
13   Cisco against you guys.  And, of course, now we're past
14   having drafted this document which we drafted in part based
15   on only having one patent in suit.  Okay?  And we're past
16   obviously the nine months we could have done anything.  And,
17   you know, from a business perspective, a legal perspective,
18   of course, that is somewhat troublesome.  This is about a
19   week ago.
20       A couple days ago, the same lawyer called Ms.
21   Drager up and said we're thinking about, it looks like we're
22   going to add in another patent, a patent called the Lao
23   (phonetic) patent.  It's a patent that is going to expire in
24   three years.  It's about 15 years old.  So all these patents
25   are old patents, they're not new patents, just issues.

36

1   They've been out there.
2       And Ms. Drager says, Where did this come from?
3   Nothing has changed in the last nine months.  There has been
4   no discovery.  This is just happening now after this whole
5   process.  And I think Ms. Drager, she didn't really get an
6   answer as to that.
7       And she said, Okay.  What else?  And he says,
8   well, there might be other patents.  And she goes, What
9   patents?  Well, I'm not allowed to tell you that.  I said,
10   What products?  I've been told I'm not allowed to tell you
11   that either.
12       So in some respects what I'm concerned about
13   obviously is the level of prejudice hearing about this for
14   the first time after nine months and after we have gone
15   through the process trying to cooperate with the schedule.
16   And I'm not asserting -- I've known Mr. Rainey for a long
17   time.  We used to be partners at Fish & Neave but there is a
18   level of prejudice here where nothing has changed over the
19   last nine months or year.  It's not like, well, we got
20   discovery and we found out that you now infringe the patent
21   we asserted against Cisco nine months ago or the law meant.
22       And now, it just seems like one of two things is
23   happening:  Either they had a basis to assert those patents
24   nine months ago and didn't, and I don't know why they
25   didn't, okay?  Or they did have a basis, and I can't figure

37

1  out why they didn't have a basis now because nothing has
2  changed in the last nine months.
3        And so what I'm concerned about also is that
4  this is going to render, this proceeding before you now,
5  somewhat superfluous and we'll have to redo this again.
6  Because I don't, for the life of me, have any sense of
7  what's the scope of this case. When they say that they
8  talked to us about adding patents, it's what I just told you
9  about. No one has come to me from the lawyer side and said
10 we're adding. They can't do it as a right anymore because
11 there has been responsive pleadings so no one came to me
12 saying they will accede to adding patents in.
13       So here is the situation that we're at: If
14 they're talking about adding other patents in now, what we
15 have is a situation where we have to work-up defenses, take
16 a certain amount of time, you know, to respond, hopefully
17 obviously more than 20 days to try to figure this all out.
18 Then we've got to talk about the schedule while we've
19 already got a discovery schedule, and then we're talking
20 about a case, then we're talking about issues of
21 consolidation.
22       I, for the life of me, don't know which patents
23 are being asserted against who anymore so I don't know how
24 we can talk about issues of consolidation, what the scope of
25 the case is, what the scope of the trial should be, okay?

38

1  And I feel like when I asked specifically, what, put your
2  cards out on the table so we can make this joint status
3  report somewhat productive in terms of trying to tailor this
4  to the case at hand, not to the case that will exist, you
5  know the answer I got was: I don't have anything in mind.
6  I'm just trying to put catchalls in there to protect my
7  client if I want to ever assert something.
8        But, you know, that is not the case right now.
9  One day after that, two patents -- or a few days after that,
10 two more patents have come up. I don't have any idea of
11 their status. Cisco hasn't been contacted so I don't know
12 if they're planning to assert the Lau patent against Cisco
13 or Alcatel or any of those. So I feel like we're in a
14 position now where we can't productively try to work all
15 this together to come up with a comprehensive plan that
16 takes into account the scope of the case.
17       Within the least week, according to Telcordia,
18 this case has just tripled in size in terms of patents and
19 these are not related patents. It's not like three patents
20 in the same chain. This case from their perspective, for
21 nine months it has been one patent, the '306 patent that
22 expires in 2007. Now, as of last week, it's three patents,
23 and with no assurance that that is all that is on their mind
24 and no explanation why we're hearing about this for the
25 first time in nine months.

39

1        THE COURT: Any response, Mr. Rainey?
2        MR. RAINEY: Sure. If we can just back up a
3  second. The proposal that is on the table from the
4  defendants is that the plaintiffs have no right at all to
5  even file a motion to ask Your Honor to consider whether it
6  would be appropriate to add a patent.
7        THE COURT: Well, that is probably a nonstarter.
8        MR. RAINEY: And all of these arguments that we
9  are hearing all have responses on an individual basis and
10 the question is, or the issue then is if we file a motion to
11 amend, which I think we probably will do at some point in
12 time in the very near future.
13       THE COURT: I would very much like to avoid the
14 need for that if we can arrive at some accord today, but go
15 ahead.
16       MR. RAINEY: We talked about nine months. I
17 mean, Your Honor, we, Telcordia filed the suit and did not
18 serve the complaint for the full 120-day period or nearly
19 the full 120-day period with an effort to try and resolve
20 not only the issues with respect to the patents that were
21 asserted but a resolution globally with the defendants.
22 That was not satisfactory.
23       We served complaints. There has been some
24 extensions of time but absolutely no discovery has taken
25 place thus far in the case. So to argue that somehow the

40

1  defendants have been prejudiced by the fact that we haven't
2  moved to amend at this point in time doesn't seem to make a
3  lot of sense to me.
4        THE COURT: Well, I think they feel prejudiced.
5  At least from what I understand, they feel they're
6  prejudiced. They feel they're looking at a moving target,
7  as it were. That they essentially have gotten communication
8  from Telcordia, one or more of the defendants has, that
9  would suggest there may be additional patents that are going
10 to be asserted and that we really do need to get about the
11 business of pinning that down. The question for the Court
12 is how much time should you be allotted further, how much
13 additional time you should be allotted to answer that
14 question. And I can tell you that November is also a
15 nonstarter for the Court. Okay? So let's talk about it
16 from there.
17       MR. RAINEY: The November date, your Honor, was
18 a date that we, the parties had agreed upon for a date for
19 amending the pleadings generally.
20       THE COURT: That is not acceptable. Let me
21 tell you, this case is a lot longer in the tooth then I
22 would like it to be and it's going to get a lot longer
23 unfortunately because of the Court's schedule.
24       As much as I would have liked to have compressed
25 the schedule that the parties had proposed, I didn't see

41

1   that it made a lot of sense, given the earliest time that
2   I could probably do it, given what I had in front of me,
3   looking at the joint status report. And I'm open to
4   discussing an earlier trial date, but right now I have
5   4/16/07. That's really beyond, way beyond where I wanted to
6   be with this case. But looking at the increments, the time
7   lines that are proposed to get things done, and knowing, for
8   instance, on summary case dispositive motions or issue
9   dispositive motions, should they be permitted to be filed,
10  how much time I will need to resolve them, we end up out
11  there. So go ahead.
12           MR. RAINEY: I guess the question is how much
13  time does Telcordia need to determine what patents to bring
14  into this case. I would submit it has taken Telcordia quite
15  a bit of time to do the analysis of the products to get to
16  the situation that it is in at this point. Notwithstanding
17  the allegation that it has known, it has been all knowing
18  for all these many years, that just simply isn't the case,
19  certainly not all knowing in the sense that we felt
20  comfortable filing a complaint for patent infringement.
21  There is a difference.
22           The rule requires us to do a certain amount of
23  investigation. We have filed, we have only gone forward on
24  the patents that the lawyers have completed their due
25  diligence on. And when the due diligence is completed on

42

1   additional patents, to the extent it makes sense to bring
2   them into the case, we would seek leave to do that at that
3   time. There has been no delay. Nobody has been sitting on
4   the situation from our end.
5            MR. CHERNEY: Your Honor, from our perspective,
6   I mean I hear that. I understand there is a level of
7   diligence. I understand we've been sitting here for nine
8   months. There isn't a lot of time for diligence but when
9   things happen the day after we filed, we complete the joint
10  status report, when they happen two days after, when my
11  client is being called by Telcordia saying, okay, now we're
12  going to assert this patent against you, now we're going to
13  assert this patent against you, either they completed their
14  diligence and they're making those calls because they have a
15  reason to make those calls because they feel like they've
16  done their diligence or they haven't.
17           What I would like -- I mean I assume the people
18  at Cisco and Alcatel feel the same way but I can't speak for
19  them -- is for Telcordia to put their cards on the table and
20  say here is what you know is our view, right now, based on.
21  If they want to later down the road bring a motion to amend
22  based on something that they learned later, didn't know
23  about, that's different. At that point, they can then
24  explain why they couldn't have done it earlier. They can
25  say, look, we didn't know about it. We only found out now.

43

1   But no discovery has occurred as Mr. Rainey has said and now
2   patents are being added kind of sub rosa by calls from
3   Telcordia to Lucent.
4            THE COURT: So you want to propose, Mr. Cherney,
5   and perhaps your colleagues as well, a cutoff for the
6   plaintiff to, as a matter of right, amend. Is that what you
7   are saying?
8            MR. CHERNEY: Well, not at a matter of right.
9   What I would like them to do is put their cards on the table
10  as table on what they know now and then later on, if they
11  want, if they feel like they want to add something within
12  some short period of time. Obviously, November is a
13  nonstarter at that point. If they want to do it, part of
14  the process will be saying why they couldn't have done it
15  back when in, you know, nine months ago or some time in that
16  period.
17           THE COURT: And file a motion.
18           MR. CHERNEY: And, okay, file a motion or
19  explain to us, maybe we could agree. But to say, look,
20  Steve, we've now got the '936 patent. We didn't put that in
21  because we didn't know you would do X. And if it's
22  believable, we'll, you know, hopefully we'll be able to work
23  things out, but right now it sounds to me they've got enough
24  that they're calling my client and saying, the day after we
25  file a joint status report based upon one patent, we're

44

1   going to start tripling the amount of patents, well, either
2   they got the support for that -- and, you know, like I said,
3   my view is that I don't know what changed. Mr. Rainey said
4   they've been doing an analysis. I'm not going to gainsay
5   him on that point. What I'm saying is put your cards on the
6   table. We're here nine months into the process. Put your
7   cards on the table.
8            THE COURT: Now, Mr. Sinder wants it done today.
9            MR. SINDER: Well --
10           THE COURT: Mr. Rainey is going to resist that.
11           MR. SINDER: Your Honor, I didn't mean to imply
12  if they said okay, in 10 days we'll file our motion, that I
13  was going to say the Court shouldn't permit them to do that.
14  I mean we're just embarking on discovery. It's going to be
15  extremely prejudicial to Alcatel I think in particular but I
16  think all the defendants have to go through the process
17  of responding to that a second or a third time as patents
18  get added. I think that should be taken into consideration
19  very heavily.
20           The second thing is I get the impression that
21  what the plaintiff wants to do is to serve broad discovery
22  requests which they have and the scope of them covering
23  everything the company makes basically and go on a fishing
24  expedition and see if they can find anything else we do
25  which might come within the scope of some patent in their

45

```
1   portfolio.
2           THE COURT: So what would you like to propose?
3           MR. SINDER: Well, I frankly believe the Court
4   should say to them they've been studying these, they've
5   sorted of admitted they're now doing their due diligence.
6   You know, give them ten days or two weeks to decide what
7   they want to add. Let them move to add those patents. We
8   might -- depending on what they are, maybe we wouldn't
9   oppose it if they come to us and can justify why it is they
10  didn't move sooner but I don't really think they should have
11  any substantial period of time after that to add patents
12  because of the prejudice and because it so effects the
13  schedule in this case.
14          THE COURT: Well, that is --
15          MR. CHERNEY: That is part of the problem.
16          THE COURT: -- a principal concern.
17          MR. CHERNEY: That was one of the main concerns
18  from my perspective was that we worked out together a joint
19  status report based on one regime and the regime has changed
20  even in a week from then. And I don't want to move too far
21  down the road both with the other side and with the Court
22  that we can't then make a schedule, a status report and a
23  regime that reflects the actual scope of the case, not the
24  scope of the case as it existed for the last nine months.
25          MR. RAINEY: Can I? If I might, Your Honor.
```

46

```
1           We specifically mentioned the prospect of adding
2   patents in the case during the course of the Rule 26
3   conference to most of the lawyers and we specifically didn't
4   negotiate a shorter schedule or a more aggressive schedule
5   with the single patent defendants with the express notion
6   that the Cisco schedule, which does involve two patents
7   already, was a lengthy schedule with additional discovery
8   and et cetera, et cetera with the idea that we would take a
9   little bit of a longer view with the Lucent and Alcatel
10  defendants to accommodate a single schedule for all three
11  defendants.
12          So I don't think there this constant discussion
13  about shock and surprise that we might be adding patents to
14  a lawsuit is really all that credible. Moreover, this is a
15  patent infringement case and it is not all that uncommon
16  that a plaintiff might find an additional patent during the
17  course of the litigation that it want to add into the case.
18  These are sophisticated patent attorneys.
19          THE COURT: The question is just how much time
20  is reasonable.
21          MR. RAINEY: Certainly. And certainly 10-to-14
22  days, we're not going to have any documents.
23          THE COURT: I don't have a problem with your
24  argument there. You need to make a counter-proposal.
25          MR. RAINEY: I was thinking. The proposal is
```

47

```
1   six months out.
2           THE COURT: Right.
3           MR. RAINEY: I think in four months, we can get
4   discovery from the defendants and we can get some
5   depositions taken and that would be a good outside window.
6           THE COURT: I'm going to give you 60 days.
7           MR. RAINEY: That's fine, Your Honor.
8           THE COURT: I'm going to give you 60 days. I'm
9   going to have you prepare the stipulated schedule as the
10  plaintiff, if you would, Mr. Bailey.
11          MR. BALICK: I'll be happy to, your Honor.
12  Thank you.
13          THE COURT: And whatever that date is -- do
14  we have April's calendar? Yes. What is 60 days out? We
15  should announce the dates so we're all in agreement.
16          MR. RAINEY: Your Honor, just for clarification,
17  is that 60 days? What is the cutoff for amending the
18  complaint?
19          THE COURT: Yes.
20          MR. RAINEY: That is going to be applicable to
21  both sides in the case?
22          THE COURT: Everything that we're going to set
23  here today.
24          MR. RAINEY: Thank you, Your Honor. That's
25  fine.
```

48

```
1           MR. CHERNEY: Your Honor, I want to make sure I
2   understand. For example, there is two situations here.
3   Obviously if we take the deposition of one of their
4   inventors after that date and he says, yep, I knew about
5   this reference, I deliberately didn't put it in front of the
6   Patent Office, I assume they're not going to argue it is
7   coming to you and asking for a motion to amend on
8   inequitable conduct.
9           THE COURT: I would hope not.
10          MR. CHERNEY: I wanted to make sure.
11          THE COURT: Because that is going to generate
12  additional time that none of us should be spending.
13          MR. RAINEY: And likewise, if we're not given
14  adequate discovery and suddenly something pops up nine
15  months from now and its makes a clear case, it goes both
16  ways.
17          THE COURT: I agree with both of those.
18  Everything goes both ways here. And should it come to pass
19  that the Court becomes concerned that the parties aren't
20  acting in good faith, there are remedies for that.
21          MR. RAINEY: Absolutely, Your Honor.
22          THE COURT: Okay. June 14th is the cutoff,
23  okay, '05.
24          MR. RAINEY: Yes. Thank you, Your Honor.
25          MR. CHERNEY: Thank you for clarifying that.
```

49

1  Your Honor.

2      THE COURT:  All right.  Then what about joining

3  parties?  July 15 is what I believe the defendants proposed

4  and additional parties should be joined on or before July

5  15.

6      MR. RAINEY:  Yes.  There again, it was just,

7  we had talked about an amendment of the pleadings date of

8  November and they proposed an earlier amendment date of July

9  I think now.

10     THE COURT:  Do you want to make it the same

11 date?

12     MR. RAINEY:  I think that is logical.

13     MR. CHERNEY:  That's fine.

14     MR. SINDER:  (Nodding yes.)

15     THE COURT:  The next yellow marks I have.  Oh.

16 At page 11 in paragraph C, that's the next point that I

17 have.  If I miss something, you should call it to my

18 attention as we work through this document.

19     MR. RAINEY:  Your Honor, on page nine, I think

20 this is one dispute you might have passed over.

21     THE COURT:  I missed one?

22     MR. RAINEY:  Having to do with the defendants'

23 date by which time they have to elect to rely on advice of

24 counsel.

25     THE COURT:  Yes, yes, yes.  Okay.  Let's talk

50

1  about it.

2      MR. CHERNEY:  Ed.

3      MR. REINES:  Yes.  Our thinking on that is the

4  issue is when should we have to take a position on whether

5  we're disclosing a willfulness opinion or not and our view

6  is that the logical time period for that is after the Court

7  issues its claim construction order.

8      THE COURT:  And I think that Telcordia asked,

9  well, why?  What does that have to do with anything?

10     MR. REINES:  And what that has to do with --

11 there is a host of reasons but one is, as Your Honor could

12 imagine, might be that willfulness opinion has, as a

13 premise, a claim construction that is inconsistent with

14 what the Court ultimately rules and that might make it so

15 prejudicial to.  I mean one would want to know whether that

16 is true before making the decision.  It's highly material

17 to that strategic decision.  That is an important and

18 difficult decision and there is no cost.  There will be

19 sufficient time for willfulness discovery from, let's say,

20 April '06 to April '07.  That's a year.  And somehow the

21 parties will be able to manage to do the very limited scope

22 of willfulness discovery, should the parties wish.

23     THE COURT:  Well, here.  Let's put some flesh on

24 these bones.  Markman is going to take place on March 22, at

25 10:00 o'clock.  That is in '06.  Okay?  At 10:00 o'clock.

51

1      Given what you have proposed to me as the regime

2  for the exchange, the meet and confer, the exchange of claim

3  charts, and the briefing, the Court would like approximately

4  30 days with the briefs before the Markman hearing.  So you

5  proposed a completion of briefing date of February 17, so I

6  tried to come within that 30-day time window that we have

7  found out, over experience, gives us adequate time to digest

8  your Markman briefs.

9      While we're at this paragraph at page 13,

10 paragraph C, you should make provision; and perhaps this was

11 on your minds when you wrote the language that you wrote;

12 for the submission of a final claim chart to the Court prior

13 to the submission of briefs.  And those are going to be the

14 positions obviously as well as the briefing positions that

15 you will be locked into.  The chart should have references

16 to the intrinsic record so that we can more easily navigate

17 our way, my clerk and I, around the record.

18     All briefing should contemplate the provision of

19 an original and two, okay?

20     MR. CHERNEY:  Okay.

21     THE COURT:  So with that in mind, counsel, why

22 don't you finish up your thoughts.

23     MR. REINES:  Your Honor, just one other thought

24 on that.

25     THE COURT:  Yes.

52

1      MR. REINES:  An original and two, we can do.

2  Something that also might make sense in the case of this

3  complexity is for the parties to deliver a binder set that

4  is organized the way we would have our status organized for

5  us; and I'm sure the parties can agree on this globally; and

6  then deliver those in whatever duplicate copies you want so

7  it's all in one and it's tabbed nicely and everything else.

8      THE COURT:  Yes.

9      MR. REINES:  Is that a good idea?

10     THE COURT:  Yes, I think it is a good idea.

11     MR. RAINEY:  That's fine, Your Honor.

12     MR. REINES:  So the issue is, on willfulness,

13 obviously as the Court knows, the plaintiff can assert

14 willfulness quite easily without much diligence at all and

15 that puts the defendant in a very difficult position as to

16 whether to waive the attorney-client advice they have which

17 would normally be confidential.  And as the Federal Circuit

18 has noted, that puts, that requires particular concern by

19 the trial judge to insure that they're minimizing the

20 prejudice to the defendant as a result of that difficult

21 choice.

22     And different courts have done it different

23 ways.  In the Northern District of California, we do it one

24 way.  That is just a model.  That is not the way it is every

25 way.  But the thought is after claim construction issues,

53

```
 1  everyone knows the lay of the land, knows what the issues
 2  are going to be for trial that's so much of a richer record
 3  for the people to make the decision as to whether they want
 4  to choose.
 5          THE COURT: I don't have difficulty with that
 6  proposal. Mr. Rainey, do you feel a prejudice as a result
 7  of? Your Markman is going to be, you will get it within
 8  your order, within 30 days, more or less, of the March 22
 9  Markman date. Okay? So you want to propose some period
10  thereafter?
11          MR. REINES: That's fine. However, a month, 60
12  days of discovery on willfulness issues thereafter is fine
13  by us. The concern we have with pulling the issue of
14  reliance of advice of counsel on discovery, if they elect to
15  rely on advice of counsel, out of the discovery period and
16  creating a satellite discovery process.
17          THE COURT: It's a stage. It's staged
18  discovery.
19          MR. RAINEY: But presumably by the time Markman
20  comes out, fact discovery will have closed.
21          THE COURT: Right.
22          MR. RAINEY: And we're going to be then into
23  expert discovery, and I'm not sure what -- the concern I
24  have is I don't know what additional discovery is going to
25  be implicated by the decision to waive privilege on an
```

54

```
 1  opinion of counsel. I just don't know what that is going to
 2  implicate. So the only concern is we have may have taken a
 3  deposition and then need to retake the deposition again.
 4  For example, if there is some waiver of privilege. I'm just
 5  concerned about creating a satellite discovery proceeding.
 6          THE COURT: I understand.
 7          MR. REINES: That's our risk. We're the ones
 8  with the witnesses on the willfulness issue. That's not
 9  their witnesses. So it would be a focused willfulness
10  discovery if people waive. If people don't waive, there is
11  no discovery period, obviously. And if there is a discovery
12  period, then we'll make people available and cooperate like
13  we're doing and intend to do so.
14          MR. RAINEY: Your Honor, as long as there is not
15  going to be any pressure against us.
16          THE COURT: Should it come to pass that one or
17  more of the parties needs a feeling to come to the Court and
18  request that it reopen fact discovery, you can do that, but
19  I suggest to you that if you're careful in how you frame
20  your discovery in the willfulness phase, it shouldn't be a
21  problem but.
22          MR. REINES: Agreed.
23          THE COURT: I do understand. I don't hear you
24  to resist exactly the reasons that the defendants seek what
25  they seek in terms of the timing and I understand you have
```

55

```
 1  articulated your position.
 2          MR. RAINEY: Yes.
 3          THE COURT: I think we can account for that.
 4          MR. RAINEY: In terms of the proposal of making
 5  the decision four weeks, I mean that's a -- you know, if
 6  we're going to create this period, you know we can do it
 7  reasonably expeditiously within that time period.
 8          THE COURT: That's fine. You can agree on a
 9  date after I leave. Whatever you agree upon. I think you
10  said 60 days.
11          MR. REINES: Sixty days of discovery, that would
12  be fine.
13          THE COURT: So April 22nd.
14          MR. REINES: That's fine.
15          THE COURT: That is what you want to tag it on
16  to that in.
17          MR. CHERNEY: That's fine.
18          MR. REINES: That's fine.
19          THE COURT: Look at your calendar.
20          MR. RAINEY: That is going to be 60 days from
21  your decision --
22          THE COURT: What were you proposing?
23          MR. RAINEY: -- or their decision.
24          MR. REINES: My understanding is, I mean I think
25  we need to think it out carefully. If we assume the
```

56

```
 1  decision comes out on April 22nd, we should have at least
 2  two weeks to make the decision, and then we can do 60 days
 3  of discovery from the date that we make the decision one way
 4  or the other.
 5          MR. RAINEY: The point is 60 days from the point
 6  they elect to rely on opinion of counsel.
 7          MR. CHERNEY: Right.
 8          THE COURT: Is that acceptable, Mr. Rainey?
 9          MR. RAINEY: I want to make sure I understand
10  what the proposal was, yes.
11          THE COURT: So whatever that is, you can pull
12  your calendars, at the time.
13          THE DEPUTY CLERK: July 10th.
14          MR. RAINEY: That's fine, Your Honor.
15          MR. SINDER: Your Honor?
16          THE COURT: Yes.
17          MR. SINDER: You had invited us to mention if
18  there was something we wanted to raise that we passed by.
19          THE COURT: Yes.
20          MR. SINDER: I wanted to bring the Court's
21  attention to on page six, it's paragraph 4-B, the first
22  sentence.
23          THE COURT: I have it highlighted. I just did
24  not --
25          MR. SINDER: Alcatel has an agreement with
```

57

1  Telcordia.

2      THE COURT: Yes, but I'm not going to give you a

3  chance to file an early motion on that. I'm not going to do

4  it. I'm not going to do it.

5      MR. SINDER: Even though this is --

6      THE COURT: No, I'm not going to jump that

7  motion up in the queue in front of other matters that I

8  currently have. I'm just not going to do it. Okay?

9      MR. SINDER: I understand, Your Honor.

10     THE COURT: Okay.

11     MR. SINDER: You've been pretty emphatic on

12  that.

13     THE COURT: Okay. Great. Let's move on.

14     I think we were at C on 11 where it appears that

15  the parties are in agreement that information and materials

16  from other litigation will be able to be used and will be

17  produced in this litigation; is that correct?

18     MR. RAINEY: The only -- absolutely, we are

19  going to produce the Telcordia production to the defendants

20  in this case. The only issue in, with respect to giving the

21  defendants access to every single sheet of paper that was

22  generated in that case is going to be the protective order

23  that existed in that case and confidentiality concerns of

24  Fore Systems. I haven't even looked into that but Fore

25  Systems produced confidential information to Telcordia in

58

1  that case pursuant to a protective order which included an

2  "outside counsel eyes only" designation.

3      THE COURT: I just don't want to have a

4  discovery dispute over that. Mr. Cherney, do you want to?

5      MR. CHERNEY: I'm happy to try to work this out

6  with Mr. Rainey in the first instance. The stuff you don't

7  have a concern with, you will send to us expeditiously.

8      MR. RAINEY: Yes.

9      MR. CHERNEY: So there is that and we will talk

10  and work out a protective order that will cover that and I

11  guess also get the people from the Fore Systems involved,

12  but it just seems there is a large corpus out there. It

13  didn't make sense to wait for discovery responses. Let's

14  get that exchange as soon as possible, to the extent that

15  you feel as you can without, you know, getting a prior

16  protective order of Judge Farnan.

17     MR. RAINEY: I think as I said before, we'd be

18  happy to do that.

19     MR. CHERNEY: I'll talk to you afterwards about

20  a schedule.

21     MR. RAINEY: That's fine.

22     THE COURT: Okay. Let me circle back and say I

23  think it's worth taking the time to say a word about the

24  discovery disputes. It just strikes me there is a high

25  potential for them in this case. I will entertain them to

59

1  a point. After I arrive at the point that I feel they're

2  vexatious to me and my staff, I'm going to send you off to a

3  discovery master, okay? And you are going to have to pay

4  for that. Your clients will have to pay for that. And I've

5  got to believe that, there is in-house counsel here, you are

6  not going to be real happy about that. So get your lawyers

7  to behave themselves, okay? And we'll get along just fine.

8  We'll get along just fine.

9      But in this district, the district judges handle

10  in the main the discovery disputes. We only have one

11  magistrate judge, unlike the Northern District of California

12  which is rich with magistrate judges. And in spite of the

13  fact that we are on a per judge basis the busiest district

14  court in the country handling patent matters, we still

15  can't get another magistrate judge. It's my mind boggling.

16     In any event, a word to the wise. Let's keep

17  the noise down to a dull roar on discovery disputes.

18     And discovery matters, not just disputes but

19  matters that affect the schedule should be raised in the

20  same fashion as so-called discovery disputes. Please don't

21  file motions if you can't agree on an extension of some

22  thing and therefore file a stipulation. And by the way, any

23  stipulations that you agree to, I need an explanation as to

24  why there is a stipulated agreement between and among the

25  parties. But don't just willy-nilly run off a motion. Dial

60

1  up chambers if you have a question. Is this something the

2  judge would rather handle by teleconference or by motion?

3  Call and ask for us if you have a question, okay? Thanks.

4      Well, let's talk about, there is a jury demand

5  in each of these cases so these will be jury trials.

6      MR. RAINEY: Yes, Your Honor.

7      THE COURT: There is I think a joint request for

8  two weeks per trial. Normally, I would be disinclined to

9  grant two weeks for a one patent case and so therein lies at

10  least part of the need to put to bed. How many patents are

11  we going to have in suit here? So at this stage, I'm going

12  to accede to the request for two weeks on each matter

13  anticipating because it's easier for me to contract than

14  expand the schedule, anticipating that there may well likely

15  be additional patents that will be brought in this case. So

16  that is what I'm going to do.

17     Is there anyone in the room today who believes

18  that you need more than two weeks to try these matters?

19     MR. CHERNEY: Certainly based on what we

20  currently know, we have no basis to ask for more than two

21  weeks.

22     THE COURT: All right. I'm glad to see that the

23  parties agree that you should include a referral to the

24  magistrate judge in the scheduling order. Is that still the

25  case?

61

1          MR. RAINEY: Yes, Your Honor.

2          MR. REINES: Yes, Your Honor.

3          MR. CHERNEY: Sure.

4          THE COURT: Okay. That should be in there.

5          We set Markman for a 3/22 at 10:00 o'clock. I'm

6     just going to block off the day. I don't think we should be

7     longer than a day but I'll block it off. And hopefully we

8     won't need a day if the current numbers of patents -- you

9     want to say something?

10         MR. CHERNEY: No, no. I was about to echo what

11    you were saying is based what we currently know, there is no

12    basis to do that, obviously in large part depends on what

13    the scope of the case is at that point.

14         THE COURT: Right. I'm going to set 9/18 at

15    10:00 o'clock, this is in '06, as the date for the

16    teleconference to consider letter briefs seeking summary

17    judgment.

18         The Court, if not specifically, at least

19    impliedly intends to implicate or state by implication that

20    the time intervals for briefing and the like, to the extent

21    they deviate from the local rule, are acceptable.

22         I've set the trial down far enough out that I

23    think we can give you those time intervals and still decide

24    any motions that are permitted.

25         And, unless I comment on a date, the dates that

62

1     you have set down in this joint status report are acceptable

2     to the Court.

3          Your pretrial order is going to be due by the

4     close of business on February 16, '07.

5          Pretrial conference will be March 15, '07, here

6     in this room, beginning at 10:00 o'clock.

7          I'd like the schedule, the stipulated schedule

8     back to chambers, well, filed electronically, what is today?

9     By next Friday. Is that nearly enough?

10         MR. CHERNEY: That's fine.

11         MR. RAINEY: That's fine, Your Honor.

12         THE COURT: I don't see anything else that I

13    have highlighted. Hold on. Well, yes, there is another.

14    There is an 8/11 date for submission of a joint agenda

15    letter identifying Daubert issues. I'm going to set a

16    September teleconference date for that. We'll get back to

17    you on that.

18         There is another issue and that's set out

19    in paragraph K at page 14. This is an issue of the

20    disagreement over numbers of depositions and links the

21    depositions. I got to tell you I'm not inclined to get

22    involved in that. I'm just not. You are going to have to

23    work that out.

24         MR. REINES: I think that makes sense. We'll

25    live under the --

63

1          THE COURT: I think the federal rules are well

2     set up to.

3          MR. CHERNEY: We'll work it out.

4          THE COURT: Okay. Anything that I have missed

5     or anything else that you want to talk about?

6          Okay. Ms. McDavid is going to come back with a

7     date for the Daubert telephone conference. I'm going to

8     leave you, wish you safe travels and good day.

9          (Conference ends at 3:25 p.m.)

**'**

'05 [1] - 48:23
'06 [3] - 50:20, 50:25, 61:15
'07 [3] - 50:20, 62:4, 62:5
'306 [7] - 21:5, 22:5, 22:7, 22:11, 26:14, 29:5, 38:21
'633 [2] - 21:5, 28:17
'936 [1] - 43:20

**0**

04-874 [1] - 1:8
04-875 [1] - 1:13
04-876 [1] - 1:18

**1**

10 [1] - 44:12
10-to-14 [1] - 46:21
10:00 [6] - 50:25, 61:5, 61:15, 62:6
10th [1] - 56:13
11 [3] - 10:20, 49:16, 57:14
12 [3] - 13:22, 15:1, 17:19
120-day [2] - 39:18, 39:19
13 [4] - 14:22, 14:24, 18:12, 51:9
14 [4] - 1:21, 14:15, 14:16, 62:19
14th [1] - 48:22
15 [5] - 13:21, 35:24, 49:3, 49:5, 62:5
16 [1] - 62:4
16(2)(b) [1] - 4:4
16.2(b [1] - 1:21
17 [2] - 15:24, 51:5
18th [1] - 34:12
1990s [1] - 33:4
1991 [1] - 33:8
1997-1998 [1] - 33:10

**2**

20 [1] - 37:17
2002 [1] - 17:16
2005 [1] - 1:21
2007 [1] - 38:22
22 [2] - 50:24, 53:8
22nd [2] - 55:13, 56:1
25 [1] - 46:2
27 [1] - 13:24
2:00 [3] - 1:21, 4:6

**3**

3/22 [1] - 61:5
30 [2] - 51:4, 53:8
30-day [1] - 51:6
3:25 [1] - 63:9

**4**

4(k)(2 [7] - 9:2, 9:20, 9:23, 15:8, 15:12, 15:17, 15:21
4-b [1] - 56:21
4/16/07 [1] - 41:5

**5**

5,000 [1] - 19:18

**6**

60 [8] - 47:6, 47:8, 47:14, 47:17, 53:11, 55:10, 55:20, 56:2, 56:5

**7**

7 [1] - 17:15

**8**

8/11 [1] - 62:14

**9**

9/18 [1] - 61:14

**A**

aback [1] - 12:20
ability [2] - 17:11, 27:2
able [4] - 26:7, 43:22, 50:21, 57:16
absolutely [3] - 14:5, 39:24, 57:18
Absolutely [2] - 29:20, 48:21
accede [2] - 37:12, 60:12
acceptable [4] - 40:20, 56:8, 61:21, 62:1
access [2] - 19:9, 57:21
accessibility [1] - 19:6
accessible [1] - 19:7
accommodate [2] - 4:12, 46:10
accord [1] - 39:14
according [2] - 17:1,

38:17
account [2] - 38:16, 55:3
accurate [2] - 18:10, 20:6
accused [1] - 6:13
accusing [1] - 12:7
acting [1] - 48:20
action [2] - 7:2, 10:2
Action [1] - 1:4
activities [5] - 6:17, 7:19, 7:23, 14:11, 20:18
actual [3] - 15:5, 30:11, 45:23
add [13] - 26:12, 28:18, 32:4, 33:2, 34:12, 35:3, 35:22, 39:8, 43:11, 45:7, 45:11, 46:17
added [3] - 35:6, 43:2, 44:18
adding [7] - 26:24, 37:8, 37:10, 37:12, 37:14, 46:1, 46:13
addition [1] - 31:22
additional [13] - 13:23, 21:20, 22:13, 28:18, 40:9, 40:13, 42:1, 46:7, 46:16, 48:12, 49:4, 53:24, 60:15
address [5] - 20:19, 26:5, 30:21, 31:11, 31:20
addressed [5] - 18:19, 22:19, 25:10, 25:14, 28:19
addressing [1] - 29:14
adducing [1] - 27:3
adequate [2] - 48:14, 51:7
admitted [1] - 45:5
admittedly [1] - 11:18
advance [1] - 27:2
advanced [1] - 26:8
advantage [1] - 20:9
advice [4] - 49:23, 52:16, 53:14, 53:15
advised [1] - 28:17
advocating [1] - 26:2
affect [1] - 59:19
afternoon [5] - 4:7, 4:8, 4:23, 4:24, 5:8, 5:12, 5:15, 5:17, 5:20
afterwards [1] - 58:19
agency [3] - 7:11, 7:13, 14:4
Agency [1] - 7:16

agenda [1] - 62:14
agent [1] - 14:4
aggressive [1] - 46:4
ago [7] - 17:20, 33:21, 35:19, 35:20, 36:21, 36:24, 43:15
agree [1] - 20:4, 28:10, 29:21, 43:19, 48:17, 52:5, 55:8, 55:9, 59:21, 59:23, 60:23
Agreed [1] - 54:22
agreed [1] - 40:18
agreement [6] - 18:14, 29:6, 47:15, 56:25, 57:15, 59:24
agreements [2] - 18:1, 18:2
ahead [4] - 11:5, 20:7, 39:15, 41:11
Alcatel [4] - 1:7, 2:15, 2:17, 2:18, 5:10, 5:24, 6:7, 6:11, 6:21, 7:4, 7:13, 7:20, 9:16, 9:23, 10:4, 11:25, 12:1, 12:8, 12:15, 12:16, 12:25, 13:4, 13:7, 13:8, 13:9, 13:11, 13:16, 13:19, 13:20, 13:25, 14:3, 14:4, 14:16, 14:17, 14:19, 14:25, 15:10, 15:25, 16:1, 16:10, 16:12, 16:13, 16:14, 16:15, 16:19, 16:20, 16:21, 17:1, 17:4, 17:5, 17:12, 17:14, 17:17, 17:22, 17:23, 18:1, 18:3, 18:7, 18:16, 18:18, 18:25, 19:17, 20:15, 20:16, 20:17, 23:24, 24:11, 25:5, 29:3, 32:13, 33:9, 33:22, 34:10, 38:13, 42:18, 44:15, 46:9, 56:25
Alcatel's [2] - 13:22, 15:23
allegation [1] - 41:17
allege [1] - 14:11
alleged [2] - 7:6, 7:8
allotted [2] - 40:12, 40:13
allowed [2] - 36:9, 36:10
alone [1] - 4:19
amend [5] - 39:11, 40:2, 42:21, 43:8, 48:7
amending [3] - 31:14,

40:19, 47:17
amendment [3] - 49:7, 49:8
amount [3] - 37:16, 41:22, 44:1
analogous [1] - 23:4
analysis [2] - 41:15, 44:4
anecdote [1] - 33:18
anew [1] - 26:7
announce [2] - 19:24, 47:15
answer [5] - 24:22, 27:5, 34:19, 36:6, 38:5, 40:13
answered [2] - 12:8, 24:23
anticipating [2] - 60:13, 60:14
ants [1] - 31:18
appeal [2] - 22:15, 26:1, 30:12
Appeals [2] - 22:21, 23:3
appear [1] - 33:13
Appearances [2] - 2:1, 3:1
applicable [2] - 26:15, 47:20
applies [1] - 15:18
apply [3] - 15:11, 15:12, 25:20
applying [1] - 29:4
approach [1] - 26:24
appropriate [2] - 18:19, 39:8
April [3] - 1:21, 50:20, 55:13, 56:1
Aprile [1] - 47:14
argue [5] - 23:24, 26:3, 28:1, 38:25, 48:6
argued [2] - 24:5
argument [12] - 15:9, 15:12, 23:22, 23:23, 24:9, 24:12, 26:20, 26:21, 28:6, 28:8, 29:17, 46:24
arguments [6] - 24:10, 26:7, 26:14, 29:7, 33:5, 39:8
arise [1] - 7:2
arm [2] - 6:25, 15:20
arrive [2] - 39:14, 59:1
Arsht [1] - 3:9
art [2] - 24:6, 32:15
articulated [3] - 19:12, 19:20, 55:1
articulating [1] - 25:23
Ashby [1] - 2:2

Case 1:04-cv-00874-GMS    Document 54-2    Filed 09/29/2005    Page 89 of 97

**assert** [10] - 18:16, 32:2, 34:5, 36:23, 38:7, 38:12, 42:12, 42:13, 52:13
**asserted** [13] - 21:4, 21:10, 22:3, 29:1, 29:2, 32:6, 33:21, 35:7, 35:12, 36:21, 37:23, 39:21, 40:10
**asserting** [5] - 33:24, 34:9, 34:23, 35:12, 36:16
**asset** [1] - 17:15
**assume** [3] - 42:17, 48:6, 55:25
**assuming** [2] - 4:13, 31:1
**assurance** [1] - 38:23
**attached** [2] - 14:22, 14:24
**attention** [4] - 10:11, 17:20, 49:18, 56:21
**attorney** [1] - 52:16
**attorney-client** [1] - 52:16
**attorneys** [2] - 16:11, 46:18
**Attorneys** [1] - 4:8
**authoritative** [1] - 25:15
**available** [1] - 54:12
**average** [1] - 17:19
**averaged** [1] - 17:18
**avoid** [1] - 39:13

**B**

**background** [1] - 33:2
**Bailey** [1] - 47:10
**balance** [1] - 19:10
**Balick** [6] - 2:3, 4:15, 4:18, 4:20, 4:25, 47:11
**bar** [2] - 25:12, 27:24
**barred** [1] - 29:14
**based** [15] - 10:2, 25:6, 27:2, 28:6, 32:21, 33:15, 35:14, 42:20, 42:22, 43:25, 45:19, 60:19, 61:11
**basic** [2] - 12:24, 13:18
**basis** [14] - 8:22, 11:11, 11:12, 14:13, 17:4, 19:19, 35:7, 36:23, 36:25, 37:1, 39:9, 59:13, 60:20, 61:12
**becomes** [3] - 30:13, 31:11, 48:19

**bed** [1] - 60:10
**beginning** [2] - 4:5, 62:6
**behalf** [3] - 2:7, 4:20, 30:9
**behave** [1] - 59:7
**believable** [1] - 43:22
**believes** [2] - 29:8, 60:17
**Ben** [1] - 5:11
**Benjamin** [1] - 2:13
**Berres** [2] - 2:16, 5:13
**best** [1] - 24:3
**between** [10] - 7:13, 8:13, 15:25, 18:11, 18:14, 18:18, 26:25, 33:3, 33:8, 59:24
**beyond** [5] - 14:15, 17:18, 28:14, 41:5
**billion** [1] - 17:15
**binder** [1] - 52:3
**binding** [5] - 22:22, 24:17, 25:15
**bit** [3] - 6:3, 41:15, 46:9
**block** [2] - 61:6, 61:7
**Blumenfeld** [4] - 3:10, 5:16, 5:17, 21:6
**board** [1] - 8:7
**boggling** [1] - 59:15
**bones** [1] - 50:24
**bound** [6] - 23:2, 23:7, 23:12, 25:24, 28:4, 29:9
**Bradstreet** [3] - 14:23, 14:24, 17:15
**Brian** [1] - 3:20
**brief** [9] - 10:22, 12:23, 13:5, 13:6, 14:17, 14:22, 15:23, 17:13, 27:18
**briefing** [8] - 13:14, 51:3, 51:5, 51:14, 51:18, 61:20
**briefs** [4] - 51:4, 51:8, 51:13, 61:16
**bring** [6] - 10:10, 34:1, 41:13, 42:1, 42:21, 56:20
**broad** [1] - 44:21
**brought** [2] - 27:20, 60:15
**budget** [1] - 25:6
**bungle** [1] - 16:23
**burden** [2] - 10:14, 32:9
**Burley** [6] - 2:6, 4:22, 12:19, 12:22, 16:2, 18:10, 19:11
**busiest** [1] - 59:13

**business** [4] - 13:10, 35:17, 40:11, 62:4

**C**

**calendar** [2] - 47:14, 55:19
**calendars** [1] - 56:12
**California** [4] - 3:13, 5:19, 52:23, 59:11
**Canadian** [1] - 18:13
**cards** [5] - 38:2, 42:19, 43:9, 44:5, 44:7
**careful** [1] - 54:19
**carefully** [1] - 55:25
**carriers** [1] - 18:8
**case** [76] - 6:22, 7:3, 7:12, 9:11, 9:25, 11:10, 11:14, 12:3, 12:10, 12:11, 12:13, 14:10, 15:6, 16:10, 16:11, 19:15, 20:14, 21:5, 21:17, 22:3, 22:5, 22:6, 22:7, 22:16, 22:17, 23:23, 24:7, 24:18, 25:12, 26:14, 26:15, 28:13, 28:15, 28:19, 30:16, 31:3, 31:5, 31:19, 31:25, 33:9, 33:13, 33:19, 34:10, 35:2, 37:7, 37:20, 37:25, 38:4, 38:8, 38:16, 38:18, 38:20, 39:25, 40:21, 41:6, 41:8, 41:14, 41:18, 42:2, 45:13, 45:23, 45:24, 46:2, 46:15, 46:17, 47:21, 48:15, 52:2, 57:20, 57:22, 57:23, 58:1, 58:25, 60:9, 60:15, 60:25, 61:13
**cases** [7] - 8:12, 8:19, 19:5, 28:16, 30:19, 60:5
**catchall** [2] - 35:1, 35:2
**catchalls** [1] - 38:6
**catching** [1] - 6:2
**certain** [2] - 37:16, 41:22
**certainly** [5] - 12:13, 14:8, 14:12, 14:17, 16:14, 22:20, 41:19, 46:21
**Certainly** [2] - 46:21, 60:19
**cetera** [1] - 46:8
**chain** [1] - 38:20

**challenge** [1] - 10:9
**chambers** [2] - 60:1, 62:8
**chance** [3] - 23:24, 24:1, 57:3
**changed** [5] - 36:3, 36:18, 37:2, 44:3, 45:19
**changing** [1] - 30:16
**chart** [2] - 51:12, 51:15
**charts** [1] - 51:3
**Cheney** [41] - 2:22, 4:17, 5:4, 5:5, 21:12, 21:22, 23:9, 23:11, 24:13, 25:23, 26:14, 27:12, 27:13, 27:16, 27:22, 28:22, 33:17, 42:5, 43:4, 43:8, 43:18, 45:15, 45:17, 48:1, 48:10, 48:25, 49:13, 50:2, 51:20, 55:17, 56:7, 58:4, 58:5, 58:9, 58:19, 60:19, 61:3, 61:10, 62:10, 63:3
**Chicago** [1] - 3:3
**Chief** [1] - 17:13
**choice** [1] - 52:21
**choose** [1] - 53:4
**circle** [1] - 58:22
**Circuit** [20] - 11:16, 12:11, 21:18, 22:4, 22:9, 22:10, 22:14, 22:20, 23:3, 23:19, 24:14, 24:16, 24:21, 25:9, 26:1, 26:11, 26:19, 27:8, 29:9, 52:17
**Circuits** [2] - 22:21, 28:5
**Cisco** [19] - 1:17, 3:17, 5:16, 18:17, 21:6, 23:25, 24:10, 26:5, 30:9, 33:22, 33:25, 34:10, 34:23, 35:13, 36:21, 38:11, 38:12, 42:18, 46:6
**cite** [3] - 24:17, 27:25, 28:5
**cited** [2] - 13:4, 25:12
**Civil** [1] - 1:4
**claim** [20] - 21:16, 21:20, 22:7, 22:10, 22:16, 22:18, 23:1, 23:13, 23:14, 23:18, 24:1, 25:11, 26:8, 28:3, 29:3, 50:7, 50:13, 51:2, 51:12, 52:25

**claims** [5] - 21:10, 21:13, 26:12
**clarification** [1] - 47:16
**clarifying** [1] - 48:25
**clear** [7] - 13:8, 14:2, 15:4, 29:19, 29:24, 29:25, 48:15
**clearer** [1] - 8:17
**clearly** [1] - 15:18
**Clerk** [1] - 56:13
**clerk** [1] - 51:17
**client** [4] - 38:7, 42:11, 43:24, 52:16
**clients** [1] - 59:4
**close** [1] - 62:4
**closed** [1] - 53:20
**collateral** [4] - 23:15, 24:25, 25:22, 26:3
**colleagues** [1] - 43:5
**Columbia** [1] - 2:6
**comfortable** [1] - 41:20
**coming** [3] - 23:23, 31:19, 48:7
**comment** [1] - 61:25
**commerce** [3] - 11:18, 11:20, 12:2
**common** [3] - 7:25, 8:16, 22:5
**communication** [1] - 40:7
**companies** [6] - 6:11, 8:24, 12:15, 16:7, 17:22, 18:11, 18:18, 18:24
**company** [21] - 6:12, 6:14, 6:17, 6:20, 8:10, 9:6, 12:7, 12:25, 13:15, 15:11, 15:15, 16:20, 17:5, 18:4, 18:15, 19:4, 19:12, 19:16, 19:20, 25:3, 44:23
**complaint** [4] - 12:8, 39:18, 41:20, 47:18
**complaints** [1] - 39:23
**complete** [1] - 42:9
**completed** [3] - 41:24, 41:25, 42:13
**completely** [2] - 6:5, 8:25
**completion** [1] - 51:5
**complexity** [1] - 52:3
**comport** [1] - 15:15
**comprehensive** [2] - 5:22, 38:15
**compressed** [1] - 40:24
**Coriaway** [2] - 2:9,

2:19
concern [8] - 45:16, 52:18, 53:13, 53:23, 54:2, 58:7
concerned [5] - 26:12, 36:12, 37:3, 48:19, 54:5
concerning [1] - 14:25
concerns [3] - 31:17, 45:17, 57:23
concluding [1] - 17:4
conduct [2] - 20:16, 48:8
confer [1] - 51:2
conference [5] - 4:11, 29:24, 34:6, 46:3, 62:5, 63:7
Conference [2] - 1:21, 63:9
confidential [2] - 52:17, 57:25
confidentiality [1] - 57:23
confused [1] - 18:5
confusing [1] - 10:22
confusion [1] - 18:6
connection [2] - 7:5, 13:5
consider [2] - 39:5, 61:16
consideration [1] - 44:18
considered [4] - 22:3, 22:13, 25:13, 28:15
considering [1] - 10:17
consistency [1] - 22:25
consistent [2] - 22:23, 26:24
consolidate [1] - 30:19
consolidated [2] - 29:22, 31:2
consolidating [3] - 30:1, 30:12, 30:23
consolidation [5] - 30:6, 30:21, 31:7, 37:21, 37:24
constant [1] - 46:12
Constitution [1] - 15:16
construction [15] - 21:16, 21:20, 22:7, 22:16, 23:1, 23:4, 23:18, 24:1, 25:11, 26:8, 26:4, 29:3, 50:7, 50:13, 52:25
constructions [3] - 22:10, 23:13, 23:14

consult [1] - 8:14
consumer [1] - 18:6
contact [2] - 7:3, 9:9
contacted [1] - 38:11
contacting [1] - 34:17
contacts [11] - 7:1, 7:8, 8:21, 8:23, 9:7, 9:13, 9:16, 9:17, 9:19, 10:2, 10:7
contemplate [2] - 27:17, 51:18
contemplated [1] - 29:4
contemplates [1] - 28:13
contemplating [3] - 28:7, 34:9, 34:21
contention [3] - 11:3, 15:24, 26:6
Continued [1] - 3:1
continuous [2] - 7:7, 9:12
contract [1] - 60:13
contradiction [1] - 23:20
contrary [1] - 28:2
controls [1] - 7:19
conversations [1] - 34:1
cooperate [2] - 36:15, 54:12
cooperating [1] - 30:3
cooperation [2] - 8:13, 30:13
coordinating [1] - 30:15
coordination [1] - 30:4
copies [1] - 52:6
corporate [1] - 17:23
corporation [2] - 13:9, 16:15
Corporation [1] - 8:20
corporations [1] - 18:9
corpus [1] - 58:12
correct [5] - 17:8, 25:16, 25:23, 31:14, 57:17
correspondence [1] - 18:17
corresponding [1] - 31:24
cost [1] - 50:18
Counsel [7] - 2:7, 2:16, 2:17, 3:6, 3:7, 3:17, 30:7
counsel [9] - 12:17, 49:24, 51:21, 53:14, 53:15, 54:1, 56:6,

58:2, 59:5
count [1] - 13:24
counter [1] - 46:24
counter-proposal [1] - 46:24
country [5] - 6:19, 9:7, 9:13, 9:20, 59:14
couple [5] - 6:19, 13:17, 17:10, 34:13, 35:20
course [4] - 35:13, 35:18, 46:2, 46:17
court [6] - 4:5, 9:14, 11:15, 16:8, 21:19, 59:14
Court [149] - 1:1, 3:20, 4:7, 4:10, 4:17, 4:19, 4:23, 5:3, 5:8, 5:12, 5:15, 5:20, 6:9, 6:15, 7:15, 7:24, 8:2, 8:21, 9:3, 10:15, 10:16, 11:1, 11:4, 11:7, 11:21, 12:6, 12:11, 12:17, 12:21, 15:22, 17:9, 19:22, 20:7, 20:11, 20:24, 20:25, 21:1, 21:8, 21:14, 21:23, 22:21, 22:24, 23:2, 23:6, 23:10, 24:12, 25:13, 25:15, 25:18, 26:6, 26:9, 26:17, 26:23, 26:25, 27:6, 27:10, 27:12, 27:15, 27:19, 28:10, 28:21, 29:8, 29:15, 29:18, 29:21, 30:7, 30:10, 30:22, 31:10, 39:1, 39:7, 39:13, 40:4, 40:11, 40:15, 40:20, 43:4, 43:17, 44:8, 44:10, 44:13, 45:2, 45:3, 45:14, 45:16, 45:21, 46:19, 46:23, 47:2, 47:6, 47:8, 47:13, 47:19, 47:22, 48:9, 48:11, 48:17, 48:19, 48:22, 49:2, 49:10, 49:15, 49:21, 49:25, 50:6, 50:8, 50:14, 50:23, 51:3, 51:12, 51:21, 51:25, 52:8, 52:10, 52:13, 53:5, 53:17, 53:21, 54:6, 54:16, 54:17, 54:23, 55:3, 55:8, 55:13, 55:15, 55:19, 55:22, 56:8, 56:11, 56:16, 56:19, 58:23, 57:2, 57:6, 57:10, 57:13, 58:3,

58:22, 60:7, 60:22, 61:4, 61:14, 61:18, 62:2, 62:12, 63:1, 63:4
Courts [2] - 40:23, 56:20
courts [1] - 52:22
cover [1] - 58:10
covering [1] - 44:22
create [2] - 10:14, 55:6
creating [2] - 53:16, 54:5
credible [3] - 10:23, 18:22, 46:14
credit [1] - 18:11
critical [1] - 13:18
criticized [2] - 16:17, 16:18
current [3] - 11:4, 17:14, 61:8
customers [1] - 18:2
cutoff [3] - 43:5, 47:17, 48:22

**D**

date [20] - 33:16, 40:17, 40:18, 41:4, 47:13, 48:4, 49:7, 49:8, 49:11, 49:23, 51:5, 53:9, 55:9, 56:3, 61:15, 61:25, 62:14, 62:16, 63:7
dates [2] - 47:15, 61:25
Daubert [2] - 62:15, 63:7
Davis [2] - 3:15, 5:19
day-to-day [1] - 7:19
days [21] - 17:18, 17:19, 35:20, 37:17, 38:9, 42:10, 44:12, 45:6, 46:22, 47:5, 47:6, 47:14, 47:17, 51:4, 53:8, 53:12, 55:10, 55:11, 55:20, 56:2, 56:5
deal [4] - 16:13, 28:17, 29:1, 29:10
dealing [5] - 15:8, 16:8, 18:9, 18:21, 18:24, 26:24
dealings [1] - 16:12
deals [2] - 16:13, 18:4
decide [5] - 32:2, 32:5, 32:22, 32:23, 45:6, 61:23
decided [3] - 17:16, 26:11, 32:23
deciding [1] - 23:1

decision [17] - 19:25, 22:25, 25:9, 25:11, 25:25, 26:5, 50:16, 50:17, 50:18, 53:3, 53:25, 55:5, 55:21, 55:23, 56:1, 56:2, 56:3
decisions [3] - 24:13, 24:14, 25:13
decisis [1] - 25:19
declaration [2] - 7:20, 17:13
declined [1] - 22:14
defend [1] - 31:17
defendant [2] - 52:15, 52:20
Defendant [2] - 1:13, 1:16
defendants [22] - 6:12, 14:9, 21:7, 22:6, 23:6, 26:18, 31:4, 31:23, 32:6, 39:4, 39:21, 40:1, 40:8, 44:16, 46:5, 46:10, 46:11, 47:4, 49:3, 54:24, 57:19, 57:21
Defendants [1] - 1:8
defendants' [2] - 21:19, 49:22
defenses [1] - 37:15
Delaware [8] - 1:2, 1:20, 6:19, 6:25, 7:3, 8:11, 9:17
delay [1] - 42:3
deliberately [1] - 48:5
delinquency [1] - 15:1
deliver [2] - 52:3, 52:6
demand [1] - 60:4
demonstrate [1] - 11:12
denial [1] - 12:12
deny [2] - 20:25, 21:1
deposition [2] - 48:3, 54:3
depositions [3] - 47:5, 62:20, 62:21
depression [1] - 17:17
depths [1] - 17:16
Deputy [2] - 5:14, 56:13
designation [1] - 58:2
despite [1] - 25:10
determination [1] - 17:7
determine [2] - 14:5, 41:13
developed [1] - 33:15
deviate [1] - 61:21
deviating [1] - 27:24

Dial [1] - 59:25
difference [2] - 31:14, 41:21
different [5] - 16:10, 18:15, 24:23, 26:2, 26:16, 42:23, 52:22
difficult [4] - 14:9, 50:18, 52:15, 52:20
difficulty [1] - 53:5
digest [1] - 51:7
diligence [8] - 41:25, 42:7, 42:8, 42:14, 42:16, 45:5, 52:14
Director [1] - 5:14
directors [1] - 13:23
disagree [1] - 30:20
disagreeing [1] - 23:16
disagreement [1] - 62:20
disclosing [1] - 50:5
discovery [56] - 11:7, 11:8, 11:10, 11:11, 11:16, 14:5, 20:14, 20:15, 21:1, 30:12, 30:20, 30:23, 32:4, 32:9, 32:10, 32:11, 32:24, 33:15, 34:15, 34:25, 36:4, 36:20, 37:19, 39:24, 43:1, 44:14, 44:21, 46:7, 47:4, 48:14, 50:19, 50:22, 53:12, 53:14, 53:15, 53:16, 53:18, 53:20, 53:23, 53:24, 54:5, 54:10, 54:11, 54:18, 54:20, 55:11, 56:3, 58:4, 58:13, 58:24, 59:3, 59:10, 59:17, 59:18, 59:20
discuss [1] - 33:6
discussing [1] - 41:4
discussion [4] - 19:22, 20:8, 33:11, 46:12
discussions [1] - 33:4
disinclined [1] - 60:8
dismiss [3] - 5:24, 20:15, 21:1
dismissal [1] - 12:12
dispositive [2] - 41:8, 41:9
dispute [3] - 21:10, 49:20, 58:4
disputed [1] - 22:14
disputes [5] - 58:24, 59:10, 59:17, 59:18, 59:20
disregard [1] - 26:19
disruption [1] - 31:5

dissents [1] - 20:4
distinct [1] - 6:4
distinguishable [1] - 11:17
distinguishes [1] - 12:3
District [6] - 1:1, 1:2, 2:6, 52:23, 59:11
district [6] - 8:19, 19:5, 59:9, 59:13
divided [1] - 11:21
document [2] - 35:14, 49:18
documents [2] - 32:16, 46:22
Don [3] - 2:6, 4:22, 12:19
done [11] - 14:8, 26:19, 31:3, 31:6, 35:16, 41:7, 42:16, 42:24, 43:14, 44:8, 52:22
down [6] - 7:9, 28:19, 40:11, 42:21, 45:21, 59:17, 61:22, 62:1
draft [1] - 34:8
drafted [1] - 35:14
Drager [6] - 3:6, 5:7, 35:10, 35:21, 36:2, 36:5
due [6] - 10:8, 15:3, 15:13, 15:15, 41:24, 41:25, 45:5, 62:3
dull [1] - 59:17
Dunn [3] - 14:23, 14:24, 17:15
Dunner [2] - 2:5, 4:25
duplicate [1] - 52:6
during [2] - 46:2, 46:16

**E**

earliest [1] - 41:1
early [3] - 18:19, 21:11, 57:3
easier [1] - 60:13
easily [2] - 51:16, 52:14
echo [1] - 61:10
Ed [3] - 5:18, 30:8, 50:2
Edward [1] - 3:12
effect [3] - 9:10, 18:8, 26:18
effective [1] - 30:15
effects [2] - 7:19, 45:12
effort [1] - 39:19
eight [2] - 13:23, 32:4

Either [2] - 15:19, 36:23
either [6] - 9:16, 10:13, 14:2, 36:11, 42:13, 44:1
Elaine [2] - 3:6, 5:6
elect [3] - 49:23, 53:14, 56:6
electronically [1] - 62:8
elements [3] - 7:15, 7:17, 21:9
embarking [1] - 44:14
emphatic [1] - 57:11
employee [1] - 8:5
employees [5] - 6:6, 13:19, 13:21, 19:17, 19:18
end [3] - 27:8, 41:10, 42:4
ended [1] - 35:4
ends [1] - 63:9
engage [1] - 21:19
enter [2] - 30:4, 30:22
entering [1] - 20:2
entertain [1] - 58:25
entire [1] - 31:1
entities [2] - 7:25, 16:6
entity [2] - 17:23, 18:20
equipment [2] - 13:2, 18:7
especially [1] - 10:23
espoused [1] - 11:24
Esq [14] - 2:3, 2:5, 2:6, 2:10, 2:12, 2:13, 2:16, 2:20, 2:22, 3:3, 3:6, 3:10, 3:12, 3:15
essentially [1] - 40:7
Essentially [2] - 22:2, 28:3
estopped [2] - 23:15, 25:1
estoppel [3] - 24:25, 25:22, 26:3
et [2] - 46:8
event [2] - 25:22, 59:16
evidence [2] - 15:3, 27:3
eviscerates [1] - 26:22
exactly [3] - 14:5, 21:23, 54:24
example [6] - 23:20, 23:21, 31:2, 31:4, 48:2, 54:4
except [1] - 8:23
exchange [1] - 51:2, 58:14

exchanged [1] - 32:10
executive [3] - 8:4, 8:7, 8:24
exercise [5] - 6:23, 9:10, 9:12, 9:14, 10:8
Exhibit [2] - 14:22, 14:24
exist [3] - 9:18, 38:4
existed [2] - 45:24, 57:23
exists [1] - 19:7
expand [1] - 60:14
expect [1] - 19:3
expedition [1] - 44:24
expeditiously [2] - 55:7, 58:7
experience [1] - 51:7
experiences [1] - 15:2
expert [1] - 53:23
expire [1] - 35:23
expires [1] - 38:22
explain [3] - 16:4, 42:24, 43:19
explanation [2] - 38:24, 59:23
express [1] - 46:5
expressed [1] - 24:16
expressly [2] - 25:10, 25:14
extension [1] - 59:21
extensions [1] - 39:24
extensive [6] - 9:6, 13:6, 13:10, 15:24, 15:25, 32:9
extensively [1] - 13:5
extent [3] - 42:1, 58:14, 61:20
extremely [1] - 44:15
eyes [1] - 58:2

**F**

facie [2] - 7:12, 11:10
facilities [1] - 32:14
fact [16] - 13:9, 13:10, 13:14, 13:17, 14:14, 14:20, 14:24, 15:4, 16:16, 17:2, 19:6, 20:17, 20:20, 25:10, 40:1, 53:20, 54:18, 59:13
facts [3] - 10:1, 11:23, 13:19
factual [1] - 11:11
fair [1] - 20:24
fairness [1] - 32:9
faith [1] - 48:20
far [7] - 26:12, 28:7, 31:1, 33:19, 39:25,

45:20, 61:22
Farabow [1] - 2:5
Farnan [10] - 21:18, 22:4, 22:6, 22:12, 22:15, 22:19, 23:16, 25:25, 29:10, 58:16
Farnan's [1] - 24:13
fashion [1] - 59:20
favor [1] - 22:15
February [3] - 51:5, 62:4
Federal [21] - 11:15, 12:11, 21:18, 22:4, 22:9, 22:10, 22:14, 22:19, 22:21, 23:19, 24:14, 24:16, 24:21, 25:9, 26:1, 26:11, 26:19, 27:8, 28:5, 29:9, 52:17
federal [4] - 9:2, 9:6, 9:14, 63:1
felt [1] - 41:19
few [1] - 38:9
fighting [1] - 12:9
figure [3] - 18:23, 36:25, 37:17
file [9] - 39:5, 39:10, 43:17, 43:18, 43:25, 44:12, 57:3, 59:21, 59:22
filed [7] - 14:12, 32:11, 39:17, 41:9, 41:23, 42:9, 62:8
files [2] - 7:21, 7:22
filing [1] - 41:20
final [2] - 15:7, 51:12
finality [1] - 27:1
Financial [1] - 17:14
financial [2] - 7:22, 17:11
financially [2] - 14:18, 15:4
fine [24] - 5:3, 11:2, 26:12, 29:15, 29:17, 29:18, 31:12, 47:7, 47:25, 49:13, 52:11, 53:11, 53:12, 55:8, 55:12, 55:14, 55:17, 55:18, 56:14, 58:21, 59:7, 59:8, 62:10, 62:11
finish [1] - 51:22
Finnegan [2] - 2:5, 4:21
firm [2] - 4:21, 16:9
First [1] - 34:14
first [8] - 5:23, 21:24, 34:14, 34:16, 36:14, 38:25, 56:21, 58:6
Fish [1] - 36:17

fishing [1] - 44:23

five [4] - 8:5, 13:20, 19:13, 32:17

flesh [1] - 50:23

Florida [1] - 35:10

focused [1] - 54:9

focusing [1] - 34:2

follow [1] - 27:23

following [2] - 4:4, 13:14

foot [1] - 24:3

footnote [1] - 14:16

force [1] - 26:18

Fore [6] - 21:17, 22:4, 24:2, 25:4, 25:6, 28:15, 57:24, 58:11

foreign [4] - 6:14, 8:10, 11:19, 15:15

formal [1] - 30:23, 31:7

formality [1] - 30:5

forth [2] - 23:13, 27:23

forward [5] - 5:1, 20:14, 24:4, 30:5, 35:6, 41:23

founded [1] - 15:17

four [3] - 32:17, 47:3, 55:5

frame [1] - 54:19

frankly [1] - 45:3

free [2] - 28:8, 28:9

French [3] - 6:14, 16:21, 17:1

Friday [1] - 62:9

front [5] - 12:6, 23:18, 24:20, 41:2, 48:5, 57:7

full [4] - 22:17, 26:8, 39:18, 39:19

fully [1] - 22:20

function [1] - 8:24

fundamental [1] - 13:19

funds [1] - 7:23

future [2] - 22:22, 39:12

**G**

Geffigan [1] - 3:20

gainsay [1] - 44:4

Garrett [1] - 2:5

Geddes [1] - 2:2

general [1] - 15:19

General [1] - 7:7

generally [1] - 40:19

generate [1] - 48:11

generated [1] - 57:22

Given [1] - 51:1

given [6] - 11:4, 12:22,

24:4, 41:1, 41:2, 48:13

glad [1] - 60:22

globally [2] - 39:21, 52:5

Gms [3] - 1:8, 1:13, 1:18

Gotshal [3] - 3:12, 3:15, 5:18, 5:19, 30:8

grant [1] - 60:9

Great [1] - 57:13

Gregory [1] - 1:23

group [2] - 30:14, 31:18

guess [4] - 5:23, 31:8, 41:12, 58:11

Guidant [1] - 8:20

guys [1] - 35:13

**H**

hand [1] - 38:4

handful [1] - 19:17

handle [2] - 59:9, 60:2

handling [1] - 59:14

happy [7] - 23:17, 25:24, 26:4, 47:11, 58:5, 58:18, 59:6

hear [4] - 6:3, 21:24, 42:6, 54:23

heard [4] - 6:5, 24:1, 24:9, 33:24

hearing [7] - 4:5, 34:14, 34:16, 36:13, 38:24, 39:9, 51:4

heavily [1] - 44:19

held [1] - 4:5

Hello [1] - 4:17

helpful [1] - 19:23, 34:22

Henderson [2] - 2:5, 4:21

hereby [1] - 28:4

heretofore [1] - 21:17

Hershkowitz [2] - 2:13, 5:11

high [2] - 15:1, 58:24

highlighted [2] - 56:23, 62:13

highly [1] - 50:16

history [1] - 23:22

Hold [1] - 62:13

holding [2] - 6:14, 6:17, 8:18, 12:25, 13:15, 15:11, 17:5

holds [1] - 6:21

Honor [49] - 4:9, 4:15, 4:20, 4:24, 4:25, 5:17, 6:8, 9:4, 12:19,

16:2, 17:11, 20:10, 21:25, 22:2, 25:8, 28:11, 29:20, 30:2, 31:16, 31:21, 33:1, 39:5, 39:17, 40:17, 42:5, 44:11, 45:25, 47:7, 47:11, 47:16, 47:24, 48:1, 48:21, 48:24, 49:1, 49:19, 50:11, 51:23, 52:11, 54:14, 56:14, 56:15, 57:9, 60:6, 61:1, 61:2, 62:11

Honor's [1] - 10:10

Honorable [1] - 1:23

hope [1] - 48:9

hopefully [2] - 37:16, 43:22, 61:7

host [1] - 50:11

hours [4] - 16:5, 17:7, 18:23

house [2] - 2:16, 3:6, 35:9, 35:10, 35:11, 59:5

hundreds [2] - 16:5, 17:6, 18:23

**I**

idea [4] - 38:10, 46:8, 52:9, 52:10

identified [2] - 13:23, 21:12

identifies [1] - 13:21

identifying [1] - 62:15

Illinois [1] - 3:3

imagine [1] - 50:12

immediately [1] - 35:9

impediment [2] - 30:13, 31:8

implicate [2] - 54:2, 61:19

implicated [2] - 9:20, 53:25

implication [1] - 61:19

implicitly [1] - 29:22

impliedly [2] - 29:22, 61:19

imply [1] - 44:11

important [6] - 13:11, 13:12, 24:4, 24:6, 25:7, 50:17

imposes [1] - 15:13

impression [1] - 44:20

in-house [2] - 2:16, 3:6

in-house [2] - 35:9, 35:11, 59:5

Inc [15] - 1:4, 1:7, 1:9, 1:12, 1:14, 1:17, 2:8,

2:15, 2:18, 3:5, 3:8, 3:17, 13:16, 18:3, 21:17

incentive [1] - 25:3

inclination [1] - 6:4

inclined [1] - 62:21

include [1] - 60:23

included [1] - 58:1

inconsistent [1] - 50:13

incorrect [1] - 25:18

increments [1] - 41:6

independent [1] - 31:5

independently [1] - 8:25

indicate [3] - 6:16, 13:20, 18:12

indicated [4] - 10:16, 17:17, 19:23, 31:22

indicates [1] - 10:23

indicating [2] - 7:21, 17:14

indication [1] - 14:20

individual [2] - 15:14, 39:9

induce [1] - 18:25

industry [3] - 10:25, 17:17, 17:19

inequitable [1] - 48:8

informal [1] - 4:10

information [4] - 20:17, 33:12, 57:15, 57:25

infrastructure [1] - 18:7

infringe [1] - 36:20

infringement [5] - 7:4, 19:17, 24:7, 41:20, 46:15

infringer [1] - 15:6

infringers [1] - 14:14

infringing [1] - 14:11

Ingersoll [1] - 2:10

initial [3] - 13:6, 22:7, 32:11

inside [1] - 4:12

instance [3] - 18:6, 41:8, 58:6

insufficient [1] - 7:1

insure [1] - 52:19

intellectual [1] - 5:14

intend [1] - 54:13

intends [1] - 61:19

interactions [1] - 33:3

interest [1] - 30:1

interesting [1] - 24:12

internal [1] - 17:3

intervals [2] - 61:20, 61:23

interview [1] - 32:17

intrinsic [1] - 51:16

inventors [1] - 48:4

investigation [2] - 10:20, 41:23

investment [1] - 6:20

invited [1] - 56:17

involve [1] - 15:3, 46:8

involved [4] - 16:11, 58:11, 62:22

involving [2] - 8:19, 33:4

Israel [1] - 3:3

issue [24] - 10:17, 11:20, 13:2, 13:16, 21:15, 22:22, 23:1, 23:2, 23:4, 25:8, 25:22, 26:20, 27:5, 31:11, 31:13, 39:10, 41:8, 50:4, 52:12, 53:13, 54:8, 57:20, 62:18, 62:19

issued [2] - 22:6, 22:24

issues [16] - 22:18, 23:13, 26:10, 27:9, 27:18, 32:15, 35:25, 37:20, 37:24, 39:20, 50:7, 52:25, 53:1, 53:12, 62:15

itself [3] - 17:22, 17:23, 18:1

**J**

Jessica [2] - 3:15, 5:19

job [1] - 24:3

John [5] - 2:16, 2:20, 3:10, 5:6, 5:13

join [1] - 20:23

joined [1] - 49:4

joining [2] - 31:14, 49:2

joint [17] - 5:22, 27:20, 29:25, 32:11, 34:6, 34:8, 34:24, 35:4, 35:5, 38:2, 41:3, 42:9, 43:25, 45:18, 60:7, 62:1, 62:14

Josy [1] - 2:10

judge [2] - 52:19, 59:11, 59:13, 59:15, 60:2, 60:24

Judge [11] - 21:17, 22:3, 22:6, 22:12, 22:15, 22:19, 23:18, 24:13, 25:25, 29:9, 58:16

judges [4] - 11:24, 24:21, 59:9, 59:12

judgment [3] - 14:18, 22:8, 61:17
July [4] - 49:3, 49:4, 49:8, 56:13
jump [1] - 57:6
June [1] - 48:22
jurisdiction [31] - 5:25, 6:24, 7:1, 7:7, 7:11, 8:11, 8:18, 8:22, 9:8, 9:10, 9:12, 9:14, 9:22, 9:24, 9:25, 10:4, 10:8, 10:12, 11:12, 12:9, 15:9, 15:10, 15:14, 15:15, 15:16, 15:19, 15:20, 16:8, 19:9, 20:13, 20:18
jurisdictional [2] - 11:9, 11:16
jury [2] - 60:4, 60:5
justification [1] - 10:21
justify [3] - 20:14, 20:20, 45:9

### K

keep [2] - 30:14, 59:16
Kenyon [4] - 2:12, 5:11
kind [2] - 34:7, 43:2
kindly [1] - 12:22
knock [1] - 25:4
knowing [5] - 17:4, 31:23, 41:7, 41:17, 41:19
known [3] - 20:20, 36:16, 41:17
knows [9] - 9:5, 10:24, 16:1, 18:4, 18:9, 31:25, 52:13, 53:1

### L

labeled [1] - 25:11
laches [1] - 33:5
lack [1] - 5:25
land [2] - 26:12, 53:1
language [1] - 51:11
Laq [1] - 35:22
large [4] - 18:7, 18:8, 58:12, 61:12
largest [1] - 31:17
last [6] - 34:2, 36:3, 36:19, 37:2, 38:22, 45:24
late [1] - 32:7
Latham [3] - 2:22, 3:2, 5:6
Lau [1] - 38:12
law [8] - 16:9, 17:1,

22:22, 23:2, 25:20, 26:12, 26:20, 38:21
lawsuit [3] - 19:16, 19:21, 46:14
lawyer [5] - 35:9, 35:10, 35:11, 35:20, 37:9
lawyers [5] - 4:13, 24:2, 41:24, 46:3, 59:6
lay [1] - 53:1
leaning [1] - 35:12
learned [1] - 42:22
least [11] - 13:18, 13:24, 26:11, 27:7, 29:23, 32:13, 38:17, 40:5, 56:1, 60:10, 61:18
leave [4] - 4:19, 42:2, 55:9, 63:8
legal [3] - 16:25, 21:15, 35:17
legality [1] - 16:21
length [1] - 33:2
lengthy [1] - 46:7
less [2] - 15:5, 53:8
letter [2] - 61:16, 62:15
level [5] - 30:5, 30:11, 33:7, 36:13, 36:18, 42:6
license [2] - 18:14, 18:25
licensing [1] - 33:7
liens [1] - 15:3
lies [1] - 60:9
life [2] - 37:6, 37:22
light [1] - 23:23
likely [1] - 60:14
likewise [1] - 46:13
limited [1] - 10:21
limits [3] - 31:3, 33:15, 34:25
lines [1] - 41:7
links [1] - 62:20
listen [1] - 6:6
literally [2] - 16:5, 19:7
litigate [1] - 23:12
litigated [2] - 23:13, 24:8
litigation [3] - 46:17, 57:16, 57:17
live [1] - 62:25
LI [25] - 2:5, 2:22, 3:2, 3:12, 3:15
local [1] - 61:21
locked [1] - 51:15
logical [2] - 49:12, 50:6
long-arm [2] - 6:25,

15:20
look [5] - 19:24, 27:13, 34:6, 42:25, 43:19
Look [1] - 55:19
looked [1] - 57:24
looking [4] - 5:1, 40:6, 41:3, 41:6
looks [2] - 35:11, 35:21
loophole [1] - 9:5
Lucent [4] - 1:12, 3:5, 3:7, 5:6, 5:7, 25:5, 29:2, 33:10, 33:23, 34:10, 35:7, 35:11, 43:3, 46:9

### M

magistrate [1] - 59:11, 59:12, 59:15, 60:24
main [2] - 45:17, 59:10
manage [2] - 8:13, 50:21
management [5] - 7:21, 8:15, 13:22, 13:25, 19:14
Manges [2] - 3:12, 3:15
manufacture [2] - 6:18, 12:2
manufactured [1] - 13:16
manufactures [2] - 17:6, 18:13
manufacturing [1] - 13:1
March [3] - 50:24, 53:8, 62:5
market [1] - 13:11
markets [1] - 13:12
Markman [16] - 22:24, 26:13, 26:17, 27:11, 27:18, 28:6, 28:8, 28:12, 29:16, 50:24, 51:4, 51:8, 53:7, 53:9, 53:19, 61:5
marks [1] - 49:15
master [1] - 59:3
material [1] - 50:16
materials [1] - 57:15
matter [5] - 16:10, 26:4, 43:5, 43:8, 60:12
matters [9] - 10:5, 21:20, 30:1, 30:23, 57:7, 59:14, 59:18, 59:19, 60:18
Mayergoyz [2] - 3:3, 5:5
Mcdavid [1] - 63:6

mean [16] - 9:24, 14:1, 17:19, 19:13, 24:20, 26:22, 27:16, 30:25, 39:17, 42:6, 42:17, 44:11, 44:14, 50:15, 55:5, 55:24
meaning [1] - 16:7
means [2] - 16:15, 16:24
meant [1] - 36:21
meet [1] - 51:2
meeting [1] - 31:24
meetings [1] - 18:24
member [1] - 8:6
members [1] - 13:21
ment [1] - 8:13
mention [2] - 11:14, 58:17
mentioned [5] - 9:15, 12:6, 33:8, 33:25, 46:1
mentioning [1] - 12:11
met [5] - 9:23, 10:6, 11:23
might [11] - 9:25, 36:8, 44:25, 45:8, 45:25, 46:13, 46:16, 49:20, 50:12, 50:14, 52:2
mind [4] - 38:5, 38:23, 51:21, 59:15
minds [1] - 51:11
minimizing [1] - 52:19
minimum [2] - 11:24, 14:1
miss [1] - 49:17
missed [2] - 49:21, 63:4
model [1] - 62:24
month [2] - 35:8, 53:11
months [27] - 15:2, 32:1, 32:4, 32:17, 32:18, 33:13, 33:21, 34:2, 34:16, 34:18, 35:16, 36:3, 36:14, 36:19, 36:21, 36:24, 37:2, 38:21, 38:25, 39:16, 42:8, 43:15, 44:6, 45:24, 47:1, 47:3, 48:15
Moreover [1] - 46:14
Morris [1] - 3:9
most [5] - 8:12, 13:11, 13:12, 17:21, 46:3
motion [17] - 5:24, 6:7, 6:11, 7:10, 13:6, 21:1, 39:5, 39:10, 42:21, 43:17, 43:18, 44:12, 48:7, 57:3, 57:7, 59:25, 60:2

motions [4] - 41:8, 41:9, 59:21, 61:24
motive [2] - 10:14, 14:7
move [6] - 20:23, 20:25, 45:7, 45:10, 45:20, 57:13
moved [1] - 40:2
moving [3] - 13:5, 13:20, 31:7, 40:6
multinational [2] - 17:21, 19:4

### N

name [2] - 18:3, 30:7
named [1] - 6:12
nature [2] - 6:20, 19:16
navigate [1] - 51:16
near [1] - 39:12
nearly [2] - 39:18, 62:9
Neave [1] - 36:17
need [17] - 19:11, 19:12, 21:19, 28:16, 33:6, 33:12, 39:14, 40:10, 41:10, 41:13, 46:24, 54:3, 55:25, 59:23, 60:10, 60:18, 61:3
needed [1] - 14:5
needs [2] - 19:20, 54:17
negotiate [1] - 46:4
negotiating [1] - 16:9
negotiations [1] - 33:7
never [2] - 33:23, 33:25
new [7] - 27:1, 27:2, 27:3, 31:18, 32:19, 35:25, 43:1
New [7] - 2:13, 2:23, 3:16, 5:19
next [6] - 11:1, 15:1, 31:13, 49:15, 49:16, 62:9
nicely [1] - 52:7
Nichols [1] - 3:9
nilly [1] - 59:25
nine [24] - 17:18, 32:1, 33:13, 33:21, 34:2, 34:16, 34:18, 35:8, 35:16, 36:3, 36:14, 36:19, 36:21, 36:24, 37:2, 38:21, 38:25, 39:16, 42:7, 43:15, 44:6, 45:24, 48:14, 49:19
nineties [1] - 18:19
Nobody [2] - 18:4,

42:3
noise [1] - 59:17
non [1] - 24:16
none [1] - 48:12
noninfringement [1] -
22:8
nonissue [1] - 20:22
nonparty [2] - 25:20,
27:1
nonprecedential [3] -
24:19, 25:9, 25:12
nonstarter [3] - 39:7,
40:15, 43:13
Normally [1] - 60:8
normally [1] - 52:17
Northern [2] - 52:23,
59:11
note [1] - 9:21
Note [1] - 4:4
notebook [1] - 12:23
noted [2] - 27:20,
52:18
Nothing [1] - 36:3
nothing [4] - 13:1,
26:15, 36:18, 37:1
notion [1] - 46:5
Notwithstanding [1] -
41:16
November [6] - 32:3,
34:12, 40:14, 40:17,
43:12, 49:8
number [1] - 31:4
numbers [5] - 4:11,
8:18, 30:16, 61:8,
62:20
numerical [1] - 31:3

**O**

o'clock [5] - 50:25,
61:5, 61:15, 62:6
obtain [1] - 10:12
obviously [12] - 15:11,
20:16, 25:24, 28:25,
29:4, 35:16, 36:13,
37:17, 51:14, 52:13,
54:11, 61:12
Obviously [4] - 23:11,
24:14, 43:12, 48:3
occurred [2] - 29:9,
43:1
occurrence [1] - 8:16
occurs [1] - 21:15
office [1] - 4:10
Office [1] - 48:6
Officer [1] - 17:14
officer [2] - 7:24, 8:3
officers [2] - 19:13,
19:14
Official [1] - 3:20

old - 35:24, 35:25
once [1] - 19:2
One [3] - 6:12, 32:8,
38:9
one [45] - 8:3, 8:6, 9:9,
9:10, 9:11, 13:11,
15:23, 17:12, 18:15,
19:12, 21:6, 22:2,
24:21, 24:24, 29:2,
31:17, 32:6, 33:1,
33:17, 33:22, 34:5,
35:7, 35:15, 36:22,
37:9, 37:11, 38:21,
40:8, 43:25, 45:17,
45:19, 48:3, 49:20,
49:21, 50:11, 50:15,
51:23, 52:7, 52:23,
54:16, 56:3, 59:10,
60:9
ones [1] - 54:7
ongoing [1] - 33:11
ooo [1] - 4:2
open [3] - 4:5, 15:3,
41:3
operate [1] - 8:24
operates [1] - 14:3
operating [1] - 30:3
operations [1] - 13:7
opinion [4] - 50:5,
50:12, 54:1, 56:6
oppose [1] - 45:9
opposite [1] - 21:23
opposition [1] - 14:17
order [15] - 10:8, 11:9,
29:13, 30:5, 30:23,
31:7, 32:4, 50:7,
53:8, 57:22, 58:1,
58:10, 58:16, 60:24,
62:3
ordered [1] - 11:16
organization [1] -
16:25
organizational [1] -
16:25
organized [3] - 17:1,
52:4
original [2] - 51:19,
52:1
otherwise [3] - 8:24,
25:2
ought [1] - 32:2
outgunned [1] - 4:13
outlined [1] - 29:4
outside [2] - 47:5,
58:2
overall [1] - 30:14
overlap [2] - 8:8, 8:23
overseas [1] - 32:15
own [2] - 7:23, 19:4

**P**

page [9] - 5:24, 14:15,
17:25, 21:15, 49:16,
49:19, 51:9, 56:21,
62:19
paper [2] - 6:5, 57:21
papers [10] - 6:16,
6:23, 10:21, 13:20,
14:20, 16:3, 16:14,
18:12, 19:24, 27:25
paragraph [5] - 49:16,
51:9, 51:10, 56:21,
62:19
parent [2] - 6:14,
6:24, 7:13, 7:16, 8:4,
8:5, 8:6, 8:7, 8:14,
10:13, 10:15, 11:18,
11:19, 11:25, 12:5,
13:6, 16:15, 16:20,
19:12, 19:20
part [6] - 8:4, 35:14,
43:13, 45:15, 60:10,
61:12
participate [2] - 24:25,
25:1
particular [3] - 16:18,
44:15, 52:18
parties [23] - 23:2,
26:21, 27:11, 29:8,
29:13, 29:21, 32:10,
33:3, 33:14, 40:18,
40:25, 48:19, 49:3,
49:4, 50:21, 50:22,
52:3, 52:5, 54:17,
57:15, 59:25, 60:23
parties' [1] - 21:16
partners [1] - 36:17
party [4] - 15:5, 26:18,
27:1
pass [3] - 11:22,
48:18, 54:16
passed [2] - 49:20,
56:18
past [3] - 15:3, 35:13,
35:15
patent [50] - 7:3,
18:15, 18:17, 19:17,
22:5, 22:8, 22:11,
22:13, 26:15, 26:14,
26:17, 29:2, 29:5,
32:6, 32:19, 33:22,
33:24, 34:3, 34:5,
34:10, 34:15, 34:22,
35:7, 35:12, 35:15,
35:22, 35:23, 36:20,
38:12, 38:21, 39:6,
41:20, 42:12, 42:13,
43:20, 43:25, 44:25,
46:5, 46:15, 46:16,

46:18, 59:14, 60:9
Patent [1] - 48:6
patents [48] - 19:1,
21:4, 22:2, 28:13,
28:18, 28:19, 28:25,
31:18, 32:2, 32:4,
33:5, 33:21, 34:20,
34:23, 35:3, 35:6,
35:24, 35:25, 36:8,
36:9, 36:23, 37:8,
37:12, 37:14, 37:22,
38:9, 38:10, 38:18,
38:19, 38:22, 39:20,
40:9, 41:13, 41:24,
42:1, 43:2, 44:1,
44:17, 45:7, 45:11,
46:2, 46:6, 46:13,
60:10, 60:15, 61:8
pay [3] - 17:11, 59:3,
59:4
payment [2] - 15:1,
17:18
Payment [1] - 15:2
payments [2] - 15:2,
15:3
pending [1] - 31:25
people [22] - 13:23,
13:24, 14:10, 14:14,
16:12, 16:13, 23:25,
24:10, 24:25, 25:1,
25:5, 32:16, 34:7,
34:13, 42:17, 53:3,
54:10, 54:12, 58:11
per [2] - 59:13, 60:8
perfectly [1] - 16:4
performing [1] - 20:18
perhaps [6] - 10:14,
23:23, 25:4, 27:3,
43:5, 51:10
period [13] - 33:10,
39:18, 39:19, 43:12,
43:16, 45:11, 50:6,
53:9, 53:15, 54:11,
54:12, 55:6, 55:7
permit [1] - 44:13
permitted [2] - 41:9,
61:24
persists [1] - 10:12
personal [2] - 5:25,
6:24
perspective [6] -
23:19, 35:17, 38:20,
42:5, 45:18
persuasive [2] -
24:24, 26:21
phase [1] - 54:20
Philips [1] - 23:23
phonetic [1] - 35:23
pinning [1] - 40:11
place [2] - 39:25,

50:24
plaintiff [16] - 4:13,
7:9, 9:1, 10:4, 10:12,
10:19, 10:24, 12:4,
12:13, 19:11, 31:22,
32:2, 43:6, 44:21,
46:16, 47:10, 52:13
Plaintiff [3] - 1:5, 1:10,
1:15
plaintiffs [2] - 21:22,
39:4
plan [1] - 38:15
planning [3] - 4:25,
28:18, 38:12
players [1] - 10:25
pleadings [3] - 37:11,
40:19, 49:7
plug [1] - 9:5
plus [1] - 31:19
Pm [3] - 1:21, 4:6, 63:9
point [20] - 14:15,
15:7, 15:22, 16:18,
17:11, 20:24, 21:8,
24:1, 25:14, 28:23,
29:11, 30:21, 33:2,
33:23, 39:11, 40:2,
41:16, 42:23, 43:13,
44:5, 49:16, 56:5,
59:1, 61:13
points [2] - 14:23,
17:10
pops [1] - 48:14
portfolio [2] - 33:7,
46:1
portion [1] - 34:11
position [7] - 10:23,
12:24, 30:18, 38:14,
50:4, 52:15, 55:1
positions [5] - 6:3,
21:16, 28:4, 51:14
possibility [1] - 10:18
possible [4] - 10:1,
10:17, 15:6, 58:14
potential [2] - 14:18,
32:17, 58:25
practically [1] - 33:18
precedent [1] - 24:17
precedential [1] -
24:16
prefiling [1] - 10:20
prejudice [5] - 36:13,
36:18, 45:12, 52:20,
53:6
prejudiced [2] - 40:1,
40:4, 40:6
prejudicial [3] - 32:20,
44:15, 50:15
preliminary [1] - 19:24
premature [3] - 11:3,
29:10, 30:21

premise [1] - 50:13
prepare [2] - 34:18, 47:9
prepared [2] - 6:1, 6:3
presently [1] - 28:15
President [1] - 5:13
pressure [1] - 54:15
presumably [1] - 53:19
Pretrial [1] - 62:5
pretrial [3] - 29:23, 30:24, 62:3
pretty [2] - 11:9, 57:11
prevent [1] - 20:2
prima [2] - 7:12, 11:10
principal [1] - 45:16
principle [1] - 25:20
privilege [2] - 53:25, 54:4
problem [4] - 31:10, 45:15, 46:23, 54:21
procedure [1] - 28:17
proceed [1] - 31:8
proceeded [1] - 31:9
proceeding [3] - 22:23, 37:4, 54:5
proceedings [1] - 25:21
process [20] - 10:9, 15:13, 15:16, 20:15, 27:11, 27:15, 27:23, 29:3, 29:4, 29:19, 29:23, 30:13, 32:24, 35:8, 36:5, 36:15, 43:14, 44:8, 44:16, 53:16
produce [1] - 57:19
produced [2] - 57:17, 57:25
product [3] - 7:5, 11:19, 17:8
production [1] - 57:19
productive [1] - 38:3
productively [1] - 38:14
products [12] - 6:13, 6:18, 6:19, 12:2, 12:7, 12:14, 13:15, 18:14, 34:3, 34:4, 36:10, 41:15
promotes [1] - 17:22
prompt [1] - 10:15
promulgated [1] - 9:5
prong [2] - 9:22, 10:6
pronounce [1] - 16:23
properly [2] - 14:10, 16:7
Properties [1] - 5:14
proposal [6] - 39:3, 46:24, 46:25, 53:6,

55:4, 56:10
propose [1] - 43:4, 45:2, 53:9
proposed [6] - 40:25, 41:7, 49:3, 49:8, 51:1, 51:5
proposes [1] - 9:2
proposing [1] - 55:22
prosecution [1] - 23:21
prospect [1] - 46:1
protect [1] - 38:6
protective [4] - 57:22, 58:1, 58:10, 58:16
prove [1] - 13:3
provision [2] - 51:10, 51:18
pull [1] - 58:11
pulling [1] - 53:13
pure [3] - 22:22, 23:1, 26:19
purely [1] - 17:5
purpose [1] - 29:13
purposes [4] - 27:10, 30:12, 30:19, 30:24
pursuant [1] - 58:1
pushing [1] - 12:5
Put [1] - 44:6
put [17] - 6:5, 7:20, 11:19, 23:13, 24:3, 29:12, 33:14, 35:1, 38:1, 38:6, 42:19, 43:9, 43:20, 44:5, 48:5, 50:23, 60:10
puts [2] - 52:15, 52:18
putting [1] - 12:1

## Q

queue [1] - 57:7
quickly [1] - 6:11
quite [4] - 5:22, 16:17, 41:14, 52:14
quote [2] - 14:22, 35:1
quotient [1] - 31:6

## R

Rainey [64] - 2:5, 4:22, 4:24, 12:22, 21:25, 25:8, 25:17, 25:19, 26:10, 27:4, 27:7, 28:11, 29:12, 29:16, 29:20, 30:18, 31:16, 36:16, 39:1, 39:2, 39:8, 39:16, 40:17, 41:12, 43:1, 44:3, 44:10, 45:25, 46:21, 46:25, 47:3, 47:7, 47:16, 47:20, 47:24,

48:13, 48:21, 48:24, 49:6, 49:12, 49:19, 49:22, 52:11, 53:6, 53:19, 53:22, 54:14, 55:2, 55:4, 55:20, 55:23, 56:5, 56:8, 56:9, 56:14, 57:18, 58:6, 58:8, 58:17, 58:21, 60:6, 61:1, 62:11
raise [6] - 26:7, 27:24, 27:25, 33:17, 56:18
raised [1] - 59:19
rather [2] - 16:19, 60:2
reach [1] - 22:14
real [1] - 59:6
really [24] - 7:6, 7:8, 7:9, 9:5, 9:18, 9:19, 10:5, 10:6, 10:11, 10:19, 11:22, 13:3, 17:12, 18:10, 18:22, 19:11, 30:3, 32:19, 34:18, 36:5, 40:10, 41:5, 45:10, 46:14
reason [3] - 23:11, 30:19, 42:15
reasonable [1] - 46:20
reasonably [1] - 55:7
reasons [8] - 9:15, 11:17, 12:5, 32:8, 50:11, 54:24
recent [1] - 11:14
reconsider [2] - 20:25, 21:2
record [7] - 11:5, 13:14, 14:2, 14:13, 51:16, 51:17, 53:2
redo [1] - 37:5
Redwood [1] - 3:13
reference [2] - 31:2, 48:5
references [1] - 51:15
referral [1] - 60:23
reflects [2] - 35:5, 45:23
regime [4] - 45:19, 45:23, 51:1
regrets [1] - 5:2
regular [1] - 10:7
Reines [24] - 3:12, 5:18, 30:2, 30:8, 30:11, 30:25, 33:1, 33:20, 50:3, 50:10, 51:23, 52:1, 52:9, 52:12, 53:11, 54:7, 54:22, 55:11, 55:14, 55:18, 55:24, 61:2, 62:24
related [1] - 38:19
relationship [6] - 7:13,

14:4, 14:6, 15:24, 15:25, 18:11
relatively [1] - 13:18
reliance [1] - 53:14
rely [5] - 49:23, 53:15, 56:6
remanded [1] - 22:12
remedies [1] - 48:20
remedy [1] - 12:13
render [1] - 37:4
reopen [1] - 54:18
reply [5] - 10:22, 12:23, 13:6, 15:23, 17:9, 17:13
report [20] - 6:23, 14:23, 14:25, 17:16, 27:21, 28:24, 29:25, 32:12, 34:6, 34:8, 34:24, 35:5, 38:3, 41:3, 42:10, 43:25, 45:19, 45:22, 62:1
Reporter [1] - 3:20
Reporter's [1] - 4:4
request [5] - 11:7, 11:8, 54:18, 60:7, 60:12
requests [3] - 32:10, 32:11, 44:22
require [4] - 7:2, 7:4, 7:7, 7:18
required [2] - 9:22, 10:20
requirements [1] - 6:25
requires [2] - 41:22, 52:18
resist [3] - 26:6, 44:10, 54:24
resolution [1] - 39:21
resolve [2] - 39:19, 41:10
respect [5] - 13:1, 13:2, 13:17, 39:20, 57:20
respects [2] - 24:17, 36:12
respond [8] - 4:8, 11:2, 11:3, 12:18, 28:6, 28:9, 29:10, 37:16
responding [1] - 44:17
response [2] - 7:10, 39:1
responses [2] - 39:9, 58:13
responsible [1] - 14:10
responsive [1] - 37:11
result [3] - 19:8,

52:20, 53:8
resulted [2] - 12:12, 22:8
retake [1] - 54:3
returns [1] - 7:23
reversed [1] - 22:10
rich [1] - 59:12
Richard [3] - 2:5, 4:22, 21:25
richer [1] - 53:2
risk [1] - 54:7
risks [1] - 15:1
road [4] - 28:20, 42:21, 45:21
roer [1] - 59:17
room [2] - 60:17, 62:6
ross [1] - 43:2
rule [6] - 9:4, 9:11, 11:4, 23:3, 41:22, 61:21
Rule [8] - 1:21, 9:2, 10:20, 15:8, 15:12, 15:17, 15:20, 46:2
ruled [3] - 22:15, 24:18
rules [4] - 9:2, 9:8, 50:14, 63:1
ruling [1] - 25:25
rulings [4] - 21:2, 22:21, 26:2, 26:4
run [1] - 59:25

## S

Sa [22] - 1:7, 2:17, 7:4, 12:1, 12:25, 13:4, 13:8, 13:14, 13:19, 13:20, 13:25, 14:3, 14:19, 15:10, 16:15, 16:19, 16:21, 16:24, 17:5, 20:15, 20:17
Sa's [1] - 13:7
safe [2] - 14:1, 63:8
Sasha [2] - 3:3, 5:5
satellite [2] - 53:16, 54:5
satisfactory [1] - 39:22
satisfy [1] - 14:18
schedule [20] - 20:2, 20:8, 27:10, 27:14, 27:17, 28:8, 28:12, 33:14, 36:15, 37:18, 37:19, 40:23, 40:25, 45:13, 45:22, 46:4, 46:8, 46:7, 46:10, 47:9, 58:20, 59:19, 60:14, 62:7
schedules [1] - 34:25
scheduling [4] - 4:5,

29:13, 30:5, 60:24
**scope** [10] - 37:7, 37:24, 37:25, 38:16, 44:22, 44:25, 45:23, 45:24, 50:21, 61:13
**search** [1] - 32:16
**second** [9] - 9:22, 10:18, 39:3, 44:17, 44:20
**secure** [2] - 14:18, 15:5
**see** [5] - 31:13, 40:25, 44:24, 60:22, 62:12
**seek** [3] - 42:2, 54:24, 54:25
**seeking** [1] - 61:16
**seem** [2] - 19:19, 40:2
**sell** [2] - 6:18, 12:2
**selling** [2] - 7:5, 13:2
**sells** [4] - 6:13, 12:7, 17:6, 18:7
**send** [4] - 32:16, 34:7, 58:7, 59:2
**sends** [1] - 5:2
**sense** [10] - 26:13, 30:14, 37:6, 40:3, 41:1, 41:19, 42:1, 52:2, 58:13, 62:24
**sentence** [1] - 56:22
**separate** [4] - 7:21, 7:22, 17:23
**September** [1] - 62:16
**serve** [2] - 39:18, 44:21
**served** [1] - 39:23
**set** [11] - 27:23, 34:24, 47:22, 52:3, 61:5, 61:14, 61:22, 62:1, 62:15, 62:18, 63:2
**setting** [1] - 27:11
**settled** [2] - 11:9, 22:16
**settlement** [2] - 10:15, 34:1
**seven** [2] - 32:3, 32:18
**severe** [1] - 15:1
**share** [1] - 7:25
**Shaw** [5] - 2:20, 5:6, 5:9, 5:10, 5:13
**sheet** [1] - 57:21
**shock** [1] - 46:13
**Shores** [1] - 3:13
**short** [1] - 43:12
**shorter** [1] - 46:4
**shortly** [1] - 19:25
**showing** [4] - 9:21, 10:3, 19:11, 20:13
**shown** [1] - 11:13
**side** [4] - 4:16, 27:23, 37:9, 45:21

**sides** [2] - 27:17, 47:21
**simple** [2] - 27:4, 27:5
**simply** [9] - 13:13, 13:15, 14:8, 16:19, 17:2, 26:4, 26:18, 26:20, 41:18
**Sinder** [36] - 2:12, 5:11, 6:8, 6:10, 6:16, 7:17, 8:1, 8:3, 9:4, 11:6, 11:8, 12:25, 14:7, 14:16, 15:8, 17:9, 17:10, 20:6, 20:10, 20:12, 31:20, 31:21, 33:8, 33:20, 44:8, 44:9, 44:11, 45:3, 49:14, 56:15, 56:17, 56:20, 56:25, 57:5, 57:9, 57:11
**Sinder's** [3] - 13:3, 16:14, 33:2
**single** [6] - 19:3, 26:15, 46:5, 46:10, 57:21
**sits** [1] - 8:7
**sitting** [2] - 42:3, 42:7
**situation** [14] - 8:12, 8:17, 9:6, 11:25, 15:13, 15:19, 16:5, 23:4, 26:16, 26:17, 37:13, 37:15, 41:16, 42:4
**situations** [1] - 48:2
**six** [2] - 47:1, 56:21
**Sixty** [1] - 55:11
**size** [1] - 38:18
**Sleet** [1] - 1:23
**slow** [1] - 15:2
**small** [1] - 8:23
**so-called** [1] - 59:20
**Societie** [1] - 16:22
**sold** [3] - 12:14, 12:15, 13:16
**someone** [1] - 25:3
**somewhat** [3] - 35:18, 37:5, 38:3
**soon** [1] - 58:14
**sooner** [1] - 45:10
**sophisticated** [1] - 46:18
**Sorry** [1] - 12:21
**sort** [2] - 10:14, 14:5
**sorted** [1] - 45:5
**sound** [2] - 23:16, 23:17
**sounds** [2] - 29:6, 43:23
**space** [1] - 4:12
**specific** [2] - 7:1, 21:13

**specifically** [5] - 10:16, 38:1, 46:1, 46:3, 61:18
**specification** [1] - 23:22
**specifics** [1] - 17:22
**specter** [1] - 31:18
**spend** [1] - 34:2
**spending** [1] - 48:12
**spent** [4] - 16:3, 16:5, 17:6, 18:22
**spite** [1] - 59:12
**spread** [1] - 9:8
**staff** [1] - 59:2
**stage** [3] - 14:2, 53:17, 60:11
**staged** [1] - 53:17
**standpoint** [2] - 32:13
**stare** [1] - 25:19
**Stargatt** [2] - 2:9, 2:19
**start** [5] - 4:12, 5:4, 30:16, 32:24, 44:1
**started** [2] - 31:19, 33:8
**state** [10] - 9:9, 9:10, 9:11, 9:16, 11:4, 13:13, 15:12, 15:14, 61:19
**statement** [2] - 6:2, 14:19
**statements** [2] - 7:22, 31:1
**States** [11] - 1:1, 6:17, 9:19, 10:7, 12:14, 13:7, 17:25, 19:6, 19:8, 19:19, 32:14
**status** [1] - 5:22, 27:20, 28:24, 29:25, 32:12, 34:8, 34:8, 34:24, 35:4, 35:5, 38:2, 38:11, 41:3, 42:10, 43:25, 45:19, 45:22, 52:4, 62:1
**statute** [2] - 6:25, 15:20
**statutory** [1] - 23:3
**steps** [1] - 7:5
**Steve** [2] - 5:5, 43:20
**Steven** [2] - 2:3, 2:22
**still** [4] - 28:16, 59:14, 60:24, 61:23
**stipulated** [4] - 22:8, 47:9, 59:24, 62:7
**stipulation** [1] - 59:22
**stipulations** [1] - 59:23
**strategic** [1] - 50:17
**stream** [3] - 11:18, 11:20, 12:1
**strikes** [1] - 58:24

**structure** [2] - 16:25, 17:3
**structured** [1] - 30:25
**Stuart** [2] - 2:12, 5:11
**stuck** [2] - 25:2, 25:6
**studying** [1] - 45:4
**stuff** [1] - 58:5
**sub** [2] - 8:8, 43:2
**subject** [5] - 8:11, 9:23, 10:4, 16:8, 20:18
**submission** [3] - 51:12, 51:13, 62:14
**submissions** [1] - 15:23
**submit** [1] - 41:14
**subsequent** [3] - 25:13, 25:25, 26:14
**subsidiaries** [2] - 6:21, 19:15
**subsidiary** [9] - 7:14, 7:20, 8:4, 8:10, 8:14, 14:3, 18:13, 19:3
**substantial** [1] - 45:11
**suddenly** [1] - 48:14
**sue** [4] - 10:22, 18:23, 25:3, 32:24
**sued** [2] - 18:18, 33:20
**sufficient** [12] - 8:9, 8:22, 9:8, 9:9, 9:19, 10:2, 10:6, 10:19, 18:11, 19:8, 20:13, 50:19
**suggest** [2] - 40:9, 54:19
**suggests** [1] - 20:17
**suing** [2] - 16:6, 16:7
**suit** [6] - 14:13, 19:1, 33:5, 35:15, 39:17, 60:11
**summarize** [1] - 6:10
**summary** [2] - 41:8, 61:16
**superfluous** [1] - 37:5
**support** [7] - 6:23, 17:2, 17:13, 28:1, 28:2, 28:3, 44:2
**Supreme** [6] - 10:15, 11:21, 12:11, 22:24, 26:17, 26:23
**surprise** [1] - 46:13
**survive** [1] - 10:8
**suspect** [2] - 10:19, 21:8
**System** [1] - 24:2
**systematic** [3] - 7:8, 9:13, 10:7
**Systems** [1] - 1:17, 3:17, 21:17, 22:4, 25:4, 25:6, 28:15,

57:24, 57:25, 58:11

## T

**tabbed** [1] - 52:7
**table** [7] - 38:2, 39:3, 42:19, 43:9, 43:10, 44:6, 44:7
**tag** [1] - 55:15
**tailor** [1] - 38:3
**talks** [1] - 14:7
**target** [1] - 40:6
**tax** [1] - 7:22
**Taylor** [2] - 2:9, 2:19
**team** [6] - 7:21, 8:4, 8:7, 8:15, 13:22, 19:14
**teams** [1] - 8:13
**Technologies** [24] - 1:4, 1:9, 1:12, 1:14, 2:8, 3:5, 3:8, 5:7
**Telcordia** [41] - 1:4, 1:9, 1:14, 2:7, 4:21, 6:23, 15:25, 16:1, 16:12, 17:3, 18:15, 19:20, 21:24, 22:1, 22:9, 22:15, 23:7, 23:12, 23:20, 24:7, 25:3, 27:24, 29:7, 33:3, 33:9, 33:21, 34:7, 34:13, 35:2, 38:17, 39:17, 40:8, 41:13, 41:14, 42:11, 42:19, 43:3, 50:8, 57:1, 57:19, 57:25
**Telcordia's** [1] - 12:24
**telecom** [1] - 17:17
**telecommunications** [1] - 10:25
**teleconference** [3] - 60:2, 61:16, 62:16
**telephone** [1] - 63:7
**ten** [1] - 45:6
**tension** [1] - 26:25
**term** [1] - 22:13
**terms** [16] - 17:18, 19:16, 22:19, 23:18, 24:6, 28:2, 29:1, 29:8, 33:18, 34:22, 34:23, 36:3, 38:18, 54:25, 55:4
**test** [3] - 9:22, 11:22, 11:24
**tests** [1] - 11:22
**themselves** [1] - 59:7
**theory** [9] - 7:11, 7:16, 7:18, 9:1, 11:18, 15:24, 26:3, 27:2
**thereafter** [3] - 35:9, 53:10, 53:12

therefore [1] - 59:22
therein [1] - 60:9
They've [2] - 18:24, 36:1
they've [5] - 42:15, 43:23, 44:4, 45:4
thinking [3] - 35:21, 46:25, 50:3
thinly [1] - 9:9
Third [1] - 23:3
third [1] - 44:17
thoughts [1] - 51:22
three [7] - 17:20, 21:15, 22:5, 35:24, 38:19, 38:22, 46:10
Thursday [1] - 1:21
timetable [1] - 32:21
timing [1] - 54:25
today [9] - 4:18, 19:25, 20:3, 33:8, 39:14, 44:8, 47:23, 60:17, 62:8
together [5] - 33:14, 33:21, 33:25, 38:15, 45:18
tooth [1] - 40:21
towards [1] - 35:12
travels [1] - 63:8
trial [9] - 22:17, 30:1, 30:21, 37:25, 41:4, 52:19, 53:2, 60:8, 61:22
trials [1] - 60:5
tried [3] - 16:23, 18:25, 51:8
tripled [1] - 38:18
tripling [1] - 44:1
troublesome [1] - 35:18
true [5] - 4:18, 14:21, 17:3, 17:21, 50:16
try [5] - 37:17, 38:14, 39:19, 58:5, 60:18
trying [11] - 7:18, 10:12, 16:6, 17:7, 26:23, 34:24, 35:1, 36:15, 38:3, 38:6
Tunnell [1] - 3:9
two [24] - 5:24, 6:11, 8:2, 11:17, 11:22, 16:22, 21:4, 21:7, 33:21, 36:22, 38:9, 38:10, 42:10, 45:6, 46:6, 48:2, 51:19, 52:1, 56:2, 60:8, 60:9, 60:12, 60:18, 60:20
Two [1] - 21:6
type [2] - 27:24, 28:6

**U**

ulterior [1] - 10:14
ultimate [1] - 6:13
ultimately [1] - 50:14
unawares [1] - 6:2
uncommon [1] - 46:15
under [8] - 7:11, 9:22, 10:20, 15:19, 15:20, 16:25, 19:1, 62:25
underscores [1] - 12:4
understood [1] - 15:8
unexpectedly [1] - 5:1
unfortunately [1] - 40:23
uniform [1] - 26:24
uniformity [1] - 22:25
unique [1] - 26:16
United [11] - 1:1, 6:17, 9:19, 10:7, 12:14, 13:7, 17:25, 19:6, 19:8, 19:18, 32:14
unless [2] - 11:23, 61:25
unlike [1] - 59:11
up [22] - 11:15, 19:14, 22:9, 23:15, 23:21, 24:20, 26:23, 27:11, 29:23, 33:18, 34:2, 35:21, 37:15, 38:10, 38:15, 39:2, 41:10, 48:14, 51:22, 57:7, 60:1, 63:2
upper [1] - 13:24
Usa [18] - 1:7, 2:15, 2:18, 7:20, 12:8, 12:16, 13:16, 14:4, 14:17, 14:25, 17:12, 17:14, 18:1, 18:2, 18:3, 19:18, 20:16
Usa's [1] - 5:24
Usdc [1] - 1:23

**V**

value [2] - 17:15, 31:6
variety [1] - 32:14
various [1] - 6:21
versa [1] - 8:15
vetted [1] - 22:20
vexatious [1] - 59:2
vice [1] - 8:15
Vice [1] - 5:13
vice-versa [1] - 8:15
view [11] - 8:9, 20:5, 21:19, 23:14, 26:22, 31:14, 42:20, 44:3, 46:9, 50:5
vigilant [1] - 10:17
virtually [1] - 8:10

virtue [1] - 31:4
vs [1] - 19:17

**W**

wait [1] - 58:13
waive [4] - 52:16, 53:25, 54:10
waiver [1] - 54:4
wants [5] - 27:24, 29:7, 32:2, 44:8, 44:21
Washington [1] - 2:6
Watkins [3] - 2:22, 3:2, 5:6
ways [3] - 48:16, 48:18, 52:23
website [8] - 13:4, 13:8, 13:21, 17:24, 19:2, 19:3, 19:4, 19:6, 19:7
week [4] - 35:19, 38:17, 38:22, 45:20
weeks [9] - 45:6, 55:5, 56:2, 60:8, 60:9, 60:12, 60:18, 60:21
Wells [5] - 3:12, 3:15, 5:18, 5:19, 30:8
whereas [1] - 24:24
whichever [1] - 20:1
whole [5] - 9:7, 9:13, 9:20, 32:19, 36:4
willfulness [10] - 50:5, 50:12, 50:19, 50:22, 52:12, 52:14, 53:12, 54:8, 54:9, 54:20
willing [2] - 6:5, 16:4
willy [1] - 59:25
willy-nilly [1] - 59:25
Wilmington [1] - 1:20
window [2] - 47:5, 51:8
wise [1] - 59:16
wish [2] - 50:22, 63:8
witnesses [3] - 32:17, 54:8, 54:9
word [4] - 13:3, 16:22, 58:23, 59:16
words [3] - 9:17, 16:22, 32:5
work-up [1] - 37:15
world [2] - 13:11, 13:12
worldwide [1] - 13:9
worth [1] - 58:23
wrote [1] - 51:11

**Y**

year [4] - 17:16, 31:19,

36:19, 50:20
years [10] - 17:20, 18:12, 19:1, 31:24, 33:12, 34:17, 35:24, 41:18
yellow [1] - 49:15
York [7] - 2:13, 2:23, 3:16, 5:19
Young [2] - 2:9, 2:19