# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-874 GMS |
| | ) | |
| ALCATEL USA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## TELCORDIA'S OPENING CLAIM CONSTRUCTION BRIEF

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Of Counsel:*

Donald R. Dunner
Don O. Burley
Steven M. Anzalone
Richard H. Smith
Houtan K. Esfahani
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC  20001-4413
(202) 408-4000

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

Dated:  March 3, 2006
167242.1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.     The Nature and Stage of the Proceeding ................................................................... 1

II.    Summary of the Argument ......................................................................................... 1

     A.     Summary of Positions ...................................................................................... 1

     B.     The Law of Claim Construction ...................................................................... 1

III.   Argument ................................................................................................................... 2

     A.     The '306 Patent ................................................................................................ 2

     B.     The '633 Patent ................................................................................................ 2

     C.     The '052 Patent ................................................................................................ 2

     1.     "telecommunications switching system" [claims 17 and 18] ......................... 3

     2.     "accessing a server with said browser" [claim 17] ......................................... 6

     3.     "providing a copy of the application program from said server to said remote computer" [claim 17] ..................................................................................... 7

     4.     "accessing said telecommunications switching system with said application program from said remote computer" [claim 17] ........................................... 9

     5.     "system manager building block" [claim 17] ............................................... 11

     6.     "communicating with a system manager building block of the telecommunications switching system from said remote computer" [claim 17] ............. 13

     7.     "monitoring" [claim 17] ............................................................................... 14

     8.     "remote computer" [claims 17 and 18] ......................................................... 15

     9.     "Hypertext markup language (HTML) server" [claim 19] ............................ 15

     10.    "Java Applet" [claim 24] .............................................................................. 16

IV.    Conclusion ............................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*,
  346 F.3d 1075 (Fed. Cir. 2003) ........................................................................................... 5

*Alza Corp. v. Mylan Labs., Inc.*,
  391 F.3d 1365 (Fed. Cir. 2004) ........................................................................................... 2

*Brookhill-Wilk 1, LLC, v. Intuitive Surgical, Inc.*,
  334 F.3d 1294 (Fed. Cir. 2003) ......................................................................................... 15

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l*,
  214 F.3d 1302 (Fed. Cir. 2000) ........................................................................................... 2

*Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*,
  93 F.3d 1572 (Fed. Cir. 1996) ............................................................................................. 6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
  381 F.3d 1111 (Fed. Cir. 2004) ........................................................................................... 2

*Jeneric/Pentron, Inc. v. Dillon Co.*,
  205 F.3d 1377 (Fed. Cir. 2000) ........................................................................................... 5

*Leibel-Flarsheim Co. v. Medrad, Inc.*,
  No. 1:04-CV-607, 2006 WL 335846 (S.D. Ohio Feb. 14, 2006) ........................................ 8

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (en banc) ............................................................................. 12

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ......................................................................................... 11

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................................................... 5

*Seachange Int'l, Inc. v. C-COR Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005) ......................................................................................... 11

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
  164 F.3d 1372 (Fed. Cir. 1998) ......................................................................................... 13

*Utah Med. Prods., Inc. v. Graphic Controls Corp.*,
  350 F.3d 1376 (Fed. Cir. 2003) ......................................................................................... 11

**Other Authorities**

*American Heritage College Dictionary* (3d ed. 1997) ........................................... 11, 14, 15

*American Heritage Dictionary of the English Language* (4th ed. 2000) .............................. 14

ii

## I.      The Nature and Stage of the Proceeding

This is an action for patent infringement brought by Telcordia Technologies, Inc. ("Telcordia"), formerly Bell Communications Research, Inc. ("Bellcore")[1] against defendant Alcatel USA, Inc. ("Alcatel") for infringement of U.S. Patent Nos. 4,893,306 ("the '306 patent") and Re. 36,633 ("the '633 patent"). Contemporaneously with this brief, Telcordia is filing its Opening Claim Construction Brief ("the Lucent/Cisco Brief") in its actions against Lucent Technologies, Inc. (No. 04-875 GMS) and Cisco Systems, Inc. (No. 04-876 GMS). Because the Lucent/Cisco Brief deals with both of the patents Telcordia is asserting against Alcatel (as well as a third patent, which Telcordia is not asserting against Alcatel), Telcordia incorporates those sections of that brief that address the '306 and '633 patents.

Alcatel, however, has filed a counterclaim for infringement of U.S. Patent No. 6,247,052 ("the '052 patent"). Accordingly, Telcordia will address the construction of the '052 patent in this brief.

## II.     Summary of the Argument

### A.      Summary of Positions

Consistent with the law of claim construction, Telcordia's proposed constructions are grounded in and supported by the language of the claims themselves, the specification, and the prosecution history. Alcatel, on the other hand, proposes claim constructions that are untethered to the intrinsic evidence. Most notably, in direct contravention to the public notice function of the patent prosecution process, Alcatel proposes constructions that seek to reclaim subject matter that Alcatel expressly surrendered during prosecution. For a number of claim terms, Alcatel also attempts to avoid the claim construction process altogether by proposing "ordinary meaning" as the construction of disputed claim terms. Whether or not a proposed construction of "ordinary meaning" might be appropriate in another situation, it is not in this case.

### B.      The Law of Claim Construction

"A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention." *Innova/Pure Water, Inc. v. Safari Water*

---

[1] Bellcore was formed in 1984 as part of the AT&T breakup to assist the newly created Regional Bell Operating Companies with technical support and research aimed at insuring the safety and integrity of the U.S. telecommunications network.

1

*Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). "Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning." *Elekta Instrument S.A. v. O.U.R. Scientific Int'l*, 214 F.3d 1302, 1307 (Fed. Cir. 2000). "In determining the meaning of disputed claim language, a court looks first to the intrinsic evidence of record, examining, in order, the claim language itself, the specification, and the prosecution history." *Alza Corp. v. Mylan Labs.*, 391 F.3d 1365, 1370 (Fed. Cir. 2004).

## III.    Argument

### A.    The '306 Patent

Telcordia hereby incorporates the discussion in its Cisco/Lucent Brief (principally found at pages 2-21) regarding the '306 patent.

### B.    The '633 Patent

Telcordia hereby incorporates the discussion in its Cisco/Lucent Brief (principally found at pages 21-33) regarding the '763 patent.

### C.    The '052 Patent

The '052 patent is directed to accessing a distributed telecommunications switching system using an application program downloaded from a server. The application program enables a user at a remote computer to access and then monitor the distributed telecommunications switching system.

As shown in Figure 1 (reproduced below), the telecommunications switch management system consists of a GUI (Graphical User Interface) launcher 8 and a distributed telecommunications switching system 230. Fig. 1; Col.4:8-13; Col.4:47-54; Col.5:5-8. The GUI launcher 8 includes a remote computer 10 and a remote server 14. Col.5:8-9; Col.5:17-24. The '052 patent explains that the remote computer 10 uses a browser 11 to access the remote server 14 through a communications link 12. Col.1:67-Col.2:4; Col.6:21-23. Once accessed, the remote server 14 then provides an application program, such as a Java Applet, to the remote computer 10 through the communication link 12. Col.2:4-6; Col.6:29-35. When the remote computer 10 runs the application program provided by the server 14, remote computer 10 accesses through a second communications link 16 a system manager building block 18 resident in the telecommunications switching system 230. Col.2:6-11; Col.5:29-33; Col.22:20-21. This access enables

2

monitoring of the switching system 230. Col.1:60-64. To determine whether a user at remote computer 10 is permitted access to the switching system 230, the system manager building block 18 contains information identifying users authorized to access the switching system 230. Col.2:17-21; Col.6:35-56.



FIG. 1

1.    "telecommunications switching system" [claims 17 and 18]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "telecommunications switching system" [claims 17 and 18] | a system that includes one or more switch fabrics for processing call information and a central unit for control and management of the calls | a telecommunication system for establishing and releasing connections among telecommunication transmission paths |

The parties disagree as to whether the construction of a "telecommunications switching system" should include only limited aspects of a switching system (i.e., only "establishing and releasing connections"), or should instead include the complete aspects of a switching system (i.e., "switch fabrics," "processing call information," and "control and management" of calls). Telcordia submits that, as explained below, the description of the term in the specification supports the latter position, i.e., a complete construction that includes switch fabrics, processing, and control and management. Moreover, Telcordia notes that during prosecution, Alcatel expressly distinguished "telecommunications switching systems" from systems that merely "establish and release connections." As such, Alcatel's more limited

3

construction is inconsistent with the '052 prosecution history and would allow Alcatel to reclaim scope that was surrendered during prosecution.

Telcordia's proposed construction is supported by the description of the invention set forth in the specification. Specifically, the specification expressly defines a "Telecommunications Switching System 230" as including a central unit for "control and management" of the delivery units, each of which provides the "switch fabric" for call processing:

> The centralized *control and management* provided by Service Unit Subsystem 232 allows a user to be connected to different Delivery Unit Subsystems 234 while maintaining a common directory number. Delivery Unit Subsystem 234 provides the *switching fabric* for distributed *Telecommunications Switching System 230.*

Col.4:8-13 (emphasis added). The aspects of "Telecommunications Switching System 230" that are set forth in Telcordia's proposed construction are also clearly seen in the graphical representation of the "telecommunications switching system" found in Figure 14:



Specifically, Figure 14 represents "Telecommunications Switching System 230," and it includes elements that perform "control and management" (Service Unit Subsystem 232) and "switching fabric" (Delivery Unit Subsystem 234). Col.4:8-13.

The definition and use of "telecommunications switching system" in the specification contemplates a more specific and complex system than that set forth in Alcatel's proposed construction (i.e., only "establishing and releasing connections"). Indeed, as shown above, the specification's definition expressly includes within the "telecommunications switching system" both the switch fabric and the control and management elements. Accordingly, the definition and use of "telecommunications switching system" in the specification controls the construction of the claim, as claim terms must always

4

be interpreted consistently with and in view of the specification of which they are part. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315-17 (Fed. Cir. 2005) (en banc).

Telcordia's proposed construction is additionally supported by the prosecution history, where the applicants distinguished claim 17 from prior art U.S. Patent No. 6,035,332 to Ingrassia, Jr. et al. ("Ingrassia") (attached as Ex. A), which discloses establishing and releasing connections among telecommunication transmission paths. Specifically, the applicants expressly argued that Ingrassia "has no capability to monitor a telecommunications switching system." Nov. 6, 2000, Response to Examiner's Action (attached as Ex. B) at 9. But under Alcatel's proffered construction, Ingrassia does indeed monitor a telecommunications switching system. Ingrassia monitors web site 134, which establishes and releases connections among telecommunications transmission paths in network 129. Ingrassia (Ex. A), Fig. 1; Col.1:52-67; *see also id.*, Col.7:29-31; Col.4:13-20.[2]

Since Ingrassia discloses a system for monitoring the web site 134 (which establishes and releases connections among telecommunication transmission paths), when the applicants argued that Ingrassia's system "has no capability to monitor a telecommunications switching system," they necessarily limited the scope of claim 17 by expressly disclaiming systems that merely establish and release connections among telecommunication transmission paths. *See ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1078 (Fed. Cir. 2003). Alcatel should not now be permitted to recapture this disclaimed scope.[3]

_____

[2] The web site 134 includes a Web Tracking and Synching gateway (WTS) 142 "responsible for maintaining all socket connections between Master Applets and WTS server 144." Ingrassia (Ex. A), Col.5:49-50. Moreover, web site 134 includes an HTTP (Hypertext Transport Protocol) server 152 that also establishes connections through the network 129. Ingrassia, Col.6:58-59; *see also* T. Berners-Lee, RFC 1945, Hypertext Transfer Protocol - HTTP/1.0 (available at http://www.ietf.org/rfc) (describing HTTP connections) (attached as Ex. C). The Ingrassia web site 134 is monitored by remote computers terminals 104A- 104N. These terminals "*display[] relevant statistics of WTS server 144*," and allow "*a supervisor agent [to] monitor all active sessions*" and "a supervisor [to] *monitor* operational status of a session." *See* Ingrassia, Col.1:52-67 (emphasis added); *see also* Fig.8b; Col.2:27-29. Each terminal 104A-104N also includes a telephone set 102A-102N, which can establish calls through network 129. Fig. 1; Col.4:13-20.

[3] Because claim 18 depends from claim 17 and contains the same "telecommunications switching system" limitation, Alcatel's statements in distinguishing claim 17 apply equally to claim 18. *See Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1383 (Fed. Cir. 2000) ("[A] dependent claim, by nature, incorporates all the limitations of the claim to which it refers.").

In summary, Telcordia's construction is consistent with the definition and use of "telecommunications switching system" set forth in the '052 patent, is consistent with the prosecution history of the '052 patent, and correctly avoids the recapture of claim scope that was surrendered during prosecution.

### 2. "accessing a server with said browser" [claim 17]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "accessing a server with said browser" [claim 17] | using the browser to access a server through a first communications link | communicating with a server using a browser |

The parties disagree as to whether this term means that a server and browser "communicate" in a generic sense, or whether the term requires specific access through a "first communications link." Consistent with the language of the claims, the specification, and the prosecution history, Telcordia submits that the browser and the server do not just generally "communicate," but rather that the claim requires the browser to access a server using "a first communication link."

Beginning with the language of the claim, Telcordia notes that "accessing" cannot mean "communicating" because claim 17 expressly uses both terms and both terms have different ordinary meanings. *See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) ("If the terms 'pusher assembly' and 'pusher bar' described a single element, one would expect the claim to consistently refer to this element as either a 'pusher bar' or a 'pusher assembly,' but not both, especially not within the same clause.") Stated differently, to equate "accessing" with "communicating" would violate the presumption that the inventors intended those terms to have different meanings since both terms are used in the same claim. *Id.*

Turning next to the specification, when describing access to "Remote Server 14," the specification teaches that the access occurs across a specific link (i.e., link 12). Col.5:17-24. The specification does not indicate that the browser generally "communicates" with the server, but rather calls out a specific link.

Finally, unequivocal evidence supporting Telcordia's construction is found in the prosecution history. There, applicants expressly distinguished the '052 invention (and expressly claim 17) from prior

6

art by noting that the '052 invention includes "a first communication link" (where the browser accesses the server) and a separate "second communication link" (where the browser accesses the telecommunications switching system). In response to a rejection of the claims over prior art, applicants explained:

> Independent Claims 1, 17, and 27 recite in general the ability to access a telecommunications switching system for monitoring purposes over a *second* communication link from a remote computer independently from a server *upon receiving an application program from the server over a first communication link separate from the second communication link.* By contrast, the Ingrassia, Jr., et al. patent . . . cannot access a telecommunications switching system for monitoring thereof through a dual communication link function provided by the claimed invention. Therefore, Applicants respectfully submit that Claims 1-30 are patentably distinct from the Ingrassia, Jr., et al. patent.

Nov. 6, 2000, Response to Examiner's Action (Ex. B) at 9 (emphasis added). Applicants argued that a first communications link between the remote computer and the server is required to allow access to the server. The Patent Office, relying on the inventors' statements, subsequently allowed claim 17 of the '052 patent over the cited prior art.

It is apparent, therefore, that Alcatel is again seeking to reclaim subject matter that was surrendered during prosecution. The browser's access to the server cannot be via just any form of "communicating," but rather is limited, as was argued during prosecution to gain allowance of claim 17, to a "first communication link." Telcordia's proposed construction remains true to the prosecution history by setting forth the "first communications link." Telcordia's construction is also consistent with the specification's description of a special link, "link 12," used by the browser to access the server. Finally, Telcordia's construction recognizes that the claim uses both "accessing" and "communicating," and adheres to the principle that these two different words, in the same claim, mean different things.

### 3. "providing a copy of the application program from said server to said remote computer" [claim 17]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "providing a copy of the application program from said server to said remote computer" [claim 17] | providing an application program from the server to the remote computer through the first communications link | ordinary meaning |

At the outset, Telcordia notes that for three of the disputed '052 claim terms, Alcatel offers only "ordinary meaning" as its proposed construction. Alcatel's proposed construction is wrong from a legal perspective and is unfair from a procedural perspective.

First, from a legal perspective, because Alcatel does not actually offer a construction that captures or explains what it believes the "ordinary meaning" to be, its proposed construction simply begs the question that must be resolved during these *Markman* proceedings. The "ordinary meaning" of a claim term is not determined in an abstract, absolute sense, but rather is determined from the perspective of one skilled in the art at the time of the invention. As such, as the Federal Circuit consistently holds, there is a process involved in determining the correct ordinary meaning:

> In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claims requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."

*Phillips*, 415 F.3d at 1314 (citations omitted). *See also Leibel-Flarsheim Co. v. Medrad, Inc.*, No. 1:04-CV-607, 2006 WL 335846, at *6 (S.D. Ohio Feb. 14, 2006) (attached as Ex. D) ("[A] patentee cannot avoid defining its own claim terms by asserting that its claims have a plain meaning. . . . [S]uch a position would improperly make the patent holder the arbiter of whether its claims are 'clear and unambiguous.'") (citations omitted).

Second, from a procedural perspective, by refusing to engage in a meaningful way in the initial *Markman* process, and instead saying simply "ordinary meaning" with respect to certain claim terms, Alcatel has avoided all of the give and take that is typically involved in arriving at proper claim constructions. Alcatel should not be able to benefit from this, and should thus be precluded (either in its *Markman* briefing or at oral argument) from contesting the constructions Telcordia has offered for these terms.

In each case, moreover, Telcordia's constructions are amply supported by the intrinsic evidence. Specifically, Telcordia's construction of the limitation "providing a copy of the application program from

8

said server to said remote computer" is (as discussed above) supported by the language of the specification describing "communication over link 12." *See supra* pp. 6-7; *see also* Col.5:21-27. And Telcordia's position is also grounded squarely in the prosecution history of the '052 patent. During prosecution, Alcatel established that, just as the remote computer (with a browser) must access the server through a first communications link (*see supra* pp. 6-7), the server must provide an application program to the remote computer also through the first communications link. Telcordia's position thus parallels the argument set forth above (*see id.*), and the same passage from the prosecution history supports Telcordia here. *See* Nov. 6, 2000, Response to Examiner's Action (Ex. B) at 9 ("receiving an application program from the server over a first communication link separate from the second communication").

In short, whatever Alcatel means by "ordinary meaning," its proposed construction cannot avoid the fact that applicants expressly limited their claims during prosecution such that the first communications link must be used to provide an application program from the server to the remote computer.

**4.    "accessing said telecommunications switching system with said application program from said remote computer" [claim 17]**

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "accessing said telecommunications switching system with said application program from said remote computer" [claim 17] | using the application program at the remote computer to directly and independently access the telecommunication switching system through a separate second communications link | ordinary meaning |

Once again, Alcatel refuses to offer a claim construction for a disputed term and instead offers "ordinary meaning" without any explanation or elaboration as to what it means by "ordinary meaning." For the reasons stated previously, this was improper, and Alcatel should thus be precluded from contesting the construction Telcordia has offered for this limitation *See supra* pp. 8-9.

Telcordia's proposed construction of this term incorporates the concept of direct and independent access through a separate second communications link as supported by the specification and the prosecution history. The specification, for example, explains that

> [t]he remote computer runs the application program, typically in a stand-alone capacity, and accesses a system manager building block via a *second communications link.*

Col.2:6-9 (emphasis added); *see also* Col.5:29-33.  Moreover, Figure 1 of the '052 patent shows that access from the remote computer to the telecommunications switching system is direct and independent from access to the server.

The prosecution history of the '052 patent also supports Telcordia's proposed construction. Specifically, when distinguishing Ingrassia from claim 17, Alcatel stated:

> Independent Claims 1, 17, and 27 recite in general the ability to access a telecommunications switching system for monitoring purposes over a second communication link from a remote computer *independently* from a server upon receiving an application program from the server over *a first communication link separate from the second communication link.* . . .  Moreover, the Ingrassia, Jr. et al. patent has a single communication link between it terminal and its web site through its network.  The dotted lines identified by the Examiner as communication links in Figure 3 of the *Ingrassia, Jr., et al. patent merely show process steps through the single communication link and not separate communication links.*  Thus, the Ingrassia, Jr. et al., patent cannot access a telecommunications switching system for monitoring thereof through a dual communication link function provided by the claimed invention.  Therefore, Applicants respectfully submit that Claims 1-30 are patentably distinct from the Ingrassia, Jr., et al. patent.

Nov. 6, 2000, Response to Examiner's Action (Ex. B) at 9 (emphasis added).  As such, to gain allowance, Alcatel clearly limited claim 17 to require an independent, separate second communication link.[4] Similarly, Alcatel distinguished over another reference, U.S. Patent No. 5,870,558 to Branton, Jr. et al. ("Branton"), by indicating that the invention requires direct access (i.e., immediate and without intervening elements) between the remote computer and the telecommunications switching system.  *See* April 10, 2000, Response to Examiner's Action (attached as Ex. E) at 9-10 ("[T]he Branton, Jr. et al. patent has no communication link to its switch network other than through its server. . . . [T]he Examiner has not shown where the Branton Jr., et al. patent shows . . . a separate second communication link to controllers 271-273 as would be required by the claimed invention.").

Therefore, again, whatever Alcatel means by "ordinary meaning," its proposed construction cannot recapture claim scope that it surrendered during prosecution.  *See Omega Eng'g, Inc. v. Raytek*

---

[4] Applicants' argument with respect to the separate first and second links was made consistently, clearly, and unmistakenly throughout the prosecution history.  Nov. 10, 1999, Response to Examiner's Action (Ex. F) at 2, 9; April 10, 2000, Response to Examiner's Final Action (Ex. E) at 2, 9; Nov. 6, 2000, Response to Examiner's Action (Ex. B) at 9.  Moreover, because Ingrassia (Ex. A) discloses multiple connection links through a single network (Col.4:55-Col.5:5), the applicants also distinguished their two separate "communication links" from Ingrassia's multiple links through a single network.

*Corp.*, 334 F.3d 1314, 1323-24 (Fed. Cir. 2003) ("The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."); *see also Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372-73 (Fed. Cir. 2005).

Telcordia's proposed construction is consistent with the language of the specification, and it accurately reflects the claim scope established during prosecution of the '052 patent.

### 5.    "system manager building block" [claim 17]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "system manager building block" [claim 17] | software resident in the telecommunications switching system used to manage the telecommunications switching system, including establishing communications between the remote computer and the telecommunications switching system | a message passage and handling system |

The two primary disputes regarding the meaning of "system manager building block" center on (1) where the element must be located in the system, and (2) whether the term requires only "message passage and handling," or instead requires "software" used to "manage" and "establish[]" communications." As to the location of the "system manager building block," Telcordia submits that the element is "resident in the telecommunications switching system." This proposed construction is supported by the language of claim 17, which recites "a system manager building block *of the telecommunications switching system.*" Col.22:20-21 (emphasis added).[5] "Of" means "originating at or from," and the use of the phrase "of the telecommunications switching system" requires, as the claim states, that the "system manager building block" be part of the "telecommunications switching system." *American Heritage College Dictionary* 946 (3d ed. 1997) (attached as Ex. G). *See also Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1382-83 (Fed. Cir. 2003) (explaining "of" in the claim construction context).

---

[5] The inventors amended claim 17 to read "a system manager building block <u>of the telecommunications switching system</u>" (underlined text added by amendment), emphasizing this feature to overcome the Ingrassia prior art. Nov. 6, 2000, Response to Examiner's Action (Ex. B) at 5.

Consistent with this plain meaning, all of the embodiments disclosed in the specification show that the "system manager building block" resides in the "telecommunications switching system." For instance, the specification explains that "FIG 1. depicts the following building blocks of the Telecommunications Switch Management System of the present invention, each of which will be discussed below in additional detail: System Manager 18 . . . ." Col.4:60-64. Figure 1 shows "System Manager 18" as part of "Telecommunications Switching System 230." Indeed, there are no descriptions anywhere in the specification that explain that the "system manager building block" is located anywhere other than in the "telecommunications switching system." Although Alcatel's proposed construction makes no effort to define where the "system manager building block" is located in the invention, the claim language and the specification both support Telcordia's position that the "system manager building block" must reside in the "telecommunications switching system."

Additionally, Telcordia submits that the express language of the claim and the specification dictate that the "system manager building block" is not merely a "message passage and handling system," but rather is "software" "used to *manage* the telecommunications switching system, *including establishing communications* . . . ." At the outset, the specification states that "[a] building block is defined to be one or more software objects and routines." Col.4:54-55. Because the patentee defined a "building block" as "software" in the specification, that definition controls. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc).

Moreover, the language of the claim and the specification both support Telcordia's position that the "software" is used to "manage" and "establish[] communications." Claim 17 expressly uses both of the limitations that Telcordia proposes: "*communicating* with a system *manager* building block of the telecommunications switching system from said remote computer." Consistent with the language of the claim, the specification states that the "system manager building block" performs a variety of management functions and establishes communications links:

- "The system manager building block also contains information identifying the users who are authorized to access the telecommunications switching system, and uses this information to determine whether to allow users to access the system." Col.2:16-20.
- "When the user of Remote Computer 10 wishes to terminate the logon session, the user enters the appropriate command at Remote Computer 10, and the GUI Launcher

12

sends a message instructing System Manager 18 to terminate the session, as shown in Block 52." Col.7:17-22.

- "The system manager building block is also in communication with another portion of the telecommunications switch management system, namely a system management interface software building block, which implements communication between the remote computer and the telecommunications switching system." Col.2:10-17.

- "System manager 18 establishes a socket connection between Remote Computer 10 and System Security Manager Client 54 [contained within the telecommunications switching system 230]." Col.6:44-46.

In summary, the Court should adopt Telcordia's proposed construction for "system manager building block" because it (1) correctly addresses the location of the element, (2) acknowledges that the specification defines the element as "software," (3) is consistent with the express claim language requiring management and communication establishment functions, and (4) is consistent with the specification's description of the element as performing a variety of management and communication establishment functions.

      6.      **"communicating with a system manager building block of the telecommunications switching system from said remote computer" [claim 17]**

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "communicating with a system manager building block of the telecommunications switching system from said remote computer" [claim 17] | communicating from the remote computer to the system manager building block through the second communications link | the remote computer communicates with a message passage and handling system of the telecommunications switching system |

Once again, the parties' dispute centers on whether the term covers simply "communicating" or is instead limited to communicating "through the second communications link." As set forth above (*see supra* pp. 6-11), Alcatel unambiguously limited claim 17 to require specific "first communication" and "second communication" links, and the claim cannot now be construed to cover "communications" in a general sense, as Alcatel urges. *See Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998). Telcordia's proposed construction properly acknowledges the prosecution history.

Moreover, Telcordia's proposed construction remains consistent with the specification, which explains:

Once Java Applet 22 has been loaded into Remote Computer 10, Remote Computer 10 can *communicate* in a stand-alone capacity with the Telecommunications Switching System 230 *through communications link 16* and System Manager 18.

Col.5:29-33 (emphasis added).

      7.      **"monitoring" [claim 17]**

| '052 claim term | Telcordia's construction | Alcatel's construction |
| --- | --- | --- |
| "monitoring" [claim 17] | obtaining performance status information from elements of the telecommunications switching system | ordinary meaning |

Once again, Alcatel offers only "ordinary meaning" without any explanation or elaboration as to what that means. As discussed above, this was improper, and Alcatel should thus be precluded from contesting the construction Telcordia has offered for this limitation. *See supra* pp. 8-9.

Telcordia proposes to construe "monitoring" in a manner consistent with the context of the claim language and the specification as well as with the accepted understanding of the term. The meaning of "monitoring" is "[t]o test or sample, especially on a regular or ongoing basis," and "to keep track of systematically with a view to collecting information." *American Heritage Dictionary of the English Language* 1136 (4th ed. 2000) (attached as Ex. H); *American Heritage College Dictionary* (Ex. G) at 881. Telcordia's construction is consistent with these definitions, and is also consistent with the specification, which explains that a remote computer may be used for "monitoring of the Telecommunications Switching System's performance." Col.5:47-48. Moreover, the specification discloses and describes figures that allow a user to obtain performance information about the status of the telecommunications switching system. Figs. 8, 9; Col.15:67-Col.16:5; Col.18:50; Col.19:32-34. Accordingly, Telcordia's construction of the "monitoring" should be adopted.

8.    "remote computer" [claims 17 and 18]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "remote computer" [claims 17 and 18] | a computer at a location that is remote from the telecommunication switching system being monitored | a computer that is separate from the telecommunications switching system |

The parties disagree as to whether "remote" is related to distance, as Telcordia contends, or whether it is merely "separate" as Alcatel contends. Telcordia's construction employs the plain meaning of remote, i.e., "[l]ocated far away." *American Heritage College Dictionary* (Ex. G) at 1155. Similarly, within the computer science arts, "remote" means:

**8.** *Comp. Sci.* Of, relating to, or being a computer device or system situated at some distance from but communicating with a central computer.

*Id.* Moreover, the Federal Circuit has examined the term "remote location" and found its ordinary meaning to be related to distance. *See Brookhill-Wilk 1, LLC, v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1302 (Fed. Cir. 2003) (construing "the term 'remote location' to encompass not just locations that are 'far apart' or 'distant,' but also those locations that are merely 'separated by intervals greater than usual'"). Telcordia's proposed construction is consistent with all of these definitions, unlike Alcatel's, which only requires separation, however slight. Moreover, Telcordia's proposed construction is consistent with the specification, which discloses communications links between the remote computer and the telecommunications switch. Col.5:29-33.

9.    "Hypertext markup language (HTML) server" [claim 19]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "hypertext markup language (HTML) server" [claim 19] | a server that provides information in hypertext markup language | a server that handles hypertext markup language |

The parties dispute whether a "hypertext markup language (HTML) server" provides information in HTML or handles HTML. Telcordia's proposed construction, that the server "provides" information in HTML, is supported by the express language of the claims. Specifically, claim 17 recites "*providing* a copy of the application program from said server to said remote computer." Col.22:10-11 (emphasis added). Claim 19 depends from claim 17 and further requires that "the server" [of claim 17] comprises a

hypertext markup language (HTML) server." Col.22:30-31. Thus, the claims dictate that the HTML server provide information to the remote server. Telcordia's proposed construction is consistent with this claim language, and is also consistent with the language in the specification describing the HTML server. Col.5:66-Col.6:2.

10.    "Java Applet" [claim 24]

| '052 claim term | Telcordia's construction | Alcatel's construction |
| --- | --- | --- |
| "Java Applet" [claim 24] | an application program written in Java program code that is invoked by the web-browser and that runs within the web-browser | a computer program, which is written in the Java language |

The parties dispute whether the term "Java Applet" should be construed to include any program written in Java language, as Alcatel contends, or more specifically to require a Java program that is invoked by a web-browser and that runs within the web-browser, as Telcordia contends.

Telcordia's construction uses the plain and ordinary meaning of the phrase "Java Applet." In a dictionary definition contemporary with the December 23, 1997 filing of the '052 patent, Sun Microsystems, Inc. provides the following definition:

> applet: A program written in the Java language to run within HotJava, the world wide web (WWW) browser.

*See* web.archive.org/web/19970803191617/www.sun.com/glossary/glossary (attached as Ex. I). This definition establishes that the plain and ordinary meaning of "Java Applet," as Telcordia contends, is a Java program that is invoked by a web-browser and that runs within the web-browser, as distinguished from any program written in the Java language. This plain and ordinary meaning is confirmed by the specification. Col.5:27-28. For example, Figure 11 of the '052 patent depicts a browser to "login" to the telecommunications switching system 230 and shows the browser running the Java Applet associated with the login, instead of showing a stand-alone program. Fig. 11; Col.6:35-38; Col.7:37-38.

IV.    **Conclusion**

For the reasons stated above, Telcordia respectfully requests that the Court adopt Telcordia's proposed claim constructions.

ASHBY & GEDDES

/s/ *John G. Day*
_____
Steven J. Balick (I/D/ #2114)
John G. Day (I/D/ #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

*Of Counsel:*

Donald R. Dunner
Don O. Burley
Steven M. Anzalone
Richard H. Smith
Houtan K. Esfahani
James T. Wilson
John M. Williamson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, D.C.  20001
(202) 408-4000

Dated:  March 3, 2006
167242.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of March, 2006, the attached **TELCORDIA'S**

**OPENING CLAIM CONSTRUCTION BRIEF** was served upon the below-named counsel of

record at the address and in the manner indicated:


Josy W. Ingersoll, Esquire                              HAND DELIVERY
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street
Wilmington, DE  19801

Stuart J. Sinder, Esquire                               VIA ELECTRONIC MAIL
Kenyon & Kenyon
One Broadway
New York, NY  10004



                                        /s/ *John G. Day*
                                        _____
                                        John G. Day