# EXHIBIT C

Network Working Group                                    T. Berners-Lee
Request for Comments: 1945                                      MIT/LCS
Category: Informational                                     R. Fielding
                                                             UC Irvine
                                                            H. Frystyk
                                                               MIT/LCS
                                                              May 1996

Hypertext Transfer Protocol -- HTTP/1.0

Status of This Memo

This memo provides information for the Internet community.  This memo
does not specify an Internet standard of any kind.  Distribution of
this memo is unlimited.

IESG Note:

The IESG has concerns about this protocol, and expects this document
to be replaced relatively soon by a standards track document.

Abstract

The Hypertext Transfer Protocol (HTTP) is an application-level
protocol with the lightness and speed necessary for distributed,
collaborative, hypermedia information systems. It is a generic,
stateless, object-oriented protocol which can be used for many tasks,
such as name servers and distributed object management systems,
through extension of its request methods (commands). A feature of
HTTP is the typing of data representation, allowing systems to be
built independently of the data being transferred.

HTTP has been in use by the World-Wide Web global information
initiative since 1990. This specification reflects common usage of
the protocol referred to as "HTTP/1.0".

Table of Contents

1.  Introduction ............................................. 4
    1.1  Purpose ............................................. 4
    1.2  Terminology ......................................... 4
    1.3  Overall Operation ................................... 6
    1.4  HTTP and MIME ....................................... 8
2.  Notational Conventions and Generic Grammar ............... 8
    2.1  Augmented BNF ....................................... 8
    2.2  Basic Rules ......................................... 10
3.  Protocol Parameters ...................................... 12

RFC 1945                        HTTP/1.0                      May 1996

      3.1  HTTP Version ........................................ 12
      3.2  Uniform Resource Identifiers ........................ 14
           3.2.1  General Syntax ............................... 14
           3.2.2  http URL ..................................... 15
      3.3  Date/Time Formats ................................... 15
      3.4  Character Sets ...................................... 17
      3.5  Content Codings ..................................... 18
      3.6  Media Types ......................................... 19
           3.6.1  Canonicalization and Text Defaults ........... 19
           3.6.2  Multipart Types .............................. 20
      3.7  Product Tokens ...................................... 20
   4. HTTP Message ............................................. 21
      4.1  Message Types ....................................... 21
      4.2  Message Headers ..................................... 22
      4.3  General Header Fields ............................... 23
   5. Request .................................................. 23
      5.1  Request-Line ........................................ 23
           5.1.1  Method ....................................... 24
           5.1.2  Request-URI .................................. 24
      5.2  Request Header Fields ............................... 25
   6. Response ................................................. 25
      6.1  Status-Line ......................................... 26
           6.1.1  Status Code and Reason Phrase ................ 26
      6.2  Response Header Fields .............................. 28
   7. Entity ................................................... 28
      7.1  Entity Header Fields ................................ 29
      7.2  Entity Body ......................................... 29
           7.2.1  Type ......................................... 29
           7.2.2  Length ....................................... 30
   8. Method Definitions ....................................... 30
      8.1  GET ................................................. 31
      8.2  HEAD ................................................ 31
      8.3  POST ................................................ 31
   9. Status Code Definitions .................................. 32
      9.1  Informational 1xx ................................... 32
      9.2  Successful 2xx ...................................... 32
      9.3  Redirection 3xx ..................................... 34
      9.4  Client Error 4xx .................................... 35
      9.5  Server Error 5xx .................................... 37
   10. Header Field Definitions ................................ 37
      10.1  Allow .............................................. 38
      10.2  Authorization ...................................... 38
      10.3  Content-Encoding ................................... 39
      10.4  Content-Length ..................................... 39
      10.5  Content-Type ....................................... 40
      10.6  Date ............................................... 40
      10.7  Expires ............................................ 41
      10.8  From ............................................... 42

        10.9   If-Modified-Since ................................... 42
        10.10  Last-Modified ....................................... 43
        10.11  Location ............................................ 44
        10.12  Pragma .............................................. 44
        10.13  Referer ............................................. 44
        10.14  Server .............................................. 45
        10.15  User-Agent .......................................... 46
        10.16  WWW-Authenticate .................................... 46
   11.  Access Authentication ...................................... 47
        11.1   Basic Authentication Scheme ......................... 48
   12.  Security Considerations .................................... 49
        12.1   Authentication of Clients ........................... 49
        12.2   Safe Methods ........................................ 49
        12.3   Abuse of Server Log Information ..................... 50
        12.4   Transfer of Sensitive Information ................... 50
        12.5   Attacks Based On File and Path Names ................ 51
   13.  Acknowledgments ............................................ 51
   14.  References ................................................. 52
   15.  Authors' Addresses ......................................... 54
   Appendix A.   Internet Media Type message/http ................. 55
   Appendix B.   Tolerant Applications ............................ 55
   Appendix C.   Relationship to MIME ............................. 56
        C.1   Conversion to Canonical Form ......................... 56
        C.2   Conversion of Date Formats ........................... 57
        C.3   Introduction of Content-Encoding ..................... 57
        C.4   No Content-Transfer-Encoding ......................... 57
        C.5   HTTP Header Fields in Multipart Body-Parts ........... 57
   Appendix D.   Additional Features .............................. 57
        D.1   Additional Request Methods ........................... 58
              D.1.1   PUT .......................................... 58
              D.1.2   DELETE ....................................... 58
              D.1.3   LINK ......................................... 58
              D.1.4   UNLINK ....................................... 58
        D.2   Additional Header Field Definitions .................. 58
              D.2.1   Accept ....................................... 58
              D.2.2   Accept-Charset ............................... 59
              D.2.3   Accept-Encoding .............................. 59
              D.2.4   Accept-Language .............................. 59
              D.2.5   Content-Language ............................. 59
              D.2.6   Link ......................................... 59
              D.2.7   MIME-Version ................................. 59
              D.2.8   Retry-After .................................. 60
              D.2.9   Title ........................................ 60
              D.2.10  URI .......................................... 60

1.  Introduction

1.1  Purpose

    The Hypertext Transfer Protocol (HTTP) is an application-level
    protocol with the lightness and speed necessary for distributed,
    collaborative, hypermedia information systems. HTTP has been in use
    by the World-Wide Web global information initiative since 1990. This
    specification reflects common usage of the protocol referred too as
    "HTTP/1.0". This specification describes the features that seem to be
    consistently implemented in most HTTP/1.0 clients and servers. The
    specification is split into two sections. Those features of HTTP for
    which implementations are usually consistent are described in the
    main body of this document. Those features which have few or
    inconsistent implementations are listed in Appendix D.

    Practical information systems require more functionality than simple
    retrieval, including search, front-end update, and annotation. HTTP
    allows an open-ended set of methods to be used to indicate the
    purpose of a request. It builds on the discipline of reference
    provided by the Uniform Resource Identifier (URI) [2], as a location
    (URL) [4] or name (URN) [16], for indicating the resource on which a
    method is to be applied. Messages are passed in a format similar to
    that used by Internet Mail [7] and the Multipurpose Internet Mail
    Extensions (MIME) [5].

    HTTP is also used as a generic protocol for communication between
    user agents and proxies/gateways to other Internet protocols, such as
    SMTP [12], NNTP [11], FTP [14], Gopher [1], and WAIS [8], allowing
    basic hypermedia access to resources available from diverse
    applications and simplifying the implementation of user agents.

1.2  Terminology

    This specification uses a number of terms to refer to the roles
    played by participants in, and objects of, the HTTP communication.

    connection

        A transport layer virtual circuit established between two
        application programs for the purpose of communication.

    message

        The basic unit of HTTP communication, consisting of a structured
        sequence of octets matching the syntax defined in Section 4 and
        transmitted via the connection.

RFC 1945                        HTTP/1.0                      May 1996

request

    An HTTP request message (as defined in Section 5).

response

    An HTTP response message (as defined in Section 6).

resource

    A network data object or service which can be identified by a
    URI (Section 3.2).

entity

    A particular representation or rendition of a data resource, or
    reply from a service resource, that may be enclosed within a
    request or response message. An entity consists of
    metainformation in the form of entity headers and content in the
    form of an entity body.

client

    An application program that establishes connections for the
    purpose of sending requests.

user agent

    The client which initiates a request. These are often browsers,
    editors, spiders (web-traversing robots), or other end user
    tools.

server

    An application program that accepts connections in order to
    service requests by sending back responses.

origin server

    The server on which a given resource resides or is to be created.

proxy

    An intermediary program which acts as both a server and a client
    for the purpose of making requests on behalf of other clients.
    Requests are serviced internally or by passing them, with
    possible translation, on to other servers. A proxy must
    interpret and, if necessary, rewrite a request message before

Berners-Lee, et al              Informational                   [Page 5]

forwarding it. Proxies are often used as client-side portals
through network firewalls and as helper applications for
handling requests via protocols not implemented by the user
agent.

gateway

A server which acts as an intermediary for some other server.
Unlike a proxy, a gateway receives requests as if it were the
origin server for the requested resource; the requesting client
may not be aware that it is communicating with a gateway.
Gateways are often used as server-side portals through network
firewalls and as protocol translators for access to resources
stored on non-HTTP systems.

tunnel

A tunnel is an intermediary program which is acting as a blind
relay between two connections. Once active, a tunnel is not
considered a party to the HTTP communication, though the tunnel
may have been initiated by an HTTP request. The tunnel ceases to
exist when both ends of the relayed connections are closed.
Tunnels are used when a portal is necessary and the intermediary
cannot, or should not, interpret the relayed communication.

cache

A program's local store of response messages and the subsystem
that controls its message storage, retrieval, and deletion. A
cache stores cachable responses in order to reduce the response
time and network bandwidth consumption on future, equivalent
requests. Any client or server may include a cache, though a
cache cannot be used by a server while it is acting as a tunnel.

Any given program may be capable of being both a client and a server;
our use of these terms refers only to the role being performed by the
program for a particular connection, rather than to the program's
capabilities in general. Likewise, any server may act as an origin
server, proxy, gateway, or tunnel, switching behavior based on the
nature of each request.

1.3  Overall Operation

The HTTP protocol is based on a request/response paradigm. A client
establishes a connection with a server and sends a request to the
server in the form of a request method, URI, and protocol version,
followed by a MIME-like message containing request modifiers, client
information, and possible body content. The server responds with a

Case 1:04-cv-00874-GMS    Document 109-3    Filed 03/04/2006    Page 8 of 29

status line, including the message's protocol version and a success
or error code, followed by a MIME-like message containing server
information, entity metainformation, and possible body content.

Most HTTP communication is initiated by a user agent and consists of
a request to be applied to a resource on some origin server. In the
simplest case, this may be accomplished via a single connection (v)
between the user agent (UA) and the origin server (O).



```
        request chain ------------------------>
   UA ------------------v------------------ O
        <----------------------- response chain
```

A more complicated situation occurs when one or more intermediaries
are present in the request/response chain. There are three common
forms of intermediary: proxy, gateway, and tunnel. A proxy is a
forwarding agent, receiving requests for a URI in its absolute form,
rewriting all or parts of the message, and forwarding the reformatted
request toward the server identified by the URI. A gateway is a
receiving agent, acting as a layer above some other server(s) and, if
necessary, translating the requests to the underlying server's
protocol. A tunnel acts as a relay point between two connections
without changing the messages; tunnels are used when the
communication needs to pass through an intermediary (such as a
firewall) even when the intermediary cannot understand the contents
of the messages.



```
        request chain ------------------------------------->
   UA -----v----- A -----v----- B -----v----- C -----v----- O
        <------------------------------------ response chain
```

The figure above shows three intermediaries (A, B, and C) between the
user agent and origin server. A request or response message that
travels the whole chain must pass through four separate connections.
This distinction is important because some HTTP communication options
may apply only to the connection with the nearest, non-tunnel
neighbor, only to the end-points of the chain, or to all connections
along the chain. Although the diagram is linear, each participant may
be engaged in multiple, simultaneous communications. For example, B
may be receiving requests from many clients other than A, and/or
forwarding requests to servers other than C, at the same time that it
is handling A's request.

Any party to the communication which is not acting as a tunnel may
employ an internal cache for handling requests. The effect of a cache
is that the request/response chain is shortened if one of the
participants along the chain has a cached response applicable to that
request. The following illustrates the resulting chain if B has a

cached copy of an earlier response from O (via C) for a request which
has not been cached by UA or A.

```
    request chain ---------->
UA -----v----- A -----v----- B - - - - - - C - - - - - - O
    <--------- response chain
```

Not all responses are cachable, and some requests may contain
modifiers which place special requirements on cache behavior. Some
HTTP/1.0 applications use heuristics to describe what is or is not a
"cachable" response, but these rules are not standardized.

On the Internet, HTTP communication generally takes place over TCP/IP
connections. The default port is TCP 80 [15], but other ports can be
used. This does not preclude HTTP from being implemented on top of
any other protocol on the Internet, or on other networks. HTTP only
presumes a reliable transport; any protocol that provides such
guarantees can be used, and the mapping of the HTTP/1.0 request and
response structures onto the transport data units of the protocol in
question is outside the scope of this specification.

Except for experimental applications, current practice requires that
the connection be established by the client prior to each request and
closed by the server after sending the response. Both clients and
servers should be aware that either party may close the connection
prematurely, due to user action, automated time-out, or program
failure, and should handle such closing in a predictable fashion. In
any case, the closing of the connection by either or both parties
always terminates the current request, regardless of its status.

1.4  HTTP and MIME

HTTP/1.0 uses many of the constructs defined for MIME, as defined in
RFC 1521 [5]. Appendix C describes the ways in which the context of
HTTP allows for different use of Internet Media Types than is
typically found in Internet mail, and gives the rationale for those
differences.

2.  Notational Conventions and Generic Grammar

2.1  Augmented BNF

All of the mechanisms specified in this document are described in
both prose and an augmented Backus-Naur Form (BNF) similar to that
used by RFC 822 [7]. Implementors will need to be familiar with the
notation in order to understand this specification. The augmented BNF
includes the following constructs:

# EXHIBIT D



H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. Ohio, Western Division.
LIEBEL-FLARSHEIM CO., et al, Plaintiffs,
v.
MEDRAD INC., Defendant.
No. 1:04-CV-607.

Feb. 14, 2006.

Joel Robert Chambers, Theodore R. Remaklus, Wood, Herron & Evans, Cincinnati, OH, for Plaintiffs.
Kenneth Franklin Seibel, Jacobs, Kleinman, Seibel & McNally, Cincinnati, OH, Barry J. Coyne, Frederick H. Colen, Kirsten R. Rydstrom, W. Thomas McGough, Reed Smith LLP, Pittsburgh, PA, for Defendant.

*ORDER*

BECKWITH, Chief J.
**\*1** The Court previously issued an order to show cause (Doc. 52), requesting the parties to explain why the parties and/or their counsel should not be sanctioned for failing to comply with the Case Management Order. Both parties have responded to the show cause order (Docs. 57 and 58), and jointly informed the Court that neither party would file a reply (Doc. 59).

*I. Factual Background.*

This patent case is related to Case No. 1:98-cv-858, *Liebel-Flarsheim v. Medrad,* where L-F alleges that certain Medrad products infringe four of L-F's patents. L-F's original complaint in this case alleged infringement (against different Medrad products) of both the four patents at issue in Case No. 98-858 as well as another, more recently issued L-F patent. Medrad counterclaimed that yet another L-F patent (the '758 patent) was invalid or unenforceable.

After an initial conference with the parties, the Court entered a Case Management Order on May 12, 2005 (Doc. 17). The CMO sets scheduling deadlines, and requires the parties to confer and cooperate on certain tasks necessary to the orderly conduct of the litigation. Section XXIII requires literal compliance with the Order, and warns the parties that they will be subject to sanctions for any failure to comply.

Friction between the parties became evident almost immediately after the first event required by the CMO, the filing of Plaintiff's preliminary infringement contentions on May 23, 2005 (Doc. 18). Those contentions significantly narrowed L-F's infringement claims, to four patents (the same four patents at issue in Case No. 98-858) against one product (Medrad's "Stellant" injector and syringes used in that injector). Medrad wrote to L-F on May 25, wanting to discuss a stipulation to dismiss L-F's now-abandoned contentions (Doc. 20, Exhibit 1). L-F did not immediately respond, so Medrad sent another letter on June 1 (Doc. 20, Exhibit 2). After that letter went unanswered for six days, on June 7 Medrad filed a motion to dismiss the claims that L-F had abandoned, and sought sanctions for being forced to file a motion (Doc. 20). L-F's response to that motion, which was timely but was not filed until July 5, essentially consisted of L-F's covenant not to sue on L-F's omitted claims. This prompted additional arguments about the terms of that covenant (see Docs. 28 and 29). The Court eventually denied Medrad's motion on August 22 (see Doc. 44, discussed *infra.* at pp. 6-7).

Section XI of the CMO clearly states that a party's preliminary contentions, which may be supplemented based on discovery, shall be deemed to be its final contentions, with two narrow exceptions not applicable here. The obvious purpose is to require the parties to focus on the patent claims that are genuinely in dispute, and to do so early in the litigation. This permits more focused discovery, and more focused efforts to define any claim disputes requiring Court resolution.

While Medrad's motion to dismiss was pending, Medrad filed its preliminary invalidity contentions on June 24 (Docs. 21 and 22). Despite Section XI of the CMO, Medrad responded to all claims of all five patents alleged in L-F's First Amended Complaint, rather than to L-F's more limited preliminary contentions.

**\*2** A week later, on July 1, Medrad filed an expedited motion to compel certain deposition testimony (Doc.

23). Medrad had served a Rule 30(b)(6) deposition notice on June 10, noticing a deposition on June 27 about L-F's preliminary contentions. Apparently the parties did not communicate with each other about the notice until June 21, when Medrad sent a letter to confirm the requested deposition and seeking the name of L-F's witness. This prompted a flurry of letters and emails about the necessity and timing of the deposition. L-F agreed to produce its witnesses but not until the end of July or early August, which Medrad said was too late.

After a telephone conference on July 6, the Court denied Medrad's motion (see Doc. 26), primarily because L-F offered, during the conference, dates for the requested depositions that permitted sufficient time for Medrad to complete the depositions and for the parties to comply with the CMO's deadline for the meet and confer session on claim construction, which was then scheduled for August 24.

The next critical event required under the CMO was the mutual exchange of initial lists of claim terms the parties believed would require construction by the Court. The date set in the CMO, July 25, is one month after defendant's preliminary invalidity contentions are filed. By then, both parties would have a reasonable picture of the other's contentions on the patents so that each party could make an initial identification of disputed claim terms. The initial identification exchange is intended to start the process of winnowing down the lists to those involving genuine disputes over claim terms that would have to be addressed in a *Markman* hearing.

L-F's initial exchange is a letter stating "all claim elements of the asserted claims [of the patents] requiring construction have been previously construed [in Case No. 98-858] and those same constructions apply to the present action." (See Doc. 57, Exhibit 2.) Medrad's initial identification is approximately 40 pages long (see Doc. 58, Exhibit 7). The record does not reflect any immediate discussion between the parties about this rather large difference in positions.

On August 8, the parties convened for the deposition of Dr. Guenther, the second of L-F's Rule 30(b)(6) witnesses. (The first, Dr. Helmicki, had been deposed on August 3.) After approximately 30 minutes, during which objections were posed to almost every substantive question, L-F's counsel terminated the deposition, stating that Medrad's questioning was inappropriate, objectionable and abusive. (See Doc. 40, Exhibit 9, pp. 24-25.) Medrad's motion to strike

L-F's claims and for sanctions (Doc. 34) was filed the next day. The Court immediately set another telephone conference on that motion for August 16. The day before that conference, six days after terminating Dr. Guenther's deposition, L-F filed a motion for a protective order (Doc. 37). L-F also filed a second amendment to its preliminary infringement contentions (Doc. 36). FN1 The Court's brief review suggests that these amendments made more than minor changes to the contentions. L-F also attached photographs of the accused products, cross-referenced to identify parts L-F alleges are covered by L-F's patents. (For instance, the amendments identify the "opening" as item # 20 on the photograph labeled as Figure 1. The question of what the "opening" is on a drawing in L-F's '669 patent was pending when Dr. Guenther's deposition was terminated.)

> FN1. The first amendment, Doc. 32, was filed August 1 and contained some minor, non-substantive changes.

*3 At the conclusion of the August 16 telephone conference, the Court granted monetary sanctions against L-F due to the termination of Dr. Guenther's deposition (see Doc. 43). FN2 The Court ordered that the Rule 30(b)(6) deposition be completed on September 2, a date both parties explicitly agreed to by both parties. The Court also granted an extension for the parties to meet and confer concerning claim construction as required by the CMO to September 14, a date both counsel again explicitly agreed to. (See Order of August 17, 2005, Doc. 43.) The deposition resumed on September 2 with a different designated witness, and was apparently completed without further Court involvement.

> FN2. Concerning this ruling, the Court notes that Medrad's affidavit of costs, filed on August 29, was followed by an objection from L-F, a reply and supplemental affidavit from Medrad, a motion to strike that reply from L-F, a response from Medrad, and a reply from L-F (Docs. 45, 46, 47, 48, 62 and 63).

On August 22, as noted above, the Court issued its order denying Medrad's motion to dismiss L-F's claims that were dropped from its preliminary infringement contentions. The Court specifically noted in that Order a growing concern with the "increasing level of tension, if not overt hostility,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 3
Slip Copy, 2006 WL 335846 (S.D.Ohio)
**(Cite as: Slip Copy)**

between counsel for the parties. The Court thus takes this opportunity to remind all counsel of this district's Statement on Civility. As noted there, common courtesy-politeness in conversation, respect for other's time and schedule, and an attitude of cooperation-plays an essential role in the administration of justice. All counsel are well advised to keep these principles in mind as this case continues." (Doc. 44 at pp. 9-10.)

*Events of September 14, 2005.*

On the day on which the parties explicitly agreed to "meet and confer" concerning their positions on claim construction, L-F's counsel sent an email to Medrad's counsel at 12:22 p.m., stating: "Please let me know what your intentions are. Since we are not proposing any claim terms for construction and I presume you will be, I am waiting to hear from you. I am in all day." (Doc. 58, Exhibit 10.)

Medrad's first communication to L-F that day was sent at 5:07 p.m., when Medrad faxed a letter and a 22-page list of claim terms with proposed definitions. Medrad described this list as a subset of its July 25 initial identification. According to Medrad, the list identified "47 core non-duplicative claim terms: 27 for the front load patents and 20 for the syringe sensing patents." (See Doc. 57, p. 8 and Exhibit 3.) Medrad's cover letter also states "We look forward to receiving Plaintiffs' proposed constructions later today. We are available to meet and confer regarding Medrad's proposed constructions and Plaintiffs' proposed constructions of the claim terms." (Doc. 57, Exhibit 3.) Medrad's cover letter said nothing about the fact that Medrad also served by mail the same day a set of interrogatories and requests to admit, essentially asking L-F to agree with all of Medrad's proposed constructions or to state L-F's own position on each one. No one from either side actually "met" or "conferred" about claim construction on September 14.

The September 14 communications and Medrad's discovery requests prompted an exchange of letters and emails over the next several days (see Doc. 57, Exhibit 5). L-F's September 17 letter complained that L-F had "heard nothing" from Medrad on September 14, only to receive by fax, at the end of the day, the 22 pages of claim terms. L-F objected to Medrad's discovery as contrary to the CMO, and described Medrad's methods as "inefficient and wasteful and in bad faith." While L-F called Medrad's proposed claim definitions "absurd," L-F said it would

incorporate the "absurd" list into the draft of the Joint Claim Construction Statement (the final of which was not due until December 31).

*4 Medrad responded on September 19, that its September 14 fax was intended to initiate "what can be a collaborative process in narrowing the terms to be construed," and proposed a telephone conference on September 23. Medrad also refused to withdraw its discovery, noting that the discovery would be "relevant" only if there was no agreement on claim terms within 30 days.

L-F responded on September 21, reiterating its position that no claim construction was needed because all required construction had been accomplished in Case No. 98-858. L-F again stated it would include all of Medrad's proposed constructions (which L-F had labeled as "absurd") into the Joint Statement. L-F concluded that, "given the parties' opposing views, we do not see what will be accomplished in a conference call. What do you want to discuss?" L-F again objected to Medrad's discovery, noting that Medrad had taken two Rule 30(b)(6) depositions on L-F's infringement contentions and asserting Medrad was not entitled to any other discovery.

The apparent "last word" was Medrad's September 21 letter, noting that L-F had provided no construction of any claim terms but had disagreed with all of Medrad's. This put Medrad at a distinct disadvantage, and Medrad defended its discovery requests on that basis. Medrad again offered to discuss both subjects by telephone on September 23. Apparently L-F declined to do so, because the Court was contacted about the stand-off and scheduled a September 28 telephone conference-the third such conference since the May 11 initial case management conference.

During that conference, the Court ordered a 30-day stay of all proceedings in this case, anticipating a forthcoming order on pending substantive motions in Case No. 98-858. It was hoped the resolution of those motions might expedite the proceedings in this case. The Court also expressed what can only be described as exasperation with both parties' conduct.

This background led to the Court's order to show cause.

*II. The Parties' Responses to the Order to Show Cause.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Both parties strenuously defend their approaches to the Case Management Order. L-F argues that its conduct simply reflects what it describes as its consistent position:
(1) with respect to the frontload patents, all of the claim terms requiring construction had already been construed by this Court as modified by the Federal Circuit, (2) with respect to the syringe sensing patents, the only claim terms requiring construction were those nine identified in the Court's Order of February 19, 2002 (Doc. No. 271) and that the parties' respective views had been fully briefed in the '858 action and submitted to the Court for decision as of April 5, 2005, and the construction adopted by the Court in the '858 action would be binding in this case, and (3) Medrad's Stellant injector, the only injector involved in this case, so little changed from the injectors involved in the '858 action as not to bring into play any additional claim terms requiring construction by this Court ...

**\*5** See Doc. 58, p. 2.

L-F alternatively argues that it has never admitted that any claim terms require "construction" because its patent claims have "plain meaning" or simply "mean what they say." (See Doc. 58, p. 15.) L-F accuses Medrad of disputing "every term in every asserted claim," and then serving improper and burdensome requests to admit. L-F notes the draconian consequences that can follow a party's failure to properly respond or object to such requests. L-F points out that this district's Local Rule 36.1, limiting the permissible number of requests to admit to 40, is not "self-executing." The rule prohibits serving more than 40, but does not state what a party's proper response should be when it is served with more than 40. Because of this facet of the rule, and reasonably believing it had exhausted efforts to secure Medrad's withdrawal of the requests to admit, L-F concluded that resort to the Court was necessary. L-F disagrees with the Court's description of L-F's position-that "there is nothing to talk about"-because L-F was ready to talk on September 14. It was Medrad who wasn't ready to talk. And L-F denies that any uncivil behavior has taken place, noting that lead counsel are both very experienced professionals.

On the other hand, Medrad's response depicts Medrad's conduct as quite reasonable, in light of the CMO requirements and L-F's July 25 unequivocal position that no claim construction was required. Medrad states that after completing its Rule 30(b)(6) depositions in early September, it narrowed its July 25 initial list of claim terms, and proposed

constructions only for the narrowed list. It sent that list to L-F on September 14 and proposed specific dates for further discussion. Medrad believes that it satisfied its obligation under the CMO by doing so, as the CMO permitted an additional three months after September 14 in which to finalize the Joint Claim Construction Statement. Medrad notes that the CMO does not require nor anticipate that the parties completely agree on everything by September 14, because the final statement was not due until December 31.

Medrad defends its lengthy claim construction proposal on several grounds. Medrad suggests that the law has "evolved" since *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed.Cir.2005), permitting Medrad to assert narrow meanings based on the patent specification for many of L-F's claim terms. This includes Medrad's definition of "injector" and "frontloadable injector" as including a pressure jacket, despite the Federal Circuit's decision in Case No. 98-858 that the claim term "opening" does not require a pressure jacket. Medrad also cites the final European Patent Office decision (issued after the Federal Circuit's decision) which supports Medrad's argument that the frontload patents require a pressure jacket.

Medrad also asserts that 11 of the 27 front load patent term definitions in its September 14 list are simply plain or ordinary meanings. Since L-F did not offer its own understanding of those terms, Medrad believed it was compelled to do so.

**\*6** Finally, Medrad argues that it had to avoid any potential argument that it had waived any claim construction arguments, as this Court found it had done in Case No. 98-858, which led to a (perhaps) over-inclusive list. Even so, Medrad asserts that its list could have easily been pared down during reasonable consultation with L-F. Medrad finally argues that its obligations under the CMO were not so "specific, clear and unequivocal" as to preclude Medrad's interpretation and conduct based on that interpretation. (See Doc. 57, p. 14.)

### III. *DISCUSSION*

Following remand of Case No. 98-858 from the Federal Circuit, L-F argued (and the Court eventually agreed) that Medrad had procedurally waived construction of additional terms of the front-load patents. But that order would not necessarily apply to this case. Moreover, L-F acknowledged that a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

different scenario existed for the syringe sensing patents: "[W]ith respect to the other terms on the [syringe sensing] patents, those have been all briefed and those briefs are before the Court and I don't believe the Court needs a hearing in order to respond to those additional terms." (See Doc. 421, 6/9/04 Hrg. Transcript at p. 8.) L-F's counsel also stated that "we believe that once the Court construes the remaining terms on the [syringe sensing] patents, that there's no non-infringement argument there." (*Id.* at p. 16.) Clearly, some claim terms of at least the syringe sensing patents had never been construed by this Court or by the Federal Circuit.

Yet L-F's July 25 letter asserted that no construction would be required of any claim terms of the four patents. L-F did not incorporate its positions in the briefs filed in Case No. 98-858, or even identify the nine claim terms that L-F had previously recognized would likely be construed by the Court in Case No. 98-858. L-F's explanation that its claims have plain meanings does not excuse L-F's July 25 position. While the CMO does not explicitly require L-F to provide its "plain meaning" interpretation of its claim, a patentee cannot avoid defining its own claim terms by asserting that its claims have a plain meaning. See, e.g., *Moore v. Standard Register Company,* 2000 U.S. Dist. LEXIS 9137 (W.D.N.Y., May 26, 2000), where the patent holder refused to provide its construction of its patent claims because the terms were "straightforward and clear." The district court noted that such a position would improperly make the patent holder "the arbiter of whether its claims are 'clear and unambiguous.'" Although [plaintiff] may believe that its claims are clear and unambiguous, [defendant] may reasonably require construction of the claims." *Id.* at *9. And see, *Centillion Data Systems v. American Management Systems,* 138 F.Supp.2d 1117 (S.D.Ind.2001), where a patent holder-plaintiff asserted that its claim terms had only ordinary and customary meanings. Therefore, argued the plaintiff, the alleged infringer should first provide any "unusual" meanings to more "efficiently" identify any terms with genuinely disputed meanings. The district court rejected this argument, noting that *Markman* disputes often involve plain meaning of ordinary words. (Indeed, the central dispute in *Markman* was the meaning of "inventory," as used in a patent for tracking "inventory" in a dry cleaning store.)

*7 While L-F's position was at one extreme, Medrad's September 14 list of claim terms appears to be at the other. That list proposes definitions that may

be at odds with the Federal Circuit's decision in Case No. 98-858 on the front load patents. These include Medrad's definition of "a power injector" as a device "that includes a pressure jacket." Other Medrad definitions seem contrary to the Federal Circuit's decision concerning the syringe sensing patents, such as "detector" defined as "A device for detecting the length of an extender." L-F would understandably question such definitions. While the CMO does not explicitly require Medrad to "explain" the basis for its proposed constructions of claim terms, Medrad made no attempt to clarify why it was proposing these definitions at this juncture of litigation about these patents. Whether or not Medrad's justifications have any merit, it undoubtedly would have helped the process of conferring about claim construction for Medrad to provide some factual basis for its proposals. Instead, Medrad served interrogatories and requests to admit, which in effect threw the gauntlet down to L-F to respond within thirty days to each and every one of Medrad's proposed definitions. Section XIII of the CMO requires the parties to "attempt to narrow and finalize the issues." The CMO contemplates a meeting followed by an ongoing process leading to the Joint Claim Construction statement, not a series of impasses and court hearings about discovery requests.

Furthermore, Medrad does not explain why it did not acknowledge or respond to Mr. Chambers' email on September 14, stating he was in the office and was waiting to hear from Mr. McGough, but instead faxed its claim list after the close of business on September 14, along with a letter stating "we look forward to receiving Plaintiffs' proposed constructions later today." That letter also fails to mention Medrad's discovery requests, which were apparently served separately by mail.

One thing the parties agree about is that many of the claim terms in play in this case were also at issue in Case No. 98-858, and some would likely be construed by the Court in ruling on dispositive motions in that case. In retrospect, given L-F's narrowed preliminary infringement contentions, it may have been more efficient to stay claim construction efforts in this case until the motions in Case No. 98-858 were decided. (This idea was discussed at the May 11 conference in this case, but not adopted for various reasons.) That observation does not excuse the lack of cooperation between the parties in approaching the claim construction process.

L-F and Medrad also agree that any monetary sanction imposed at this point would be in the nature

Slip Copy                                                                            Page 6
Slip Copy, 2006 WL 335846 (S.D.Ohio)
**(Cite as: Slip Copy)**

of criminal contempt, because neither party would have an opportunity to purge the contempt by a change in conduct. Nor would the sanction compensate an "injured party" for losses such as attorneys fees. See, e.g., _Downey v. Clauder_, 30 F.3d 681, 685 (6th Cir.1994) (criminal contempt punishes past acts of disobedience, and requires the court to find that the party willfully violated a specific, clear and unequivocal court order). See also, _In re Chandler_, 906 F.2d 248 (6th Cir.1990) (criminal contempt requires finding willfulness that is commensurate with a deliberate or intentional violation of court order). While neither party asserts that the Court lacks the power to impose a criminal sanction, they both assert that several conditions must be met before such a sanction is justified. The Court must find that its order was disobeyed. The Court must also be satisfied that the terms of its order are clear and specific, and "leave no doubt or uncertainty in the minds of those to whom it is addressed." See _Downey v. Clauder, supra_, 30 F.3d at 685 (internal citation omitted). The Court must then find that the disobedience was deliberate or intended, and not accidental, inadvertent or simply negligent. The Court must find that the deliberate or intended conduct is established beyond a reasonable doubt. Finally, the Court must have provided notice that it was considering such a sanction.

**\*8** The Court believes that neither party complied with the "meet and confer" requirement of the CMO. No one "met" or "conferred" on September 14. Indeed, the record contains no indication that the parties ever spoke to one another about any of their differences over the several months preceding September 14. The parties specifically agreed to a date to meet and confer, yet neither party seems to have put any serious effort into making arrangements for an actual meeting on that date.

With respect to whether the violation was willful and intentional, the Court reviewed both the CMO and this district's Local Rules. Neither define "meet and confer." In fact, the Local Rules do not use that phrase. L.R. 7.3(a) requires counsel to "consult" about motions to which other parties might reasonably be expected to consent. L.R. 37.1, concerning discovery motions, requires counsel to exhaust "all extrajudicial means" for resolving differences, but does not require a "meet and confer" session.[FN3]

FN3. At the risk of being considered facetious, the Court might say that the terms

of the CMO have plain meanings and are as clear and unambiguous as L-F's patent claims.

The Court's understanding of the phrase "meet and confer" is a conference in which opposing parties actually talk to one another. The Court notes that other federal districts have explicitly defined "meet and confer" as a personal or face-to-face communication or conference. See, e.g., N.D. Cal. Local Rule 1-5(n):

"Meet and confer" or "confer" means to communicate directly and discuss in good faith the issue(s) required under the particular Rule or order. Unless these Local Rules otherwise provide or a Judge otherwise orders, such communication may take place by telephone. The mere sending of a written, electronic, or voice-mail communication, however, does not satisfy a requirement to "meet and confer" or to "confer." Rather, this requirement can be satisfied only through direct dialogue and discussion-either in a face to face meeting or in a telephone conversation.

See also, S.D. Cal. Civil L.R. 16.5, stating in part that "[U]nder no circumstances may counsel satisfy the 'meet and confer' obligation by written correspondence." To similar effect is E.D. La. L.B.R. 7026-1(A), requiring counsel for a moving party to certify "that counsel have conferred in person or by telephone in a good faith effort to resolve amicably the issues without court intervention ..." and requiring the moving party to arrange that conference. Similarly, the Eastern District of Virginia's Local Rule 7(E) requires a face to face conference, either in person or by telephone.

L-F and Medrad earnestly represent that neither they nor their counsel wanted to disobey this Court's order. They also earnestly deny any deliberate intent to do so. Given their representations, and considering all of the facts and arguments discussed above, the Court cannot conclude beyond a reasonable doubt that the parties or their counsel willfully or deliberately intended to violate the Court's Case Management Order. Thus the Court will _not_ find the parties or their counsel in criminal contempt of this Court, under the exacting standards required by _Downey v. Clauder, supra_, and _In re Chandler, supra_.

**\*9** This conclusion should not be interpreted as condoning the conduct that has occurred. Neither party has displayed the attitude of cooperation that is an essential part in the administration of justice.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 335846 (S.D.Ohio)
**(Cite as: Slip Copy)**


SO ORDERED.

S.D.Ohio,2006.
Liebel-Flarsheim Co. v. Medrad Inc.
Slip Copy, 2006 WL 335846 (S.D.Ohio)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2667856 (Trial Motion, Memorandum and Affidavit) Medrad's Reply in Support of Defendant Medrad's Expedited Combined Motion to Strike Claims and for other Sanctions (Aug. 16, 2005)
• 2005 WL 2667858 (Trial Motion, Memorandum and Affidavit) Defendant Medrad'S Opposition to Plaintiffs', Liebel-Flarsheim Company et Al., Motion for A Protective Order (Aug. 16, 2005)
• 2005 WL 2667853 (Trial Motion, Memorandum and Affidavit) Plaintiffs', Liebel-Flarsheim Company et Al, Motion for A Protective Order (Aug. 15, 2005)
• 2005 WL 2667851 (Trial Motion, Memorandum and Affidavit) Defendant Medrad's Expedited Combined Motion to Strike Claims and for other Sanctions and Memorandum in Support Thereof (Aug. 09, 2005)
• 2004 WL 2255841 (Trial Pleading) Complaint and Jury Demand (Sep. 07, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

ATTORNEY'S DOCKET NO.
0:6560.5892



*A f/Gau 2756*

1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:       Peter Sung-An Huang, et al.

Serial No.:                 08/997,348

Filing Date:                December 23, 1997

Group Art Unit:             2756

Examiner:                   Mehmet B. Geckil

Title:                      GRAPHIC USER INTERFACE SYSTEM

                            TELECOMMUNICATIONS SWITCH MANAGEMENT

                            SYSTEM

Assistant Commissioner
    for Patents
Washington, D.C.    20231

Dear Sir:

I hereby certify that this
correspondence is being deposited
with the United States Postal Service
as first class mail in an envelope
addressed to: Assistant
Commissioner for Patents,
Washington, D.C. 20231, on the date
shown below.

_____
Name

10 Apr 00
_____
Date of Signature

RESPONSE TO EXAMINER'S FINAL ACTION

        In response to the Official Action mailed January 24, 2000,
Applicants respectfully request the Examiner to reconsider the
rejection of the claims in view of the following amendments
thereto and the comments as set forth below.

DAL01:513733.1

ATTORNEY'S DOCKET NO.                              PATENT APPLICATION
036560.5892                                             08/997,348

2

IN THE CLAIMS

For the convenience of the Examiner, all pending claims are
shown below whether or not an amendment has been made. Please
amend the claims as follows:

1. (Twice Amended) A graphic user interface system which
provides displays for enabling one or more users to access a
telecommunications switching system, comprising:

a remote computer having a browser for providing
communications, the remote computer generating an access request
by a user for access to the telecommunications switching system;

a server [publicly] accessible by said browser and operable
to receive the access request from the remote computer over a
first communications link, the server having an application
program which enables said remote computer to communicate with
the telecommunications switching system, [said server being in
communication with said remote computer via a first public
communications link, and] the server being capable of providing
a copy of said application program to said remote computer, said
remote computer running the application program separate from the
server; and

a system manager building block in communication via a
second [public] communications link with said remote computer
running said application program, the second communication link
being separate from the first communication link, said system
manager building block also being in communication with a system
management interface building block for communicating with the
telecommunications switching system, said system manager building
block containing information related to authorized users for
determining whether to permit the users to access the
telecommunications switching system, the remote computer operable
to access the telecommunications switching system through and as
authorized by the system manager building block using the
application program.



ATTORNEY'S DOCKET NO.                    PATENT APPLICATION
036560.5892                                       08/997,348

3

  2. The graphic user interface system of claim 1, wherein said server further comprises a server page for storing said application program.

  3. The graphic user interface system of claim 1, wherein said server is a hypertext markup language (HTML) server.

  4. The graphic user interface system of claim 1, wherein said system manager building block further comprises a runtime library for containing said information related to authorized users.

  5. The graphic user interface system of claim 1, wherein said system manager building block is configured to maintain records related to each instance a user accesses the telecommunications switching system.

  6. The graphic user interface system of claim 1, wherein said server provides said application program to said remote computer in the form of a Java Applet.

  7. The graphic user interface system of claim 1, wherein said application program is configured to run on said remote computer in a stand-alone capacity without additional communication with said server, in order to communicate with said system manager building block to access said telecommunications switching system.

  8. The graphic user interface system of claim 1, wherein said system manager building block and said system management interface building block conform to a common object request broker architecture (CORBA).

DAL01:513733.1

ATTORNEY'S DOCKET NO.                              PATENT APPLICATION
036560.5892                                              08/997,348

4

9.   (Amended) The graphic user interface system of claim 1,
wherein said remote computer is in communication with said server
via a first <u>public</u> communications link, and wherein said remote
computer is in communication with said system manager building
block via a second <u>public</u> communications link.

10.   (Amended) The graphic user interface system of claim
9, wherein said first and second <u>public</u> communications links are
internet communications links.

11.   (Amended) The graphic user interface system of claim
9, wherein said first and second <u>public</u> communications links use
an internet inter-ORB protocol (IIOP) communications protocol.

12.   (Amended) The graphic user interface system of claim
9, wherein said first and second <u>public</u> communications links use
a hypertext transport protocol (HTTP) communications protocol.

13.   The graphic user interface system of claim 1, wherein
said system manager building block further comprises said server,
and wherein said remote computer is in communication with said
server and with said system manager building block via a single
communications link.

14.   The graphic user interface system of claim 13, wherein
said single communications link is an internet communications
link.

15.   The graphic user interface system of claim 13, wherein
said single communications link uses an internet inter-ORB
protocol (IIOP) communications protocol.



ATTORNEY'S DOCKET NO.                    PATENT APPLICATION
036560.5892                                      08/997,348

5

16.  The graphic user interface system of claim 13, wherein said single communications link uses a hypertext transport protocol (HTTP) communications protocol.

17.  (Amended)  A method for accessing a telecommunications switching system, comprising the steps of:

initializing a browser running on a remote computer;

accessing a server with said browser, said server having an application program for communicating with said telecommunications switching system;

providing a copy of the application program from said server to said remote computer;



initializing said application program on said remote computer and accessing said telecommunications switching system with said application program from said remote computer;

determining whether to permit access to said telecommunications switching system by said remote computer; and

communicating with a system manager building block from said remote computer to provide communication with the telecommunications switching system.

18.  The method of claim 17, wherein said step of accessing a server further comprises the step of accessing a server page in the server, wherein the server page contains said application program for communicating between said remote computer and said telecommunications switching system.

19.  The method of claim 17, wherein the server comprises a hypertext markup language (HTML) server.

ATTORNEY'S DOCKET NO.                          PATENT APPLICATION
036560.5892                                        08/997,348

6

20. The method of claim 17, wherein said step of determining whether to permit access to said telecommunications switching system further comprises the step of comparing information provided by a user at said remote computer with information related to authorized users contained in a runtime library in said system manager building block.

21. The method of claim 17, wherein said step of determining whether to permit access to said telecommunications switching system further comprises the steps of:

comparing identification numbers provided by a user at said remote computer with identification numbers of authorized users; and

comparing passwords provided by said user with passwords of authorized users.

22. The method of claim 17, further comprising the step of maintaining records related to each instance a user accesses the telecommunications switching system.

23. The method of claim 17, further comprising the step of establishing a socket connection between said remote computer and a system security manager client building block.

24. The method of claim 17, wherein said application program is provided to the remote computer in the form of a Java Applet.

25. The method of claim 17, wherein said step of initializing said application program on said remote computer comprises running said application program in a stand-alone capacity without further communicating with the server.

ATTORNEY'S DOCKET NO.                                    PATENT APPLICATION
036560.5892                                                      08/997,348

7

26.   The method of claim 17, wherein said system manager building block conforms to a common object request broker architecture (CORBA).

27.   A graphic user interface system which provides displays for enabling one or more users to remotely access a telecommunications switching system, comprising:

a remote computer having an internet browser for accessing a first internet communications link;

a hypertext markup language (HTML) remote server accessible by said internet browser and having a server page, said server page having a Java application program which enables said remote computer to communicate with the telecommunications switching system, said remote server being in communication with said remote computer via said first internet communications link, and being capable of providing a copy of said Java application program to said remote computer in the form of a Java Applet so that said remote computer can run said copy of said Java application program in a stand-alone capacity without additional communication with said remote server; and

a system manager building block having a CORBA architecture and having a runtime library, said system manager building block being in communication via a second internet communications link with said remote computer running said copy of said Java application program, said system manager building block also being in communication with a system management interface building block having a CORBA architecture for communicating with the telecommunications switching system, said runtime library containing information related to identification numbers and passwords of authorized users for determining whether to permit the users to access the telecommunications switching system.

DAL01:513733.1

ATTORNEY'S DOCKET NO.                          PATENT APPLICATION
036560.5892                                          08/997,348

8

28.   The graphic user interface launcher of claim 27, wherein said system manager building block is configured to maintain records related to each instance a user accesses the telecommunications switching system.

29.   The graphic user interface launcher of claim 27, wherein said first and second internet communications links use an internet inter-ORB protocol (IIOP) communications protocol.

30.   The graphic user interface launcher of claim 27, wherein said first and second internet communications links use a hypertext transport protocol (HTTP) communications protocol.

DAL01:513733.1

ATTORNEY'S DOCKET NO.                           PATENT APPLICATION
036560.5892                                            08/997,348

9

<u>REMARKS</u>

This Application has been carefully reviewed in light of the Official Action mailed January 24, 2000. In order to advance prosecution of this case, Claims 1 and 9-12 have been amended in order to clarify and further describe various inventive concepts. Applicants respectfully request reconsideration and favorable action in this case.

Claims 1-16 stand rejected under 35 U.S.C. § 112, second paragraph, as being indefinite. Claim 1 has been amended to address matters raised by the Examiner. Therefore, Applicants respectfully submit that Claims 1-16 are in accordance with 35 U.S.C. § 112, second paragraph.

Claims 1-30 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Branton, Jr., et al. in view of Koved. With respect to Independent Claim 1, there is recited ". . . a server accessible by said browser and operable to receive the access request from the remote computer over a first communications link, the server having an application program which enables said remote computer to communicate with the telecommunications switching system, the server being capable of providing a copy of said application program to said remote computer, said remote computer running the application program separate from the server; and a system manager building block in communication via a second communication link with said remote computer running said application program, the second communication link being separate from the first communication link, . . . , the remote computer operable to access the telecommunications switching system through and as authorized by the system manager building block using the application program." The Examiner has not shown how the cited references provide for these limitations of the claimed invention.

By contrast, the Branton, Jr., et al. patent has no communication link to its switch network other than through its server and no application program is provided to the workstation by the server to enable the workstation to access a

DAL01:513733.1



ATTORNEY'S DOCKET NO.                    · PATENT APPLICATION
036560.5892                                         08/997,348

10

telecommunications switching system. The Examiner identifies the
Branton, Jr., et al. web server 284 as the claimed server and its
controllers 271-273 as the claimed system manager building block.
However, the Examiner has not shown where the Branton, Jr., et
al. patent shows a remote computer with a first communication
link to web server 284 and with a separate second communication
link to controllers 271-273 as would be required by the claimed
invention. At best, the Branton, et al. patent at FIG. 7 shows
each of workstations 702-706 with a single communication link to
intranet 708, web server 710, and LAN 714 in order to communicate
with web server 284 or controllers 271-273. Thus, the Branton,
Jr., et al. patent does not provide the access to a
telecommunication switching system from a stand alone remote
computer as specified by the claimed invention. Further, the
applet identified by the Examiner in col. 13 of the Branton, Jr.,
et al. patent is used to display to the user, for example, of
workstation 702 the results of the user's request. The Branton,
Jr., et al. patent provides no disclosure with respect to
providing a remote computer with an application program over a
first communication link that is used to enable the remote
computer to access a telecommunications switching system through
a system manager building block over a separate public
communication link. The Koved patent is only used to provide
support for user access and has no disclosure pertaining to the
limitations discussed above. Therefore, Applicants respectfully
submit that Claims 1-30 are patentably distinct from the proposed
Branton, Jr., et al. - Koved combination.

The Examiner has not provided a full and complete
examination of every claim pending in the present Application.
Though Claims 1-30 were stated as being rejected, the Examiner
only has shown that Claim 1 was considered in the Office Action
with no specific reference made to Claims 2-30. As such, the
Office Action is not in compliance with M.P.E.P. § 707.07(i).
Accordingly, Applicants respectfully request the withdrawal of
the finality of the present Office Action in order that proper

ATTORNEY'S DOCKET NO.                              PATENT APPLICATION
036560.5892                                             08/997,348

11

consideration can be given to all pending claims and their limitations.

Applicants have now made an earnest attempt to place this case in condition for allowance. For the foregoing reasons and for other reasons clearly apparent, Applicants respectfully request full allowance of Claims 1-30.

The present Response to Examiner's Final Action is necessary to address and clarify the Examiner's characterization of the cited references. The present Response could not have been presented earlier as the Examiner has only now provided this characterization of the cited references.

The Commissioner is hereby authorized to charge any fees or credit any overpayments to Deposit Account No. 02-0384 of BAKER BOTTS L.L.P.

Respectfully submitted,

BAKER BOTTS L.L.P.

Attorneys for Applicants

Charles S. Fish

Reg. No. 35,870

2001 Ross Avenue

Dallas, Texas 75201-2980

(214) 953-6507

April 10, 2000

DAL01:513733.1