## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-874 GMS |
| | ) | |
| ALCATEL USA, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### TELCORDIA'S ANSWERING CLAIM CONSTRUCTION BRIEF
### ADDRESSING TELCORDIA'S '633 PATENT AND ALCATEL'S '052 PATENT

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

*Of Counsel:*

Donald R. Dunner
Don O. Burley
Steven M. Anzalone
Richard H. Smith
Houtan K. Esfahani
James T. Wilson
John M. Williamson
Pedro F. Suarez
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: March 24, 2006

**TABLE OF CONTENTS**

I.      Introduction ...................................................................................................................1

II.     Telcordia's '633 Patent ..............................................................................................1

        A.      Preliminary Statement ................................................................................1

        B.      Argument Regarding '633 Patent Claim Constructions ..........................2

                1.      residual time stamp (RTS) [claims 1, 5, 11, 33] ............................2

                2.      counting the network clock cycles [claim 1] / counting network
                        clock cycles [claim 5] ......................................................................4

                3.      network clock [claims 1, 5, 11, 33] .................................................5

                4.      network clock cycles [claims 1, 5] ...................................................7

                5.      $2^P$ counts uniquely and unambiguously represent the range of
                        possible network clock cycles within an RTS period [claims 1
                        and 5] ...............................................................................................8

                6.      transmitting . . . an RTS [claims 1, 5, 11, 33] ...............................10

                7.      at the end of each RTS period [claims 1, 5] ...................................12

                8.      the period between each pulse [claim 1] / the periods between
                        pulses [claim 5] ..............................................................................14

                9.      derived network clock frequency $f_{nx}$ / derived network clock
                        [claims 11, 33] ...............................................................................15

                10.     Additional Improper Summary Judgment Positions ........................16

                11.     means, at the source node, for defining a derived network clock
                        frequency $f_{nx}$ from a network frequency $f_n$ where $f_{nx} = f_n/x$, x is a
                        rational number, and $f_{nx}$ is less than or equal to twice the service
                        clock frequency [claim 11] ............................................................16

                12.     means, at the source node, for counting the derived network
                        clock cycles modulo 16 in an RTS period [claim 11] ....................19

III.    Alcatel's '052 Patent ..................................................................................................20

        A.      Preliminary Statement ..............................................................................20

        B.      Argument Regarding '052 Patent Claim Constructions ........................20

                1.      "telecommunications switching system" [claims 17 and 18].............20

2.    "remote computer" [claims 17 and 18] .................................................22

3.    "accessing a server with said browser" [claim 17].............................23

4.    "providing a copy of the application program from said server to
said remote computer" [claim 17].................................................27

5.    "accessing said telecommunications switching system with said
application program from said remote computer" [claim 17]............27

6.    "system manager building block" [claim 17].....................................28

7.    "communicating with a system manager building block of the
telecommunications switching system from said remote
computer" [claim 17] .....................................................................30

8.    "monitoring" [claim 17] ...................................................................31

9.    "Hypertext markup language (HTML) server" [claim 19] .................31

10.    "Java Applet" [claim 24] ................................................................32

IV.    Telcordia's '306 Patent ....................................................................................32

V.    Conclusion.......................................................................................................33

# TABLE OF AUTHORITIES

**Cases**

*BJ Servs. Co. v. Halliburton Energy Servs., Inc.,*
   338 F.3d 1368 (Fed. Cir. 2003)...................................................................9

*Enzo Biochem, Inc. v. Gen-Probe Inc.,*
   285 F.3d 1013 (Fed. Cir. 2002).................................................................23

*Exxon Research & Eng'g Co. v. United States,*
   265 F.3d 1371 (Fed. Cir. 2001)...................................................................9

*Gart v. Logitech, Inc.,*
   254 F.3d 1334 (Fed. Cir. 2001).................................................................10

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,*
   222 F.3d 951 (Fed. Cir. 2000)...................................................................26

*Hockerson-Halberstadt, Inc. v. Converse, Inc.,*
   183 F.3d 1369 (Fed. Cir. 1999)...................................................................13

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n,*
   341 F.3d 1332 (Fed. Cir. 2003)...................................................................9

*Intel Corp. v. VIA Techs., Inc.,*
   319 F.3d 1357 (Fed. Cir 2003).....................................................................9

*Intervet America, Inc. v. Kee-Vet Labs., Inc.,*
   887 F.2d 1050 (Fed. Cir. 1989).................................................................25

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
   358 F.3d 898 (Fed. Cir. 2004).....................................................................9

*Lockheed Martin Corp. v. Space Systems / Loral, Inc.,*
   324 F.3d 1308 (Fed. Cir. 2003).................................................................17

*Marley Mouldings Ltd. v. Mikron Indus. Inc.,*
   417 F.3d 1356 (Fed. Cir. 2005).....................................................................9

*Micro Chem., Inc. v. Great Plains Chem. Co.,*
   194 F.3d 1250 (Fed. Cir. 1999).................................................................11

*Nystrom v. TREX Co.,*
   424 F.3d 1136 (Fed. Cir. 2005).................................................................13

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)...............................................13

*Rambus Inc., v. Infineon Technologies, AG,*
   318 F.3d 1081 (Fed. Cir. 2003).................................................................26

*Rheox, Inc. v. Entact*, Inc.,
  276 F.3d 1319 (Fed. Cir. 2002) ........................................................................... 26

*Seachange International, Inc. v. C-COR, Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005) ........................................................................... 25

*Searfoss v. Pioneer Consolidated Corp.*,
  374 F.3d 1142 (Fed. Cir. 2004) ........................................................................... 22

*Springs Window Fashion LP v. Novo Industries, L.P.*,
  323 F.3d 989 (Fed. Cir. 2003) ............................................................................. 25

*Storage Technology Corp. v Cisco Systems, Inc.*,
  329 F.3d 823 (Fed Cir. 2003) .............................................................................. 26

**Statutes**

35 U.S.C. § 112(2) ................................................................................................... 8, 9

35 U.S.C. § 112(6) ................................................................................................. 17, 19

35 U.S.C. § 282 ........................................................................................................... 9

**Other Authorities**

*American Heritage College Dictionary* (3rd ed. 1997) ............................................... 23

*IEEE Standard Computer Dictionary* (1990) .............................................................. 7

IEEE Standard Dictionary of Electrical and Electronic Terms (6th ed. 1996) ............. 22

*McGraw-Hill Dictionary of Scientific and Technical Terms* 1568 (4th ed. 1989) ......... 7

## I.    Introduction

In its opening claim construction brief, Alcatel dealt solely with Telcordia's '633 patent and Alcatel's '052 patent, relying on the discussion of the '306 patent found in Lucent's brief (the '763 patent was not asserted against Alcatel).  To make things easier for the Court, Telcordia will follow suit.  That is, Telcordia will specifically address only Telcordia's '633 patent and Alcatel's '052 patent in this answering brief and address the '306 and '763 patents in its answering briefs in the Lucent and Cisco cases, respectively.

## II.    Telcordia's '633 Patent

### A.    Preliminary Statement

Alcatel's discussion of the '633 patent in its opening brief is littered with misrepresentations of Telcordia's positions on the merits.  These misrepresentations generate disputes where none exist and distract from the true substantive disputes that are plainly apparent in the Final Joint Claim Chart (D.I. 98).  They also require Telcordia to devote a considerable portion of this reply brief to correcting the record.  Telcordia also largely disagrees with Alcatel's characterization of Telcordia's '633 invention. Specifically, in its introductory section, Alcatel mischaracterizes the '633 invention and presents flawed analogies that fail to capture the invention.  Alcatel's Opening Claim Construction Brief for U.S. Patent Nos. 6,247,052 and RE. 36,633 ("Alcatel Op. Br. at 20-22").  Again, this necessitates corrections by Telcordia.

Additionally, Telcordia notes the unhelpful organizational structure of Alcatel's opening brief, which fails to follow the simple structure of the Final Joint Claim Chart.  Alcatel's opening brief reorders the claim terms, combines the analysis of claim terms, and fails to address a number of terms.  Alcatel's approach is confusing and hard to follow.  The charts in each section of Telcordia's opening brief, on the other hand, were taken verbatim from the Final Joint Claim Chart (D.I. 98) and were presented in the same order as they appear there.  And in this answering brief, Telcordia will follow the same approach and again address the disputed claim terms in the same order as they are set forth in the Final Joint Claim Chart.

1

**B.    Argument Regarding '633 Patent Claim Constructions**

**1.    residual time stamp (RTS) [claims 1, 5, 11, 33]**

| '633 claim term | Telcordia's construction | Defendants' construction |
| --- | --- | --- |
| residual time stamp (RTS) [claims 1, 5, 11, 33] | the value in a P-bit counter sampled at the end of each RTS period | a contiguous p-bit representation of the number of network clock cycles [claims 1, 5]<br>a contiguous p-bit representation of the number of derived network clock cycles [claims 11, 33] |

Alcatel addresses this claim term (the first term in the '633 section of the Final Joint Claim Chart) in section IV(A)(3) of its brief. *See* Alcatel Op. Br. at 28-29. Alcatel incorrectly dismisses the dispute between the parties over whether an RTS is the number of network clock cycles (Telcordia contends that it is not), and Alcatel generates a new dispute by explaining, for the first time, what it means by "contiguous" (a word that is found nowhere in the intrinsic record).

Initially, Alcatel mischaracterizes Telcordia's construction by stating that "Telcordia's construction uses different words to capture the same concept: the 'value of the P-Bit counter at the end of the RTS period' is the number of network (or derived network) clock cycles." Alcatel Op. Br. at 28. The value of the P-Bit counter is *not* the number of network clock cycles, and Telcordia has never said that it is. As Telcordia explained in its opening brief, the P-Bit counter "counts clock cycles" but it does that using a "modulo" count that does not represent the *actual number* of network clock cycles. *See* Telcordia's Opening Claim Construction Brief, filed in both the *Lucent* and *Cisco* cases (Lucent D.I. 104; Cisco D.I. 94) ("Telcordia Op. Br. (Lucent/Cisco)") at 23. And Telcordia then explained *how* a modulo count differs from an "actual number" count, analogizing to a clock. *See id.* at 24. That is, a 12-hour clock provides a modulo count of the number of hours in a day and is ambiguous on its face. If the clock reads 3:00, without additional information one cannot know whether three hours have passed in the day (i.e., the time is 3:00 a.m.) or 15 hours have passed in the day (i.e., the time is 3:00 p.m.). Thus, the modulo count is *not* a count of the actual number of hours that have passed in the day, just as the modulo count of the P-Bit counter is *not* the number of network clock cycles.[1]

---

[1] Another reason that the RTS is not a count of the number of network clock cycles in an RTS period is that the RTS represents only the ending count of the period. Determination of the number of

2

Instead of dealing with this dispute, Alcatel says that the parties' dispute concerns "a different issue: must this representation be a single contiguous P-Bit value, or can the p-bits of the RTS be broken up and transmitted one at a time." Alcatel Op. Br. at 28.[2] This new issue is not concerned with defining the RTS, but rather centers on how the RTS is *transmitted*, which is a different claim element altogether. In any event, though, Alcatel's position that the RTS must be transmitted as an inseparable block of data (i.e., in consecutive bit positions in one packet) is not correct. The claims require only that the RTS be "transmitted" and do not specify how. *See, e.g.,* '633 Patent, Col.9:1-2 ("transmitting from the source node to the destination node an RTS"); Col.10:9-10 ("transmitting over the telecommunications network an RTS"). Moreover, nothing in the specification or prosecution history suggests that the bits making up the RTS must remain together during transmission or in any other way supports Alcatel's position.

The portions of the specification that Alcatel cites merely reinforce the language of the claims (i.e., that "transmitting" is required, but nothing more). For instance, Alcatel notes that the specification identifies "the P-bit RTS to be transmitted," and states that "this number . . . is . . . transmitted." '633 Patent, Col.6:47-51. Nothing in the specification explains or implies that the RTS is an inseparable block of data during transmission. Moreover, even if the specification were to describe transmission of an inseparable block of data (which it does not), it would be improper to read that operation into the broad concept of "transmitting" set forth in the claims.

Indeed, the concept of "transmission" set forth in the claims clearly incorporates the technique of breaking data down into smaller packets and transmitting those packets separately. Indeed, Alcatel's own brief acknowledges that:

> [I]n a packet switched network, such as the Internet, the nodes communicate with one another via small packets of data that may be sent to each other via different paths through the network. . . . [T]hese packets may be *transmitted* over a network interspersed with thousands of other packets.

---

cycles in the period additionally requires knowledge of the RTS value at the start of the period. '633 Patent, Col.8:32-38.

[2] This "dispute" is new, however, as Alcatel has never before explained what "contiguous" means.

Alcatel Op. Br. at 21 (emphasis added).  Moreover, Lucent similarly recognizes that the concept of "transmission" includes the technique of breaking blocks of data down and sending them separately:

> A packet-switched network operates by dividing data into smaller groups of data called "packets." . . . A packet-switched network uses capacity more efficiently than a circuit-switched network.  Because network links are not exclusively dedicated to a specific communication as in a circuit-switched network, packets can be delayed or lost. *Transmission* therefore is not as reliable or predictable, thereby making use of packet-switched networks for the *transmission* of real-time data like voice a more challenging task than in circuit-switched networks.

Lucent Op. Br. at 3 (emphasis added).  Consistent with the defendants' own positions, there is nothing inherent in the word "transmission" that would prevent breaking the RTS down and sending it in separate packets.

In sum, there is no reason to limit an "RTS" to a discrete block of data that can never be separated during transmission.  Accordingly, Telcordia's proposed construction should be adopted by the Court.

### 2.    counting the network clock cycles [claim 1] / counting network clock cycles [claim 5]

| '633 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| counting the network clock cycles [claim 1] / counting network clock cycles [claim 5] | counting modulo $2^p$ the cycles of the network clock within an RTS period | counting the actual number of cycles from the timing reference that synchronizes the source and destination nodes |

Alcatel relegates the discussion of this disputed term to a footnote in the section of its brief addressing the "network clock."  Specifically, Alcatel incorrectly posits that:

> Once the Court construes "network clock," the construction of "network clock cycles" and "counting the network clock cycles" is straightforward.  The term "network clock cycles" means the actual number of cycles of the network clock (not the cycles of the derived network clock), and "counting the network clock cycles" means counting the actual number of cycles from the network clock (not the derived network clock).

Alcatel Op. Br. at 32 n.7.  But Alcatel never explains *why* this is correct, or provides any basis for rejecting Telcordia's construction.  Alcatel simply presumes that its construction of the "counting" limitation is correct.

As Telcordia noted in its opening brief, however, there remain two key disputes that are exclusive to the "counting" limitation, regardless of the Court's ultimate decision as to any other disputed claim terms.  *See* Telcordia Op. Br. (Lucent/Cisco) at 24-26.  First, Telcordia's construction calls for a

4

"modulo" count, as is expressly required by the claim language (Col.8:63; Col.10:2; Col.11:56; Col.16:18), whereas Alcatel's construction incorrectly calls for an "actual number" count, in direct conflict with the claim language. And as explained in its opening brief as well as above (*see supra* p. 2), a "modulo" count is not an "actual number" count. In the context of the '633 patent, therefore, a modulo count of the derived network clock cycles is *not* a count of the actual number of network clock cycles. In its opening brief, Alcatel fails to acknowledge this and thus offers neither support for its proposed construction nor any reason to reject Telcordia's.

Second, Telcordia's construction calls for a count "within an RTS period," as also is expressly required by the claim language (Col.8:64; Col.10:3-4; Col.11:56; Col.16:18), whereas Alcatel's construction fails to identify the relevant time period in which counting occurs. Again, however, Telcordia addresses this issue and supports its position in its opening brief (*see* Telcordia Op. Br. (Lucent/Cisco) at 24-26), while Alcatel ignores the issue.[3]

In short, beyond the fact that Telcordia's proposed construction of the "counting" limitation is correct, Alcatel's failure even to address the limitation in its opening brief should cause the Court to adopt Telcordia's construction.

### 3.    network clock [claims 1, 5, 11, 33]

| '633 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| network clock [claims 1, 5, 11, 33] | the timing reference that synchronizes the SRTS function at the source and destination nodes | the timing reference that synchronizes the source and destination nodes |

Alcatel addresses this claim term (the fifth term in the '633 section of the Final Joint Claim Chart) in section IV(A)(6) of its brief. *See* Alcatel Op. Br. at 32-34. However, Alcatel's only argument against Telcordia's proffered construction of "network clock" is based on the misrepresentation that Telcordia's construction for "network clock" is the same as Telcordia's construction for "derived network clock." As is abundantly clear from the following excerpts of the Final Joint Claim Chart (D.I. 98)—

---

[3] While the parties have also proffered competing constructions for the "network clock" and "derived network clock" limitations, these disputes only tangentially concern the parties' dispute regarding the "counting" limitation and are thus discussed separately. *See infra* pp. 5-7, 15.

which compares Telcordia's construction for "network clock" with its construction for "derived network clock" and "derived network clock frequency $f_{nx}$"—it is clear that Telcordia has never contended that the "network clock" is the same as the "derived network clock."

| '633 claim term | Telcordia's construction |
| --- | --- |
| network clock [claims 1, 5, 11, 33] | the timing reference that synchronizes the SRTS function at the source and destination nodes |
| derived network clock frequency $f_{nx}$ [claims 11, 33] | The frequency of the network clock signal $f_n$ expressed as a factor of x (where x may be 1). |
| derived network clock [claims 11, 33] | *See* construction of "derived network clock frequency $f_{nx}$" above. |

Alcatel, though, looks at the constructions Telcordia has proposed in the Final Joint Claim Chart, and contends that:

- "[A]ccording to Telcordia, the derived network clock is the same as the network clock." Alcatel Op. Br. at 34.
- "Telcordia's attempt to define both clocks to be the same eliminates the word 'derived' from the claims." Alcatel Op. Br. at 33.
- "Telcordia's construction collapses the distinction between the two clocks, essentially making them one and the same." Alcatel Op. Br. at 32.

Contrary to Alcatel's contentions, Telcordia offers different constructions for each term, recognizing that the claims call for a "network clock," and a "derived network clock frequency $f_{nx}$." Nevertheless, Alcatel's entire argument centers on the non-issue of whether the clocks are the same.[4]

By manufacturing a dispute where none exists, Alcatel ignores the more substantive disputes that actually do exist as to these terms. Alcatel thus offers nothing from the claims, the specification, or the prosecution history to support its proffered constructions for "network clock" and "derived network

---

[4] Alcatel also criticizes Telcordia for offering a construction for only "derived network clock frequency." Alcatel Op. Br. at 34 n.8 ("Tellingly, Telcordia does not offer a construction of 'derived network clock.' Rather, it construes 'derived network clock frequency' and incorporates this construction by reference as its construction of 'derived network clock.'"). However, Alcatel fails to mention that the phrase "derived network clock" does not appear by itself anywhere in the claims. Only the complete phrase "derived network clock frequency $f_{nx}$" appears in the claims, which is why Telcordia offers a construction for that term. The isolated term "derived network clock" was included in the Final Joint Claim Chart (even though the phrase does not independently appear in the claims) at the defendants' insistence.

clock," and offers no rebuttal to any of the following Telcordia positions: (1) that the "network clock" should be construed to synchronize the SRTS function, consistent with the context of the '633 specification (versus Alcatel's far-reaching construction that expands the definition of "network clock" beyond the context of the patent); (2) that the "derived network clock frequency $f_{nx}$" is derived, according to the specification, by dividing the *frequency* of the "network clock" by a rational number (versus Alcatel's ambiguous suggestion that the "clock" and not the "frequency" be divided); (3) that "x" is a rational number, and specifically x may be 1, as expressly disclosed in the specification (versus Alcatel's suggestion that the expressly disclosed x=1 embodiment be ignored); and (4) that rational numbers can be greater than, equal to, and less than 1 (versus Alcatel's suggestion that the claims are limited to dividing by numbers that are greater than 1). *See* Telcordia Op. Br. (Lucent/Cisco) at 26-27, 30-31.[5]

In sum, Telcordia has properly supported its proposed constructions regarding the terms "network clock" and "derived network clock." Alcatel, on the other hand, has focused exclusively on a "straw man" (i.e., whether the clocks are the same), and failed to support its proposed constructions at all. Accordingly, Telcordia's constructions should be adopted.

### 4.     network clock cycles [claims 1, 5]

| '633 claim term | Telcordia's construction | Defendants' construction |
| --- | --- | --- |
| network clock cycles [claims 1, 5] | cycles of the network clock (see above) | the actual number of cycles from the network clock |

Alcatel has not addressed the disputed term "network clock cycles" independent of other disputed terms (e.g., "network clock," "counting the network clock cycles"). By choosing not to address this term (despite contesting Telcordia's construction and insisting that the term appear in the Final Joint Claim Chart), Alcatel ignores the irreconcilable conflict created by its construction. Specifically, Alcatel's

---

[5] While the concept of a "rational number" is readily understood, Telcordia provides the following dictionary definitions as background: "[R]ational number. A real number that can be expressed as a fraction $x/y$ where $x$ and $y$ are integers and $y$ is not equal to zero." *IEEE Standard Computer Dictionary* 167 (1990) (attached as Ex. A); and "[R]ational number [MATH]. A number which is the quotient of two integers." *McGraw-Hill Dictionary of Scientific and Technical Terms* 1568 (4th ed. 1989) (attached as Ex. B).

construction requires two different and inconsistent types of counting (counting an actual number and modulo counting). *See* Telcordia Op. Br. (Lucent/Cisco) at 26-27.

In short, beyond the fact that Telcordia's proposed construction of the "network clock cycles" limitation is correct, Alcatel's failure even to address the limitation in its opening brief should cause the Court to adopt Telcordia's construction.

### 5.    $2^P$ counts uniquely and unambiguously represent the range of possible network clock cycles within an RTS period [claims 1 and 5]

| '633 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| $2^P$ counts uniquely and unambiguously represent the range of possible network clock cycles within an RTS period [claims 1 and 5] | P is chosen so that $2^P$ defines a range of counts that represents each possible RTS period end-point with a different modulo $2^P$ count (bit pattern). | This claim limitation is indefinite for failure to satisfy the requirements of 35 U.S.C. § 112(2). |

Alcatel's argument regarding this limitation shows precisely why this Court should not rule, at this stage of the case, on what is really a motion for summary judgment that the claim is invalid as indefinite (the defendants have offered a proposed construction of "indefinite" for five '633 terms and three '763 terms). *See* Telcordia Op. Br. (Lucent/Cisco) at 27-28. First, Alcatel contends, with no support, that a person of ordinary skill in the art would not understand the word "uniquely" as used in claims 1 and 5. Alcatel Op. Br. at 30. Building on that, Alcatel then argues that the Court is faced with a dilemma that it must resolve by finding the claim language indefinite:

> In construing this limitation, the Court is thus left with only two options: either the Court must find that the word "uniquely" is superfluous and should be read out of the claims, or the Court must find that the claim language is not amenable to construction . . . . The former interpretation is disfavored. . . . The later is thus, in this case, unavoidable.

*Id.* at 30 (citations omitted).

In reality, however, there is no dilemma, and the Court is left with as many options as it desires. For the reasons set forth below, Telcordia respectfully submits that the option that makes the most sense is to adopt Telcordia's claim construction (as Alcatel has failed to offer any proposed construction) and to consider summary judgment positions, if at all, after August 11, 2006, as the Revised Scheduling Order (D.I. 89) dictates.

First, as Telcordia explained in its opening brief, the asserted claims are entitled to a statutory presumption of validity under 35 U.S.C. § 282, and that presumption may be overcome only by clear and convincing evidence. *See* Telcordia Op. Br. (Lucent/Cisco) at 27-28 (citing *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir 2003)). Second, as also recognized in Telcordia's opening brief, to find a claim invalid under 35 U.S.C. § 112(2), there must be clear and convincing evidence that a person skilled in the art would not "reasonably understand the claim when read in the context of the specification." *Marley Mouldings Ltd. v. Mikron Indus. Inc.*, 417 F.3d 1356, 1359 (Fed. Cir. 2005). *See also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004) (noting that the Federal Circuit "has frequently alluded to the 'familiar axiom that claims should be construed, if possible, as to sustain their validity'") (quoting *Rhine v. Casio, Inc.,* 183 F.3d 1342, 1345 (Fed. Cir. 1999)).

Against these high substantive and evidentiary standards, Alcatel cites only one case in support of its position that a finding of invalidity in this case—and at this stage—is "unavoidable." Alcatel Op. Br. at 31 (citing *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003)). But *Honeywell* fails to support Alcatel's position. There, the Federal Circuit affirmed a finding of invalidity under 35 U.S.C. § 112(2) by the International Trade Commission ("ITC"), but the decision clearly indicates that (unlike the situation here) the ITC had conducted an evidentiary hearing, considered expert testimony, and made findings of fact. *See* 341 F.3d at 1334, 1336-38, 1339-40. Indeed, in considering § 112(2) invalidity challenges the Federal Circuit often recognizes the factual component of the challenge. *See, e.g., Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1379 (Fed. Cir. 2001) ("Even the government's expert agreed that the 'period sufficient' could be determined from conducting such checks, and that he 'wouldn't say they are difficult to do.'"); *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003) ("[D]efiniteness . . . is amenable to resolution by the jury where the issues are factual in nature.").

Here, the issues *are* factual in nature. For example, Alcatel submits that one skilled in the art would not understand the claim, but the facts (if Telcordia is afforded the opportunity to discover and develop them) will likely show otherwise. Indeed, even an Alcatel subsidiary (Newbridge) evaluated

Telcordia's invention and took a license to the '633 patent, resulting in the payment of substantial royalties to Telcordia for Alcatel's products that use Telcordia's technology.

In short, Telcordia submits that in asserting indefiniteness, Alcatel is both acting prematurely and misusing the claim construction process.   Moreover, having decided not to engage in the claim construction process as it relates to this limitation, Alcatel leaves the Court with only one proposed construction to consider.   Accordingly, Telcordia's proposed construction (which is amply supported) should be adopted by the Court.

### 6.    transmitting . . . an RTS [claims 1, 5, 11, 33]

| '633 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| transmitting . . . an RTS [claims 1, 5, 11, 33] | sending an RTS over the network | the RTS is transmitted in a portion of the overhead other than the convergence sublayer overhead |

Alcatel addresses this claim term (the eighth term in the '633 section of the Final Joint Claim Chart) in section IV(A)(1) of its brief.  *See* Alcatel Op. Br. at 23.  Alcatel, however, provides an overly simplistic and superficial analysis in arguing that the specification expressly disclaims placing the RTS in the "convergence sublayer" during transmission.   The specification does not disclaim using the "convergence sublayer," and in fact the use of the "convergence sublayer" to carry the RTS is expressly covered by the claims.

Alcatel's argument is based on the mere *fact* that the specification criticizes certain prior art that uses the "convergence sublayer" without acknowledging the expressed *reasons* that the specification levies its criticisms.   A more thorough analysis regarding *why* the prior art was criticized reveals that Telcordia did not disclaim the use of the "convergence sublayer." *See, e.g., Gart v. Logitech, Inc.*, 254 F.3d 1334, 1340-42 (Fed. Cir. 2001) (carefully analyzing the *specific reasons* set forth in the specification for distinguishing the prior art in determining that the patentee did not limit the claims through "remarks distinguishing the prior art").

The '633 specification does criticize and distinguish the prior art "Time Stamp" or "TS" technique, which requires sending a TS in the "convergence sublayer."   Specifically, the specification

explains that rigidity, complexity, and inefficient use of bandwidth are all disadvantages of a prior art technique that sends the TS in the "convergence sublayer." '633 Patent, Col.3:32-34.  But the specification makes clear that the *reason* for these disadvantages is the large *size* of the TS (i.e., the number of bits), and not the *location* of the TS.  *See* Col.3:6-8 (*"Because of the size* of the TS (2 octets), it has been proposed that the TS be transmitted via the Convergence Sublayer (CS) overhead.") (emphasis added).  Indeed, the specification notes that solving the problem of *size* (not location) of the prior art TS stands as one of the primary aims of the invention:

> As described hereinabove, the TS approach requires a large number of bits (16-bits in the example), to represent the number of network clock cycles within a time interval defined by a fixed number (N) of service clock cycles.  In accordance with the present invention, the number of bits required to represent the number of network clock cycles within that time interval is substantially reduced.

'633 Patent, Col. 3:40-46.  The '633 patent's residual time stamp ("RTS") can accomplish in *3 or 4* bits what the prior art time stamp "TS" accomplished in *16* bits.  Col.6:36-37 ("a 3-bit RTS is sufficient").  Having solved the problem of size, the problems of rigidity, complexity, and inefficient use of bandwidth are also solved (because size was the *reason* for these problems), regardless of where the RTS is located.  Reading the specification as a whole, it is clear that Telcordia only disclaimed, if anything, the large *size* of the prior art TS, not the *location* of the prior art TS.  *See, e.g., Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1260-61 (Fed. Cir. 1999) (analyzing criticisms of prior art in the context of the specification as a whole in finding no disavowal).

Moreover, the claim language merely requires "transmitting . . . an RTS" and does not dictate the location of the RTS.  Moreover, every example in the specification indicates that during transmission, the RTS is located in the ATM adaptation layer (AAL).  *See, e.g.,* '633 Patent, Col.4:7-9; Col.6:52-53.  Because the AAL *includes* the "convergence sublayer," the specification cannot be read to expressly disclaim placing the RTS in the "convergence sublayer."  *See* Telcordia Op. Br. (Lucent/Cisco) at 28-29.  Indeed, if that had been intended, the examples that disclose using the AAL (which includes the "convergence sublayer") would have been qualified with language explaining that although the AAL may

11

be used, the "convergence sublayer" portion of the AAL may not be used. The specification contains no qualifications of this kind, and instead contemplates using any part of the AAL.

In sum, Alcatel's disclaimer position rests on a mischaracterization of the technology (the AAL includes the "convergence sublayer"), a misunderstanding of the reason that the specification criticizes the prior art (the *size* of the prior art time stamp, not is *location*), and a misunderstanding of the law of disclaimer (the specification should be evaluated as a whole). Alcatel's disclaimer position also conflicts with the language of the claims (which require only "transmitting," without further limitations) and the language of the specification (which provides express examples that would cover sending the RTS in the "convergence sublayer").

 7.    at the end of each RTS period [claims 1, 5]

| '633 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| at the end of each RTS period [claims 1, 5] | after each RTS period has ended | at the end of each RTS period |

Alcatel addresses this claim term (the ninth term in the '633 section of the Final Joint Claim Chart) in section IV(A)(5) of its brief. *See* Alcatel Op. Br. at 31-32. Alcatel's proposed construction for this term merely parrots the claim language verbatim, and makes no real attempt to define the claim term at issue. Similarly, Alcatel's only citation to intrinsic evidence in support of its position also merely parrots the language of the claim verbatim. *See* Alcatel Op. Br. at 31-33 (citing '633 Patent, Col.4:6 ("At the end of each RTS period . . . .")).

Alcatel views the phrase "at the end of each RTS period" in complete isolation, and relies upon dictionary definitions of "at" and "end" to argue that the ordinary meaning of the phrase "at the end of each RTS period" is readily apparent "even to lay judges." *Id*. at 31.[6] Alcatel then goes on to clarify its position that the ordinary meaning of "at the end of the period" is "during the period," a position that

---

[6] It is hard to understand how the term "uniquely" is so ambiguous that Alcatel refuses even to attempt to construe it, while the term "at the end of each residual time stamp period" is so plain on its face that it is "readily apparent even to lay judges, and claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." Alcatel Op. Br. at 30-31 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005)).

simply is not reflected in its proposed construction. *Id.* ("*[T]he plain meaning of those words makes clear that to be at the end of an interval is still within that interval.*") (emphasis in original). Against these internally inconsistent positions, and against its own failure to offer a construction that does more than parrot back the words of the claim, Alcatel levies unwarranted criticisms of Telcordia for allegedly attempting to "rewrite the claims" and "evade the law." *Id.* There is no basis to this charge, however.

At the outset, Telcordia's construction recognizes that the term "at the end of each RTS period" does not appear in isolation. Controlling case law requires that the term be considered in the context of the claim as a whole and the specification of which it is part. *See Hockerson-Halberstadt, Inc. v. Converse, Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction, however, demands interpretation of the entire claim in context, not a single element in isolation."); *see also Nystrom v. TREX Co.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) (noting that claim construction cannot properly be "divorced from the context of the written description and prosecution history") (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc)).

Here, the claim as a whole dictates that an RTS be transmitted "at the end of each RTS period," and the specification distinctly sets forth the steps that must occur as part of "transmitting . . . an RTS at the end of each RTS period." '633 Patent, Col.9:1-4, Col.10:7-12, Col.4:6-9, Col.6:52-57. Those steps include sampling the P-bit counter, processing the ATM cell payload in processor 16, adding an ATM header in assembler 17, and then transmitting. *Id.* Telcordia submits that the steps (sampling, processing, adding, transmitting) occur *after* the RTS period ends, whereas Alcatel contends that they occur *during* the RTS period. Telcordia's construction is correct because the RTS cannot even be determined, let alone processed and transmitted, until the RTS period ends (this is true under either Telcordia's or Alcatel's construction of "residual time stamp"). *See* '633 Patent, Col.4:12-16, Col.6:45-48. In other words, the "value in a P-bit counter" (the RTS according to Telcordia) or the "contiguous p-bit representation" (the RTS according to Alcatel) cannot be determined (because the P-bit counter is not sampled) until the RTS period ends. Col.4:6-7; Col.6:45-48. Because determining the value in a P-bit counter is the first of a number of sequential steps that ultimately result in transmitting the RTS (again, transmitting is the event

that occurs "at the end of each RTS period" according to the claims), the remaining steps all occur *after* the RTS period ends.

In short, Telcordia's construction accounts for and recognizes what happens "at the end of each RTS period" (as dictated by the claims and the specification), and recognizes that the sequential steps, as described in the specification, must happen after the RTS period ends.  Alcatel's construction, on the other hand, ignores what happens at the end of the RTS period and instead focuses on the phrase "at the end" in isolation.

In fact, Alcatel's attempt to use a dictionary definition of "end" to support its position—a selective one at that, since there is no question that "end" has numerous *different* definitions, depending on usage, and the usage "the end of the day" was chosen by Alcatel only because it supported its position—illustrates the difficulties of using dictionaries as the primary reference point instead of the specification.  For example, saying that you will meet in the lobby "at the end" of the movie means that you will meet in the lobby *after* the movie is over, not while the movie is still playing.  At bottom, therefore, this limitation ("at the end of each RTS period") must be defined in the context of the specification and claims, and once that is done, Alcatel's position that "at the end" means "during" must be rejected.  In the context of the claims and the specification, the phrase "transmitting . . . at the end of the RTS period" must be construed to mean "transmitting after the RTS period ends."  Accordingly, the Court should adopt that construction.

### 8.  the period between each pulse [claim 1] / the periods between pulses [claim 5]

| '633 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| the period between each pulse [claim 1] the periods between pulses [claim 5] | the interval between each pair of pulses in the signal produced from the received RTS codes | the time interval between two pulses |

Alcatel addresses this claim term (the tenth term in the '633 section of the Final Joint Claim Chart) in section IV(A)(7) of its brief.  *See* Alcatel Op. Br. at 34-36.  Alcatel contends that its construction is the "widely accepted meaning of commonly understood words," and Alcatel attacks

Telcordia's construction as "an unnecessarily complex construction that is not supported by the specification and would not be understood by one of ordinary skill in the art." *Id.* at 35. Again, however, Alcatel improperly construes the term in isolation and offers only an abstract definition. Moreover, Alcatel fails to support its abstract construction. Specifically, in support of its position Alcatel offers only (1) a dictionary definition for the proposition that a "period" is "an interval of time"—a proposition with which Telcordia agrees and expressly incorporates into its construction, and (2) a citation to specification language that explains "*the successive RTSs are converted into a pulse signal which has periods between pulses*"—a reference that squarely supports Telcordia's construction and which is also expressly incorporated into Telcordia's construction. *Id.* (emphasis added). Telcordia thus submits that the claim term should be construed in context, not in the abstract, and that Alcatel's only offered support actually confirms Telcordia's proposed construction, not Alcatel's.

9.    **derived network clock frequency $f_{nx}$ / derived network clock [claims 11, 33]**

| '633 claim term | Telcordia's construction | Defendants' construction |
| --- | --- | --- |
| derived network clock frequency $f_{nx}$ [claims 11, 33] | The frequency of the network clock signal $f_n$ expressed as a factor of x (where x may be 1). | *See* construction of "derived network clock" below. |
| derived network clock [claims 11, 33] | *See* construction of "derived network clock frequency $f_{nx}$" above. | a clock derived by dividing the network clock by a rational number |

Alcatel addresses these limitations (the eleventh and twelfth terms in the '633 section of the Final Joint Claim Chart), together with the "network clock" limitation, in section IV(A)(6) of its brief. *See* Alcatel Op. Br. at 32-34. Telcordia thus incorporates its previous arguments regarding the "network clock" limitation, which is addressed above. *See supra* pp. 5-7. Moreover, Telcordia again notes that the claim term to be construed is "derived network clock frequency $f_{nx}$" and that although the defendants insisted upon including the truncated term "derived network clock" as an independent term in the Final Joint Claim Chart, that term does not exist independent of "frequency $f_{nx}$" in any of the asserted claims.

10.    **Additional Improper Summary Judgment Positions**

In what is in effect a motion for summary judgment, Alcatel asks the Court to invalidate claims 5 and 11 due to the alleged indefiniteness of the following disputed claim terms:

- counting means [claim 5]
- transmitting means [claim 5] / means for transmitting from the source node an RTS that is equal to the modulo 16 count of derived network clock cycles in the RTS period [claim 11]
- receiving means [claim 5]
- converting means [claim 5]

*See* Alcatel Op. Br. at 25-28, 37-39. For the reasons stated above, however, this request is both premature and a misuse of the claim construction process. *See supra* pp. 8-10. And having again opted out of the claim construction process, Alcatel has left the Court with only Telcordia's proposed construction to consider. Accordingly, that construction (which is amply supported) should be adopted by the Court.

11.    **means, at the source node, for defining a derived network clock frequency $f_{nx}$ from a network frequency $f_n$ where $f_{nx} = f_n/x$, x is a rational number, and $f_{nx}$ is less than or equal to twice the service clock frequency [claim 11]**

| '633 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| means, at the source node, for defining a derived network clock frequency $f_{nx}$ from a network frequency $f_n$ where $f_{nx} = f_n/x$, x is a rational number, and $f_{nx}$ is less than or equal to twice the service clock frequency [claim 11] | The function is "defining a derived network clock frequency $f_{nx}$ from a network frequency $f_n$ where $f_{nx} = f_n/x$, x is a rational number, and $f_n/x$ is less than or equal to twice the service clock frequency." The corresponding structure is divide by x circuit 11 (Fig. 2), or a direct connection to the network clock when x=1, or a multiplier (PLL) when x is less than 1. | The function is "defining a derived network clock frequency $f_{nx}$ from a network frequency $f_n$." The corresponding structure is divide by x circuit 11. |

Alcatel addresses this claim term (the twentieth term in the '633 section of the Final Joint Claim Chart) in section IV(A)(8) of its brief. *See* Alcatel Op. Br. at 36-39. At the outset, however, Alcatel materially misrepresents Telcordia's position as to the recited function of this term. Specifically, Alcatel states that:

16

> The parties agree that . . . the recited function is "defining a derived network clock frequency $f_{nx}$ from a network frequency $f_n$." The dispute between the parties is limited to identification of the corresponding structure for performing the claimed function.

Alcatel Op. Br. at 36. In fact, mere reference to the Final Joint Claim Chart (D.I. 98) reveals that the parties disagree on the recited function and thus dispute both that and the identification of corresponding structure. Alcatel also misquotes the language of the claim in its opening sentence (stating that the claim reads "$f_{nx}=f_{nx}$" where in fact the language reads "$f_{nx}=f_n/x$"). *See* Alcatel Op. Br. at 36.

Moreover, Telcordia's constructions of both the function and structure of this limitation are correct. First, as Telcordia notes in its opening brief, the Court should define the function of the limitation to include the entire function recited in the claim, and not the truncated version offered by Alcatel (with which Telcordia does *not* agree). As the Federal Circuit stated in *Lockheed Martin Corp. v. Space Systems / Loral, Inc.,* 324 F.3d 1308 (Fed. Cir. 2003), the function of a § 112(6) limitation may not be "improperly broadened by ignoring the clear limitations contained in the claim language. The function of a means-plus-function claim must be construed to include the limitations contained in the claim language." *Id.* at 1319.

By improperly suggesting that the Court ignore the clear functional limitations contained in the claim language, Alcatel concomitantly suggests that the Court ignore the corresponding structure that performs the ignored aspects of the function. Specifically, the parties agree that "divide by x circuit 11" is structure that corresponds to the recited function of "defining a derived network clock frequency $f_{nx}$ from a network frequency $f_n$"—but Telcordia submits that the complete functional language set forth in the claim language "$f_{nx}=f_n/x$" and "x is a rational number" implicates *additional* corresponding structure. These limitations clarify that the "divide by x circuit 11" can only be corresponding structure where an actual division occurs. But because "x is a rational number," x can be the number one. Indeed, the specification expressly discloses an example where x=1 ('633 Patent, Col.6:10), and the claims, by dictating that x is a rational number, establish that x can also be less than one. As a result, where x=1, the claimed mathematical operation "$f_{nx}=f_n/x$" does not really require a division at all (since dividing by 1 accomplishes nothing), thus resulting in a "direct connection to the network clock" (i.e., no division) as

set forth in Telcordia's proposed construction (and ignored in Alcatel's).[7] From the perspective of one skilled in the art, this "direct connection to the network clock" is expressly disclosed, in the specification where an embodiment showing x=1 is set forth. Col.6:7-20. This alternative embodiment, from the perspective of one skilled in the art, would be similar to the embodiment disclosed in Figures 2 and 3, but with a direct connection instead of the "÷X" boxes. The same analysis applies where x is less than the number one (as the claim and the specification both expressly disclose, x is a rational number and therefore can be less than one). Col.4:63; Col.11:53. In such an embodiment, the claimed mathematical operation "$f_{nx}=f_n/x$" is a mathematical division, but actually results in $f_n$ being *multiplied* to produce a larger number.

Again, this alternative embodiment, from the perspective of one skilled in the art, would be similar to the embodiment disclosed in Figures 2 and 3, but with phase locked loop (PLL) (i.e., a "multiplier") instead of the "÷X" boxes. One of skill in the art would understand that the structure required to multiply the frequency $f_n$ is a phase locked loop (PLL) (i.e. a "multiplier"), and, contrary to Alcatel's position, ample support for this concept is found in the specification. Col.4:35-37 ("The resultant gated through output pulse stream drives a *multiply-by-N phase locked loop* to recover the service clock") (emphasis added); Col.3:18-20 ("The service clock is recovered by supplying the resultant pulse stream as the reference signal to a *multiply-by-N phase locked loop (PLL)*.") (emphasis added); Fig. 3 PLL (at 41). In view of the basic mathematical relationships expressly set forth in the functional language of the claim, Telcordia submits that one skilled in the art would understand the structure that corresponds to the claim's function as set forth in Telcordia's proposed construction.

In sum, Telcordia's construction identifies the correct recited function, and identifies all of the structure disclosed in the specification that corresponds to the recited function. Alcatel's construction, on the other hand, truncates the function and ignores the structure corresponding to the complete function.

_____

[7] When x=1, the equation $f_{nx}=f_n/x$ becomes $f_{nx}=f_n$—that is, the derived network clock frequency and the network clock frequency are the same. Under these conditions, the network clock frequency can be applied directly (without division) to the P-bit counter 12.

12.    **means, at the source node, for counting the derived network clock cycles modulo 16 in an RTS period [claim 11]**

| '633 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| means, at the source node, for counting the derived network clock cycles modulo 16 in an RTS period [claim 11] | The function is "counting the derived network clock cycles modulo 16 in an RTS period." The corresponding structure is P-Bit Counter 12 (Fig. 2). | The function is "counting the derived network clock cycles modulo 16 in an RTS period." The corresponding structure P-Bit Counter 12 (where P=4) and Latch 15. |

Alcatel addresses this claim limitation (the twenty-first term in the '633 section of the Final Joint Claim Chart) in section IV(A)(10) of its brief.  *See* Alcatel Op. Br. at 39-40.  While the parties agree that this limitation is covered by § 112(6), Alcatel insists that "Latch 15"—which by Alcatel's own admission does not count the derived network clock cycles—must be included as corresponding structure.  *See* Alcatel Op. Br. at 39-40.  Telcordia's proposed construction, on the other hand, excludes "Latch 15" because the specification clearly states that "latch 15 *samples* the current count of counter 12," and does not *count*.  Col.6:47-49.  The only structure in the specification that performs the function of counting is P-Bit counter 12.  Col. 6:38-40 ("The derived network clock, $f_{nx}$, drives a P-bit counter, which is continuously counting these derived network clock pulses."); Col.3:66-Col.4:1 ("[A] free running P-bit counter counts clock cycles in a clock signal derived from the network clock.").  Latch 15 simply does not perform the counting function.

Alcatel's suggestion that "[i]t is the combination of P-bit counter 12 and latch 15 which counts," and that without latch 15 "there would be no way to count the number of derived network clock cycles *in a particular RTS period*" (Alcatel Op. Br. at 40), is wrong.  Without latch 15 there would be no way to sample the count of the P-bit counter, because latch 15 performs the function of *sampling*, not *counting*.  But the P-bit counter will count the "derived network clock cycles modulo 16 in an RTS period" regardless of whether latch 15 samples the count or not.  In other words, latch 15 has nothing to do with the recited function, which is *counting* not *sampling*.  Accordingly, this Court should adopt Telcordia's construction and reject Alcatel's.

19

III.    **Alcatel's '052 Patent**

A.    **Preliminary Statement**

Alcatel's consistent approach to the claim construction issues involved in the '052 patent is to disregard the specification and the prosecution history. Indeed, now in litigation, Alcatel unashamedly attempts to reclaim what it disclaimed through repeated arguments during prosecution—effectively urging this Court to erase the prosecution history and reject the recognized public-notice function the prosecution history provides to competitors.

Moreover, a repeated theme in Alcatel's claim constructions of the '052 patent's terms is its request to construe terms so as to make things easy for "a lay jury." It is clear, however, that this is really code for ignoring troubling limitations either found in the claim language or required by the prosecution history.

B.    **Argument Regarding '052 Patent Claim Constructions**

1.    **"telecommunications switching system" [claims 17 and 18]**

| '052 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| "telecommunications switching system" [claims 17 and 18] | a system that includes one or more switch fabrics for processing call information and a central unit for control and management of the calls | a telecommunication system for establishing and releasing connections among telecommunication transmission paths |

Alcatel addresses this claim term (the first term in the '052 section of the Final Joint Claim Chart) in section II(B)(1) of its brief. *See* Alcatel Op. Br. at 7-9. However, in asking this Court to adopt its proposed construction, Alcatel starts with a dictionary definition and gives little (if any) regard to the '052 patent specification and the prosecution history—an approach clearly rejected by the Federal Circuit. *See supra* p. 13. To explain what is meant by a "telecommunications switching system," however, the '052 inventors did not rely on a dictionary definition. Instead, they expressly stated that the features of the "telecommunications switching system" were "described in" an earlier Alcatel patent, U.S. Patent No. 5,495,484 ("the '484 patent"), entitled "Distributed Telecommunications Switching System," which the '052 patent "incorporated by reference." '052 Patent, Col.4:39-41. And there is no question that the '052

patent and the '484 patent (attached as Ex. C) describe a very specific—and complex—type of telecommunications switching system. *See, e.g.,* '484 Patent, Col.2:63-Col.3:67 ("Distributed telecommunications switching system 10 includes a service unit subsystem 12 that provides *control and management. . . .* Distributed telecommunications switching system 10 also includes a plurality of delivery unit subsystems 14 that provide the message transport mechanism for *call information* under the control and direction of service unit subsystem 12.") (emphasis added); Col.2:66-67 ("Delivery unit subsystem 14 provides the *switching fabric* for distributed telecommunications switching system 10.") (emphasis added).

Moreover, Alcatel's current reliance on a dictionary to describe its claimed system is obviously intended to cause the Court to construe "telecommunications switching system" in an unreasonably broad manner that is inconsistent with the way in which the specification indicates that the term is being used. As Telcordia explained in its opening brief, the specification teaches that the claimed "telecommunications switching system" is a specific type of telecommunications system that includes both the "switch fabric" and the "control and management" elements included in Telcordia's construction. *See* Telcordia's Opening Claim Construction Brief filed in this case (D.I. 109) ("Telcordia Op. Br. (Alcatel)") at 4-5.

Indeed, as also noted in its opening brief, Telcordia's construction is supported by the prosecution history, where the applicants distinguished the prior art Ingrassia patent by saying that Ingrassia "has no capability to monitor a telecommunications switching system." Telcordia Op. Br. (Alcatel) at 5. If Alcatel's proposed construction were adopted, however, this distinction would disappear. That is, under Alcatel's construction, Ingrassia *would* monitor a telecommunications switching system. *Id.* Thus, when Alcatel distinguished Ingrassia, Alcatel limited the scope of claim 17 by expressly disclaiming systems that merely establish and release connections among telecommunication transmission paths. *Id.* Alcatel should not now be permitted to avoid this and recapture what it disclaimed during prosecution.

Alcatel also argues that the phrases "switch fabric" and "call information" should not be used in any instruction because those phrases would only confuse a lay juror. *See* Alcatel Op. Br. at 8. Telcordia

submits, though, that this is not a sufficient basis for simply ignoring a claim limitation—and thus broadening the claim. Telcordia believes that the meaning of "switch fabric" and "call information" will be made abundantly clear during trial. But if that turns out not to be so, Telcordia would welcome a modification of this construction to make the meaning of both terms clear to the jury.[8]

Further, there is no merit to Alcatel's argument that the requirement for "a central unit for control and management of the calls" would be contrary to the '052 patent's criticism of "centralized switching." *See* Alcatel Op. Br. at 8-9. Telcordia's construction does not require "centralized switching," but rather centralized *control*, i.e., "a central unit for control and management of the calls." Col.4:8-14. In sum, therefore, the construction Alcatel is seeking is untethered to the '052 patent specification and would regain claim scope that Alcatel gave up during prosecution. As a result, Telcordia's construction, which is amply supported by the specification, should be adopted.

### 2. "remote computer" [claims 17 and 18]

| '052 claim term | Telcordia's construction | Defendants' construction |
|---|---|---|
| "remote computer" [claims 17 and 18] | a computer at a location that is remote from the telecommunication switching system being monitored | a computer that is separate from the telecommunications switching system |

Alcatel addresses this claim term (the second term in the '052 section of the Final Joint Claim Chart) in section II(B)(2) of its brief. *See* Alcatel Op. Br. at 9-10.[9] In particular, Alcatel argues that the remote computer may be anywhere as long as it is "separate from" the telecommunication switching system. But "separate from" could be in a different box within the same building as, or even within inches of, the switching system. That, clearly, is not what the patent envisioned in using the term

---

[8] Indeed, Alcatel's argument against including the phrase "call information" in the construction is *not* that it is not a proper claim limitation, but that the jury may be misled into thinking that "call information" is "limited to telephone calls." *See* Alcatel Op. at 8. But Telcordia recognizes that "call information" is not limited in that manner. *See IEEE Standard Dictionary of Electrical and Electronic Terms* 126 (6th ed. 1996) (attached as Ex. D) (defining "call" in the context of "telephone switching systems" as "a demand to set up a connection"). Again, if this were not made clear during trial, Telcordia would be amenable to modifying its construction as necessary to make it clear.

[9] In its opening brief, Telcordia somehow addressed this claim term out of order. *See* Telcordia Op. Br. (Alcatel) at 15. It is being addressed in the correct order (i.e., as it appears in the Final Joint Claim Chart) in this answering brief.

"remote." Telcordia's construction, on the other hand, incorporates the generally understood definition of remote, i.e., "[l]ocated far away" or "at some distance" from the switching system. *American Heritage College Dictionary* (3rd ed. 1997) at 1155 (Ex. G to Telcordia Op. Br. (Alcatel)).

Moreover, Alcatel's assertion that its proffered construction is supported by the specification's statement that the remote computer can be in "any desired remote location" (Alcatel Op. Br. at 9) is circular and fails to support its position. Similarly, the specification's statement that authorized users "located anywhere" can access the switching system (*id.*) was clearly intended, in context, to mean that no matter how far away (i.e., remote) they are from the system, they can access it. Alcatel's attempt to infer more from this statement is simply unreasonable. Further, what the specification says about remote server 14, and what it means by being included within the System Manager 18 (*id.* at 10), are too tangential to the question of where a remote *computer* is to be of any assistance. And finally, Alcatel's assertion that its construction of "remote computer" is correct because a "television remote control" can obviously be in the same room as the television (*id.*) reflects Alcatel's repeated failure to recognize context. Almost by definition, having a television remote control anywhere *except* in the same room as the television would make no sense. Here, on the other hand, the entire idea of the invention was to monitor the telecommunications switching system *from a distance.*

In sum, this Court should reject Alcatel's proffered construction requiring only that the remote computer be "separate" from the telecommunications switching system.

### 3.    "accessing a server with said browser" [claim 17]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "accessing a server with said browser" [claim 17] | using the browser to access a server through a first communications link | communicating with a server using a browser |

Alcatel addresses this claim term (the third term in the '052 section of the Final Joint Claim Chart) in section II(B)(3) of its brief. *See* Alcatel Op. Br. at 10-14. However, in advancing a construction not limited to using the browser to access a server through "a first communications link," Alcatel ignores the prosecution history.

During prosecution, the examiner of the '052 patent rejected claims 1-30 using the same prior art.[10]  In response, however, Alcatel made numerous arguments to distinguish the prior art from claim 17 because the prior art lacked a "first communications link" and a separate "second communications link." The '052 inventors initially responded with comments regarding the features they believed distinguished claims 1, 17, and 27 from the prior art—expressly mentioning claim 17—and later made their comments applicable to all of claims 1-30.  *See, e.g.,* Nov. 10, 1999, Response to Examiner's Action (Ex. F to Telcordia Op. Br. (Alcatel)) at 9 ("With respect to Claim 1, there is recited '. . . said server being in communication with said remote computer via a *first public communication link* . . . and a system manager building block in communication via a *second public communication link. . . . Independent Claims 17 and 27 include similar patentably distinct imitations.*") (emphasis added); April 10, 2000, Response to Examiner's Action (Ex. E to Telcordia Op. Br. (Alcatel)) at 9-10 ("[T]he Examiner has not shown where Branton, Jr., et al. patent shows a remote computer with a *first communication link* . . . and with a *separate second communication link* . . . as would be required by the claimed invention. . . . *Claims 1-30 are patentably distinct from the proposed Branton, Jr., et al. - Koved combination.*") (emphasis added); Nov. 6, 2000, Response to Examiner's Action (Ex. B to Telcordia Op. Br. (Alcatel)) at 9 ("Independent Claims 1, 17, and 27 recite . . . receiving an application program from the server over a *first communication link separate* from the *second communication link. . . . Therefore, Applicants respectfully submit that Claims 1-30 are patentably distinct from the Ingrassia, Jr., et al. patent.*") (emphasis added).

Alcatel's contention that the arguments made during prosecution were "general" in nature and not meant to restrict the scope of claim 17 (*see* Alcatel Op. Br. at 11-12) is without merit.  Here, the Federal Circuit's decision in *Seachange International, Inc. v. C-COR, Inc.*, 413 F.3d 1361 (Fed. Cir. 2005), is

---

[10] Although the '052 examiner specifically recited the elements of claim 1, he also said "[o]ther claimed features are all obvious variations of the well known features of using graphical user interfaces to access remote devices via the www [world wide web][,] features and applets[.]  August 4, 2000, Office Action, U.S. Application No. 08/977,348,  p. 4.  That statement by the examiner was never expressly disputed by the '052 patent inventors.

particularly instructive. In *Seachange*, the examiner rejected a group of claims using the same prior art. In response, the *Seachange* inventors failed to make separate patentability arguments for each of the claims in the group and instead made "global comments" to distinguish the group of claims from the prior art. *Id.* at 1373-75. The Federal Circuit concluded that one of the claims reciting "a network for data communication" had to be limited to a "point-to-point" network—even though the limitation was recited in another claim—because the general arguments distinguishing the prior art were applicable to all of the claims of the group. *Id.* at 1374.

As in Seachange, the '052 inventors responded to the examiner (as noted above) with comments regarding the features they believed distinguished claims 1, 17, and 27 from the prior art and later made their comments generally applicable to the group of claims 1-30. This Court, like the Federal Circuit in *Seachange*, should thus reject Alcatel's contention that the arguments made during prosecution were "general" in nature and limit claim 17 based on the arguments Alcatel made in obtaining the '052 patent.

Implicitly recognizing the weakness of its argument that its statements during prosecution were too "general" to amount to an estoppel, Alcatel argues alternatively that the statements were erroneous and thus should be ignored. *See* Alcatel Op. Br. at 13. In making this argument, Alcatel relies on *Intervet America, Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989). However, *Intervet* has no application in the present situation, where there is no indication that the attorney's statements in question were in fact "erroneous."

Indeed, subsequent Federal Circuit cases have limited *Intervet* to its facts, i.e., a single, conspicuous error on the part of the prosecuting attorney—in fact, a statement so conspicuous that a reasonable competitor would realize the mistake. In *Springs Window Fashion LP v. Novo Industries, L.P.*, 323 F.3d 989 (Fed. Cir. 2003), for example, the Federal Circuit rejected an argument very similar to Alcatel's:

> Here, as in *Hockerson-Halberstadt,* there is no indication that the detailed distinction of Pluber [prior art] was simply an inadvertent misstatement by the prosecuting attorney for which the applicant should be given a mulligan. The statements distinguishing Pluber

[prior art] were *detailed, consistent,* and *repeated.* A reasonable competitor would have believed that the applicant's disclaiming statements were not a mere mistake.

323 F.3d at 996 (emphasis added) (citing *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000)).

As noted above, the '052 inventors also made detailed, consistent, and repeated statements regarding the first communication link to distinguish the '052 patent from the prior art. Thus, the *Intervet* decision has no application here.[11]

Finally, while Alcatel also argues that a "first communications link" and a separate "second communications link" should not be required because that would exclude a single link embodiment disclosed in the '052 patent (*see* Alcatel Op. Br. at 11-12), this argument should also be rejected. Surrender shown by statements in the prosecution history is given full effect even where a preferred embodiment is read out of a claim. *See Springs Window*, 323 F.3d at 996 ("[W]e have adopted claim constructions excluding an embodiment when the prosecution history requires the claim construction because of disclaimer.") (citing *Rheox, Inc. v. Entact*, Inc., 276 F.3d 1319, 1327 (Fed. Cir. 2002)). Thus, even though the '052 patent describes a single communication link embodiment (Col. 5:50-60), the claims (including claim 17) are limited to accessing a server through a "first communications link" and accessing a telecommunications switching system through a separate "second communications link."

In sum, during prosecution, Alcatel disclaimed the claim construction it now seeks. Accordingly, this Court should adopt Telcordia's construction.

---

[11] The cases cited by Alcatel—*Rambus Inc., v. Infineon Technologies, AG*, 318 F.3d 1081, 1090 (Fed. Cir. 2003), and *Storage Technology Corp. v Cisco Systems, Inc.*, 329 F.3d 823, 832 (Fed Cir. 2003)—are inapposite factually. Both involve the situation where a prosecuting attorney made a single, conspicuous, erroneous statement, not repeated statements.

4.    **"providing a copy of the application program from said server to said remote computer" [claim 17]**

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "providing a copy of the application program from said server to said remote computer" [claim 17] | providing an application program from the server to the remote computer through the first communications link | ordinary meaning |

Alcatel addresses this claim term (the fourth term in the '052 section of the Final Joint Claim Chart) in section II(B)(4) of its brief. *See* Alcatel Op. Br. at 14. Alcatel's position is that there is nothing ambiguous about this claim term, and thus no need to construe it. Indeed, Alcatel argues that Telcordia's construction "is simply a restatement of the claim terms and another opportunity for Telcordia to once again improperly import its 'communication link' non-infringement theory into claim 17." *Id.*

Alcatel is wrong again, however, since the repeated statements in the prosecution history discussed above (*see supra* pp. 24-26) narrow this claim limitation to situations where the application program is provided "through the first communications link." In short, during prosecution, Alcatel disclaimed the coverage it is now seeking. Accordingly, Telcordia's construction of this limitation should be adopted as well.

5.    **"accessing said telecommunications switching system with said application program from said remote computer" [claim 17]**

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "accessing said telecommunications switching system with said application program from said remote computer" [claim 17] | using the application program at the remote computer to directly and independently access the telecommunication switching system through a separate second communications link | ordinary meaning |

Alcatel addresses this claim term (the fifth term in the '052 section of the Final Joint Claim Chart) in section II(B)(5) of its brief. *See* Alcatel Op. Br. at 14-15. Here too Alcatel's position is that there is nothing ambiguous about this claim term and thus no need to construe it, that Telcordia's construction "is simply a restatement of the claim terms," and that "Telcordia is attempting to improperly import its 'communication link' limitations into the claim." *Id.*

Again, however, Alcatel's statement in the prosecution history—restricting this limitation to those situations where the telecommunication switching system is accessed "through a separate second communications link"—cannot be ignored. *See* Nov. 6, 2000, Response to Examiner's Action (Ex. B to Telcordia Op. Br. (Alcatel)) at 9 ("Independent Claims 1, 17, and 27 recite in general the ability to access a telecommunications switching system for monitoring purposes over a second communication link from a remote computer *independently* from a server upon receiving an application program from the server over *a first communication link separate from the second communication link.*") (emphasis added). Nor can Alcatel erase the statement during prosecution requiring *direct* access between the remote computer and the telecommunications switching system. *See* April 10, 2000, Response to Examiner's Action (Ex. E to Telcordia Op. Br. (Alcatel)) at 9-10 ("[T]he Branton, Jr. et al. patent has no communication link to its switch network other than through its server. . . . [T]he Examiner has not shown where the Branton Jr., et al. patent shows . . . a separate second communication link to controllers 271-273 as would be required by the claimed invention. . . . Claims 1-30 are patentably distinct from Branton[.]"); *see also* Telcordia Op. Br. (Alcatel) at 9-11.

In sum, it is also apparent here that during prosecution, Alcatel disclaimed the coverage it is now seeking. Accordingly, Telcordia's construction of this limitation should be adopted.

**6.    "system manager building block" [claim 17]**

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "system manager building block" [claim 17] | software resident in the telecommunications switching system used to manage the telecommunications switching system, including establishing communications between the remote computer and the telecommunications switching system | a message passage and handling system |

Alcatel addresses this claim term (the sixth term in the '052 section of the Final Joint Claim Chart) in section II(B)(6) of its brief. *See* Alcatel Op. Br. at 15-16. Alcatel, however, advances a construction for this term that is inconsistent with the language of claim 17.

In particular, even though the word "manager" is part of the claim term, Alcatel asserts that the system manager building block does not actually manage anything. To support this position, Alcatel points to a single passage in the specification describing that the system manager 18 can function as a message passing and handling system. *Id.* at 15.

Telcordia acknowledged in its Final Joint Claim Chart that message passing and handling is *one* of the functions performed by the system manager building block. But nothing in the specification or prosecution history indicates that the one function listed in the '052 patent specification defines the system manager 18 and prevents the "system manager building block" from being given the meaning its words require. Moreover, Alcatel is wrong in asserting that the *only* function that the "system manager building block" performs is message passage and handling, and that the term should thus be construed as limited in this manner. Even if this were legally relevant, it is wrong factually. As Telcordia noted in its opening brief, the specification actually teaches that the system manager building block performs a variety of management functions, including establishing communications. *See* Telcordia Op. Br. (Alcatel) at 12-13.

Further, while Alcatel asserts that Telcordia is wrong in asserting that the system manager building block "is resident in the telecommunications switching system" (Alcatel Op. Br. at 16), Telcordia's position is supported by the actual claim language. Claim 17 recites "a system manager building block *of* the telecommunications switching system" Col.22:20-21 (emphasis added). The "of" requires that the system manager building block be a part of the "telecommunications switching system."[12] Additionally, Alcatel's argument that the system manager building block "may or may not" be part of the telecommunications switching system (Alcatel Op. Br. at 16) neither deals with the actual claim language nor finds any support in the specification. Finally, while Alcatel concedes that the '052

---

[12] Alcatel's additional criticism of Telcordia's construction as "unwieldy and unhelpful" is legally irrelevant. Telcordia has correctly construed the claim language, and it would be improper to ignore claim limitations simply to make the construction shorter or easier to follow. That said, Telcordia's goal is not to obfuscate anything, so if Alcatel can suggest better or simpler language that incorporates the same concepts, Telcordia would welcome whatever suggestions Alcatel can provide.

specification "defines a 'building block' in a general sense as one or more software objects and routines"(Alcatel Op. Br. at 15), its construction fails to reflect the requirement that the "building block" be software.

In sum, unlike Alcatel's proposed construction, Telcordia's construction is consistent both with the plain meaning of the phrase "system manager building block" (it *manages* the telecommunications switching system) and with the discussion of the phrase in the specification, which explains the management functions the system manager building block performs (including establishing communications links). *See* Telcordia Op. Br. (Alcatel) at 11-13. Telcordia's construction should thus be adopted.

### 7. "communicating with a system manager building block of the telecommunications switching system from said remote computer" [claim 17]

| '052 claim term | Telcordia's construction | Alcatel's construction |
| --- | --- | --- |
| "communicating with a system manager building block of the telecommunications switching system from said remote computer" [claim 17] | communicating from the remote computer to the system manager building block through the second communications link | the remote computer communicates with a message passage and handling system of the telecommunications switching system |

Alcatel addresses this claim term (the seventh term in the '052 section of the Final Joint Claim Chart) in section II(B)(7) of its brief. *See* Alcatel Op. Br. at 16-17. Here again, Alcatel disregards the repeated statements in the prosecution history that (as discussed above) require a "first communication link" and a "second communications link." These statements indicate that rather than covering "communicating" in a general sense, as Alcatel urges, the term is limited to communicating "through the second communications link." *See supra* pp. 24-28; Telcordia Op. Br. (Alcatel) at 13-14. Indeed, while Alcatel describes this requirement as "phantom" (Alcatel Op. Br. at 17), Alcatel has no good response to Telcordia's prosecution history argument.

As a result, this Court should thus adopt Telcordia's construction, which—unlike Alcatel's— remains true to the specification and the prosecution history. *See also* '052 Patent, Col. 5:29-33.

30

8.    "monitoring" [claim 17]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "monitoring" [claim 17] | obtaining performance status information from elements of the telecommunications switching system | ordinary meaning |

Alcatel addresses this claim term (the eighth term in the '052 section of the Final Joint Claim Chart) in section II(B)(8) of its brief. *See* Alcatel Op. Br. at 17-18. At the outset, however, it must be recognized that Alcatel is arguing against a construction found nowhere in Telcordia's construction. Specifically, Alcatel argues that by using the word "obtaining," Telcordia "adds an active element to the claim language." *Id.* at 17. But nothing is being "added" in Telcordia's construction, and Alcatel's complaint is baseless. The words "monitoring" (in the claim language) and "obtaining" (in Telcordia's construction) are both verbs connoting some activity, but neither word seems more "active" than the other.

Moreover, Alcatel once again Alcatel offers only "ordinary meaning" as its construction. In the context of the '052 patent, however, the meaning of "monitoring" is not so simple, and Telcordia submits that some explanation is needed. Telcordia's construction is grounded in the language of claim 17 ("monitoring of the telecommunications switching system"), the specification ("monitoring of the Telecommunications Switching Systems performance"), and dictionary definitions of the term. *See* Telcordia Op. Br. (Alcatel) at 14. Accordingly, Telcordia's construction of "monitoring" should be adopted by the Court.

9.    "Hypertext markup language (HTML) server" [claim 19]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "hypertext markup language (HTML) server" [claim 19] | a server that provides information in hypertext markup language | a server that handles hypertext markup language |

Alcatel addresses this claim term (the ninth term in the '052 section of the Final Joint Claim Chart) in section II(B)(9) of its brief. *See* Alcatel Op. Br. at 18. The parties' original dispute was whether a "hypertext markup language (HTML) server" provides information in HTML or handles HTML.

However, now that Alcatel has explained what it meant by "handles," Telcordia accepts Alcatel's proposed construction for this term, but notes that Alcatel's construction should be modified to be consistent with Alcatel's position in its brief. This could be done by adding a parenthetical ("meaning that it receives, stores, and provides information") following Alcatel's proposed construction, or in some other way that accomplishes this same end.

### 10. "Java Applet" [claim 24]

| '052 claim term | Telcordia's construction | Alcatel's construction |
|---|---|---|
| "Java Applet" [claim 24] | an application program written in Java program code that is invoked by the web-browser and that runs within the web-browser | a computer program, which is written in the Java language |

Alcatel addresses this claim term (the tenth term in the '052 section of the Final Joint Claim Chart) in section II(B)(10) of its brief. *See* Alcatel Op. Br. at 18-19. However, Alcatel provides no support for its construction—either from the specification or from a dictionary. Alcatel does cite to the '052 patent (at Col.2:4-6), but all the cited language says is that the server provides a "Java Applet." That hardly supports Alcatel's interpretation (or *any* interpretation) of the phrase "Java Applet."

Telcordia's construction, on the other hand, is supported both by a dictionary definition contemporary with the filing date of the '052 patent (indeed, this definition is that of Sun Microsystems, the creator of Java[13]) and also by the '052 specification. *See* Telcordia Op. Br. (Alcatel) at 16. Accordingly, the Court should adopt Telcordia's construction of "Java Applet."

## IV.    Telcordia's '306 Patent

In addressing the claim construction issues relating to the '306 patent, Telcordia relies on the discussion of that patent in Telcordia's Opening Claim Construction Brief filed in both the *Lucent* and *Cisco* cases (Lucent D.I. 104; Cisco D.I. 94) as well the discussion in Telcordia's Answering Claim Construction Brief filed in the *Lucent* case.

---

[13] *See, e.g.*, Learn About Java Technology, www.java.com/en/about/ (attached as Ex. E) ("Java technology was created as a computer programming tool in a small, secret effort called 'the Green Project' at Sun Microsystems in 1991.")

## V.    Conclusion

For the reasons stated above and in Telcordia's opening brief, Telcordia respectfully requests that the Court adopt Telcordia's proposed claim constructions.

/s/Lauren E. Maguire
_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D.#2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Of Counsel:*

Donald R. Dunner
Don O. Burley
Steven M. Anzalone
Richard H. Smith
Houtan K. Esfahani
James T. Wilson
John M. Williamson
Pedro F. Suarez
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Ave., NW
Washington, DC  20001
(202) 408-4000

*Attorneys for Plaintiff*
*Telcordia Technologies, Inc.*

Dated:  March 24, 2006

167967.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of March, 2006, the attached **TELCORDIA'S**

**ANSWERING CLAIM CONSTRUCTION BRIEF ADDRESSING TELCORDIA'S '633**

**PATENT AND ALCATEL'S '052 PATENT** was served upon the below-named counsel of

record at the address and in the manner indicated:


Josy W. Ingersoll, Esquire                     HAND DELIVERY
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street
Wilmington, DE  19801

Stuart J. Sinder, Esquire                      VIA ELECTRONIC MAIL
Kenyon & Kenyon
One Broadway
New York, NY  10004


                                 /s/ Lauren E. Maguire
                                 _____
                                 Lauren E. Maguire


150908.1